UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                      :

UNITED STATES OF AMERICA      :

     - against -              :

                                 :             05 CR 1039 (CM)

Samuel Israel III,             :

               Defendant.      :

                                 :
-------------------------------------------------------x

---

## SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF SAMUEL ISRAEL III

---

## REDACTED

 

MORVILLO, ABRAMOWITZ, GRAND,
   IASON, ANELLO & BOHRER, P.C.
Attorneys for Defendant Samuel Israel III
565 Fifth Avenue
New York, New York 10017
(212) 856-9600

Of Counsel:

Barry A. Bohrer
Barbara L. Trencher

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. PERSONAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Sam Israel's Family Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    1.  Sam Israel's Childhood ▇▇▇▇▇▇▇▇▇▇▇▇▇▇
    ▇▇▇▇▇▇▇▇ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    2.  Sam Israel Marries, Has Children and Divorces . . . . . . . . . . . . . . . . . . . . . . . . 7

    3.  Sam Israel's Current Relationship With His Family . . . . . . . . . . . . . . . . . . . . . 8

    4.  Sam Israel's Current Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. Sam Israel's Medical History and Struggles With Pain and Addiction . . . . . . . . . . . . . 11

    1.  Sam Israel's Painful and Life Threatening Medical Conditions . . . . . . . . . . . . . . . 11

    2.  Sam Israel's Long History of Addiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

C. Sam Israel's Employment History from 1982 Through 1996 . . . . . . . . . . . . . . . . . . 15

D. Sam Israel's Charitable and Community Work . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

II. THE OFFENSE AND SAM ISRAEL'S ACCEPTANCE OF
RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. The Scheme Is Devised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. Bayou Fund's Marketing Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C. Sam Israel's and Marino's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D. The Fund Stops Trading and Sam Israel Is the Victim of Fraud . . . . . . . . . . . . . . . . . 23

E. Sam Israel Accepts Responsibility and Pleads Guilty . . . . . . . . . . . . . . . . . . . . . . . 23

i

III. SAM ISRAEL'S CONDUCT POST PLEA ..................................... 24

IV. SENTENCING CONSIDERATIONS ......................................... 25

    A. The Court Should Exercise Moderation Based On Sam Israel's
       Extraordinary Physical Impairment ......................................... 27

        1. Sam Israel Suffers From an Extraordinary Physical Impairment ................ 28

        2. Case Law Supports a More Moderate Sentence on the
           Basis of Sam Israel's Extraordinary Physical Impairment ..................... 30

        3. Sam Israel's Medical Condition May Cause Him to Experience
           Greater Suffering From Incarceration Than Is Typical ....................... 35

    B. Sam Israel Is Less Culpable than Marino ................................... 36

        1. Sam Israel's Judgment Was Impaired Due to His Mental and
           Physical Condition ███████████████ ..................... 36

           a. Sam Israel's Pain, Surgery and Addictions Interfered
              with His Judgment .......................................... 37

           b. Sam Israel's Inability to Admit Bayou Fund's Failure ███
              ███████████████ .......................................... 39

        2. Marino Was the Lynchpin and the Mastermind ........................... 41

    C. Sam Israel Has Provided Substantial Assistance to the Government in
       the Prosecution of Marquez ███████████████ ..................... 43

        1. Sam Israel Meets the Requirements for a Departure Pursuant to
           Section 5K1.1 .............................................. 44

        2. Sam Israel Meets the Requirements for a Departure Pursuant to
           Section 3553(a) of Title 18 ..................................... 46

V. SAM ISRAEL SHOULD BE PERMITTED TO SURRENDER VOLUNTARILY
   BECAUSE (1) HE IS NOT A FLIGHT RISK OR A DANGER TO THE
   COMMUNITY AND (2) HIS MEDICAL NEEDS CANNOT BE MET BY
   THE U.S. MARSHALS SERVICE ..................................... 47

CONCLUSION ..................................... 50

## TABLE OF AUTHORITIES

### FEDERAL CASES

**Page(s)**

Estelle v. Gamble, 429 U.S. 97 (1976) ....................................... 28, 49-50

Pabon v. Wright, 459 F.3d 241 (2d Cir. 2006) ............................... 28, 49-50

Simon v. United States, 361 F. Supp. 2d 35 (S.D.N.Y. 2005) ........................... 26

United States v. Altman, 48 F.3d 96 (2d Cir.1995) ............................... 28, 31

United States v. Barbato, No. 00 Cr. 1028, 2002 WL 31556376
(S.D.N.Y. Nov. 15, 2002) ......................................... 32-33

United States v. Blarek, 7 F. Supp. 2d 192 (E.D.N.Y. 1998) ........................... 33

United States v. Booker, 543 U.S. 220 (2005) ....................................... 35

United States v. Boy, Nos. 93-30100, 93-30133, 1994 WL. 59781 (9th Cir.
Feb. 25, 1994) ......................................... 34

United States v. Crosby, 397 F.3d 103 (2d Cir. 2005) ................................. 26

United States v. Cutler, -- F.3d --, Nos. 05-2516, 05-3303, 05-6178, 2008 WL 706633,
(2d Cir. 2008) ......................................... 28

United States v. Fernandez, 443 F.3d 19 (2d Cir. 2006) ............................... 46

United States v. Gigante, 989 F. Supp. 436 (E.D.N.Y. 1998) ........................... 32

United States v. Hammond, 37 F. Supp. 2d 204 (E.D.N.Y. 1999) ................. 31-32, 36

United States v. Huerta, 878 F.2d 89 (2d Cir. 1989) ................................. 46

United States v. Koon, 518 U.S. 81 (1996) ....................................... 34-35

United States v. Martinez, 207 F.3d 133 (2d Cir.2000) ............................... 28

United States v. Napoli, 179 F.3d 1 (2d Cir. 1999) ................................. 28

United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) ................................. 31

United States v. Roth, No. 94 Cr. 726, 1995 WL 35676
(S.D.N.Y. Jan 30, 1995) ......................................... 32

<u>Page(s)</u>

United States v. Speed Joyeros, S.A., 204 F. Supp. 2d 412 (E.D.N.Y. 2002) . . . . . . . . . . . . 44-45

United States v. Tanasi, No. 02 Cr. 96, 2003 WL 328303, at *5
(S.D.N.Y. Feb. 11, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

## FEDERAL STATUTES & GUIDELINES

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25-26, 35, 44, 46

28 U.S.C. § 991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

U.S.S.G. § 5H1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28, 31, 35

U.S.S.G. § 5K1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## LAW REVIEW ARTICLES

Adam J. Kolber, The Subjective Experience of Punishment, Columbia Law Review,
Forthcoming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Stacey M. Studnicki, Individualized Sentencing: Federal Sentencing
Departures Based Upon Physical Condition, 1994 Det. C.L. Rev. 1215,
1215-44 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Samuel Israel III in connection with his sentencing scheduled for April 14, 2008. The purpose of this memorandum is to present to the Court the factors we believe are of primary importance in determining a just and fair sentence for Sam.

On September 29, 2005, Sam entered a plea of guilty to a three count information. Count One charged Sam with conspiracy to commit investment advisor fraud, in violation of 18 U.S.C. § 371. Count Two charged Sam with investment advisor fraud, in violation of 15 U.S.C. §§ 80b-6, 80b-17. Count Three charged Sam with mail fraud, in violation of 18 U.S.C. § 1341. The total maximum sentence of incarceration on these three counts is thirty years. Based on his offense conduct as defined solely by the Sentencing Guidelines, the Presentence Investigation Report ("PSR") recommends a sentence of 30 years incarceration; the PSR also recommends that Sam be permitted to voluntarily surrender to a Bureau of Prisons facility within 45 days of the sentencing date. We submit that based on the facts discussed below, and particularly Sam's medical history and physical condition, the Court should exercise moderation in sentencing Sam, and should allow him to voluntarily surrender after the Bureau of Prisons has designated the facility at which Sam will serve his sentence.

As the PSR notes, for much of Sam's life, including the period of the offense conduct, he has struggled with addiction. Sam's addiction is closely tied to the fact that Sam suffers from serious medical conditions, including ███████████████████. He has undergone nine surgeries on his back and neck, and experiences constant, significant pain. Sam also suffers from ████████████████████████████████████

████████████████████████████████████

1

██. Though these facts do not excuse Sam's conduct, they certainly serve to offer some explanation for the conduct that led to the plea in this case. Moreover, Sam's physical condition necessarily means that any term of imprisonment will be more painful, and more difficult for Sam than the same sentence would be for a healthy individual who does not suffer from chronic, debilitating medical conditions.

We have received numerous letters on Sam's behalf in connection with his sentencing.[1] These letters demonstrate that Sam is a remorseful man who, aside from his offense conduct, has led a law abiding, kind and charitable life. These letters also serve to demonstrate that those who know Sam best believe that Sam's misconduct was linked to his physical condition, and the fact that his mental processes and decisions were impaired by his addiction to pain killers and the constant pain from which he suffers.

Sam accepts full responsibility for his offense. He understands the impact his conduct has had on investors in the Bayou Fund and its employees, as well as his loved ones, and he feels terrible shame. Since pleading guilty, he has made every effort to assist the Government and investors in recovering Bayou Fund's assets, and has devoted numerous hours to community service, in an effort to repay to society some of the debt that he knows cannot be recovered.

In light of the foregoing considerations, we respectfully submit that the Court should exercise moderation in sentencing Sam, and should allow him to voluntarily surrender.

---

[1] Letters submitted in support of this memorandum are annexed as Appendix A and cited as "Ex. _ to Appx. A."

# I.    PERSONAL HISTORY

## A.    Sam Israel's Family Background

### 1.    Sam Israel's Childhood ██████████████████

Sam was born in New Orleans, Louisiana on ████ 1959, as the middle child of three boys. Sam's older brother, Larry, is one and a half years older than Sam, and his younger brother, Robert, is three and a half years younger.

Sam's family was, and remains, well established and highly respected in the New Orleans community.[2] Sam's grandfather was a colonel in the United States army during World War II, and received the French Legion of Honor. Sam's paternal grandmother was a golf champion who won the Southern District Golf Championship twelve consecutive years. During World War II, she traveled with Bob Hope and Bing Crosby to raise money through the sale of war bonds. Sam's paternal grandparents were very formal and were not at all affectionate; his grandfather was particularly hard on his sons and grandsons, and held them to virtually unachievable standards. Sam's paternal grandmother is still alive and living in New Orleans.

Sam's maternal grandparents, the Rothschilds, were more loving and light-hearted. His maternal grandfather was a pediatrician, who served for a period as the head of the Pediatric Society of the South, a professor at Louisiana State University and Tulane, and a board member at Touro. Sam's maternal grandmother was a New Orleans socialite.

---

[2] "[In New Orleans], the Israels were people to know and generous patrons of charitable and civic causes. Sam's father, Lawrence, served on the President's Council of his alma mater, Tulane University, near the city's Audubon Zoo. The campus is home to the Merryl and Sam Israel Jr. Environmental Sciences Building, named for Israel's grandparents." http://www.bloomberg.com/apps/news?pid=nifea&&sid=aq3TjcUbSyX0

Sam's mother, Ann Israel, is very respected for her charitable work. She was the first woman president of the Trinity Episcopal School, and she started a fund-raiser known as Christmas in October, which seeks to reclaim New Orleans from poverty by raising money to restore historic homes and teaching lower middle class families how to care for those homes. She also ran the Junior League of New Orleans and served on the board of Tulane Medical Center.

Sam's father, who was always seeking the approval of Sam's paternal grandfather, worked very hard in the family business, a commodity company that imported coffee, rubber, shrimp and fertilizer, among other things. The company, known as ACLI International, had offices and representatives in over 100 countries, and Sam's father was President of the company.[3] During Sam's childhood, his father traveled frequently. When he was home, he often hosted government officials and heads of state in the family home.

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

███████

---

[3] ACLI International is a commodities trading firm, originally named Leon Israel & Bros. In 1981, the Israel family sold the firm to Donaldson Lufkin & Jenrette Inc. for $44 million.



When Sam was in eighth grade, his younger brother Robert was badly burned in an accident. Robert spent six months recovering in the hospital, and underwent numerous skin graft procedures. At the time, Sam's older brother was in boarding school and Sam's father was out of town extensively, so Sam and his mother alternated shifts at the hospital. Because the family was in the process of moving to New York, when he was home, Sam was also responsible

for packing up the family house. When Robert finally left the hospital, his recovery continued at home. Sam has very clear memories of applying pressure to Robert's skin grafts to promote the healing process.

When Sam was 16 and in tenth grade, the family moved to Harrison, New York. Sam attended Hackley School, a private school in Tarrytown. ███████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████

Upon graduating from Hackley, Sam attended Tulane University. He was on Tulane's football team, but was injured during his first year, which ended his football career. As a result of the injury, Sam had several surgeries on his shoulder, and subsequently became addicted to painkillers. This was the beginning of Sam's long history of addiction.

████████████████████████████████, Sam has always exhibited an incredible capacity for kindness. According to Sam's mother,

> From the time he was young, Sam cared for and tried to help both animals and other human beings. It was Sam who brought home and cared for stray and wounded animals; it was Sam who stopped to help people in trouble or hurt in accidents; it was Sam who helped care for me when I had kidney cancer and his brother when he was badly burned and it was Sam who visited New Orleans and helped me care for my mother when she was ill and dying. Sam's volunteer service also reflected his desire to help others. In New Orleans he helped tutor kids in a program similar to head start [sic] at Trinity School, and later read to children in the pediatric program at Mount Sinai Medical Center. He loves coaching youngsters in sports and it is my understanding that he was involved with child protective services [in New York] after I went back to New Orleans.[4]

---

[4] See letter of Ann R. Israel, Ex. A to Appx. A.

6

This sentiment is echoed by Sam's older brother Larry, who noted,

> when Sam was a child, my family passed a flipped over car in a desolate area [and] Sam insisted we stop and ran to help the inhabitants without hesitation or fear for his own safety. . . He [did] community volunteer work in New Orleans as a youngster helping disadvantaged kids and in New York as a volunteer at Mt. Sinai Hospital.  His love of people and animals is legendary in our family.  He has raised everything from [d]ogs to [a]lligators with great patience and care.[5]

Similarly, Sam's younger brother emphasized that,

> Sam and I used to help underprivileged children learn to read Wednesdays after school at the Christ Church on St. Charles Avenue.  We used to go to Boyscouts [sic] and get involved in community projects, such as food distribution and helping refurbish homes in poor areas.  Sam has one of the kindest hearts of anyone I know.[6]

And a dear friend of Sam's who he met in high school said,

> As a friend, Sam was always a standout.  One could not have a better friend.  He remains loyal, honest, considerate, and a supportive individual who has the ability to see and understand things from another person's perspective.  Sam often introduced me as his brother, which always raised the eyebrows of many of his business associates, due to the fact that I am African American.  But in fact, through all of our 30 years together, he truly and always treated me as a brother.[7]

### 2.     Sam Israel Marries, Has Children and Divorces

In 1984, when Sam was 25, he married Janice McKirgan, his high school sweetheart.  Janice is a CPA who worked at Price Waterhouse and JP Morgan Securities until 1990, when she gave birth to S▮▮▮▮, Sam's oldest child.  Sam and Janice had another child, J▮, in 1994.

---

[5]  See letter of Lawrence J. Israel, Jr., Ex. B to Appx. A.

[6]  See letter of Robert Israel, , Ex. C to Appx. A.

[7]  See letter of Earl Leach, , Ex. D to Appx. A.

In 2002, Sam and Janice separated. Sam believes that their relationship broke down as a result of Sam's back condition and surgeries. For years, Janice viewed Sam as a substitute father; her father had died when she was 18 or 19, and she viewed Sam as a strong figure who would take care of her. Sam's back condition and surgeries made Sam appear weak, fragile and vulnerable; when Sam was bedridden, Janice took care of Sam. The situation deteriorated further when Sam developed a serious addiction to his painkillers following the surgery. Shortly thereafter, Janice and Sam separated. At the time, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

3.    **Sam Israel's Current Relationship With His Family**

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████Sam is very concerned about the impact his sentence will have on J██.

8

Sam's older brother, Larry, is an independent S&P futures broker in Chicago. He is married with two sons, Eric and Drew. Sam is very close to Larry and Larry's wife, and is also close to Eric and Drew. Sam's younger brother, Robert, is a real estate entrepreneur in New Orleans. He manages shopping centers and owns Smoothie Kings. Robert is married, and has two sons, D█████ and Z█████. Sam talks with both of his brothers three to four times per week. Notably, like Sam, Larry and Robert struggle with addiction. Additionally, Sam's brothers have both struggled in business, and rely on Sam for psychological support.

Sam's parents now live in Chicago and New Orleans. Sam's father, who is 75,



Sam's father is wheelchair-bound. Sam remains very close to his mother, who is 73 and █████████

████████████████ Sam talks to his mother every day, and Sam's mother relies on Sam to make medical decisions for her and her husband.

Michael Levine, who has been friends with Sam for more than 15 years, noted that,

> Throughout Sam's trials and tribulations what has struck me, and what I most admire about him, is his devotion to his family. He is intensely concerned and devoted to his parents, as well as to his brothers, and most importantly to his children. In spite of his numerous health problems he coached his son's basketball team, and never missed a single game, that I am aware of, in which his son J███ has played.[8]

---

[8] See letter of Michael Levine, Ex. E to Appx. A.

Similarly, this sentiment was echoed by Rebecca Landry, who is Sam's first cousin:

> Sam has always been very kind and loving, not only with his extended family, but particularly with our grandparents and his children. In my experience, he has been a good and fun parent. On numerous occasions Sam told me how he hated being away from his kids for any extended periods of time and that they were the most important things in his life. I ask you for leniency in Sam Israel's case, so that he does not have to be away from his children and the rest of his family, particularly his father whose health is failing, that he loves so much.[9]

### 4.    <u>Sam Israel's Current Relationship</u>

Sam now lives with Deborah Ryan, who he has known since 1998 or 1999. Deb is an artist and decorative painter who paints murals and provides faux finishing and Venetian plaster services through her company, Deb Ryan Designs LLC.

Deb has been with Sam though numerous back surgeries, physical rehabilitation and drug rehabilitation. She is friendly with Sam's daughter S████ and his ex-wife, Janice, and she is very close to J██. Deb is very concerned about what will happen to J██ after Sam is sentenced, and is also concerned that she will no longer be permitted to spend time with J██.

Deb relies on Sam for support. Deb's father passed away when Deb was 9-years-old, and six years ago, Deb's mother fell down a flight of stairs, broke her neck and died. Though Deb has a brother, she speaks to him infrequently, and Sam is the only person to whom Deb is close. She counts on Sam for emotional stability and mental well-being. Sam is very concerned about the effect that his long absence will have on Deb.

---

[9] <u>See</u> letter of Rebecca R. Landry, Ex. F to Appx. A.

**B.**     **Sam Israel's Medical History and Struggles With Pain and Addiction**[10]

**1.**     **Sam Israel's Painful and Life Threatening Medical Conditions**

In 1987, Sam injured a disc in his lower back while playing racquetball. As a result of this injury, Sam learned that he has ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[10]  Sam's medical records, which document the information provided herein, are attached as Appendix B. Letters from Sam's doctors are cited as "Ex. _ to Appx. B."

11





---

[11] See 1/29/08 Letter of Dr. Howard B. Eison, Ex. A to Appx. B.



**2.** <u>**Sam Israel's Long History of Addiction**</u>

Sam began drinking alcohol at age 14. In high school, he abused marijuana regularly and took speed. Following his shoulder surgeries during his first year of college, Sam became addicted to codeine-based painkillers. Throughout college, Sam used cocaine

---

[12] <u>See</u> 3/14/08 letter of Dr. David M. Hirsh, Ex. H to Appx. B.

approximately once every month, and used marijuana regularly. From time to time he also used LSD.

After college, when Sam began working on Wall Street, he continued to smoke marijuana regularly. Because he spent considerable time socializing with brokers and clients, Sam also began drinking heavily, four to five nights every week. During this period, he continued to take codeine-based painkillers.

After Sam's surgeries in 1988, his addiction to painkillers worsened. At times, Sam had prescriptions from multiple doctors so that he could obtain enough painkillers to support his habit. When the pain became unbearable, he took more and more painkillers. Thus, immediately before surgeries, Sam was in terrible pain and functioning poorly because of the combination of the pain and the debilitating effects of the painkillers. After surgery, his addiction to the painkillers would gradually improve with medical assistance, until the condition in his back worsened again. Between 1991 and 1994, Sam's cocaine addiction was substantial. Though he used less cocaine after 1994, he continued to use cocaine weekly until 2002.

Sam has not abused alcohol or cocaine since 2002. However, he still must take painkillers as a result of his medical condition.

### C.    Sam Israel's Employment History from 1982 Through 1996

As noted above, Sam attended Tulane University. Between his sophomore and junior years in college, Sam spent the summer in New York. During that summer, he attended a party thrown by friends of his parents, and met Frederic J. Graber. Sam was told that Graber was known as the "boy wonder of Wall Street." At the time, Graber was in his early thirties, and having already been made a partner at Lehman Brothers, he had started his own trading company, Frederic J. Graber & Co. Graber hired Sam as a summer intern. Sam enjoyed

working at Frederic J. Graber & Co., and was successful there, so when Graber offered Sam a job during Sam's senior year at Tulane, Sam agreed to leave Tulane. Sam accepted the job in part because he believed it would allow him to avoid working for his father. His starting salary was $16,500.

From 1982 to 1988, Sam worked at Frederic J. Graber & Co. He started as a gofer on the floor of the Big Board of the New York Stock Exchange and worked his way up to trader. At the end of Sam's first year at Frederic J. Graber & Co., Sam earned his Series 7 license. In 1985 or 1986, Sam became a partner. He traded on the short side of the market in derivatives and options.

When Sam first began working at Frederic J. Graber & Co., Graber spent four to five evenings per week entertaining clients and socializing with brokers. After several years, Graber began sending Sam out with the clients and brokers in the evenings, and Sam came to understand that part of his job was to entertain clients with food and alcohol, and spend time socializing with brokers. Indeed, before Sam got married in 1983, Graber warned Sam's future wife that Sam's job required him to go out with clients and brokers at least four to five nights every week. The nights out involved considerable alcohol, and during this period, Sam drank excessively.

In 1989, Sam joined Gerard Klauer Mattison & Company. Because Graber had asked Sam not to go to a competing hedge fund for at least six months, Sam worked at Gerard Klauer as a broker, but he did not enjoy the work and left in 1990 to work at Gruntal & Co. At Gruntal, Sam traded with Howard Alper, who was running a $100 million fund. A year later, Alper left Gruntal and Sam joined JGM Management, a company that managed a hedge fund run by co-defendant James Marquez.

16

Marquez's fund, which was known as HMR Investors, was not successful, so Sam left after approximately a year. In 1993, Sam joined Omega Advisors, a hedge fund run by Leon Cooperman. Omega Advisors was very successful during Sam's tenure, with the fund's assets growing from $250 million to $3 billion.

On Wall Street, Sam sought out people who may have been less experienced, but demonstrated ambition. Thus, Michael Levine, who has known Sam for more than 15 years, said,

> I met Sam not long after college, when I was a junior broker from a small firm. Despite the fact that I was of relatively small stature on Wall Street, he always went out of his way to answer any questions, no matter how sophomoric they may have been. In retrospect, I'm sure many of these questions would have been met with a more than dismissive attitude by virtually any other client I dealt with. On most occasions he went beyond the small scope of my inquiries and helped me to understand the "bigger picture," walking me through the next step, and often supplying reading materials from his own resources. Whatever success I have in this business, I owe a huge debt of gratitude to Sam, which I doubt I will ever be able to repay.[13]

Those who knew Sam when he worked on Wall Street admired him. Roger J. Weiss, an investor in Bayou Fund and a lawyer who taught at Stanford Law School, practiced at Cleary Gottlieb & Hamilton in New York and formed a successful investment management firm known as Weiss Peck & Greer, has known Sam since Sam was a child:

> [As Saw was growing up, he was] warm, generous, fun loving, giving, a better than average student, a good athlete and well rounded. I watched him thru [sic] high school, college and was able to observe his business career from approximately 1984 to 1993 or so since the firm at which he worked, an investment firm, "cleared" it [sic] business thru [sic] our firm. His conduct and ethics were exemplary. . . . In my eyes, you have in front of you a good person who always had time to help a friend, the less fortunate and who willingly gave of his time and money to help those who needed it. Even

---

[13] See letter of Michael Levine, Ex. E to Appx. A.

though I was an investor in Bayou and got scorched by their actions, I want you to know that the Sam Israel I have always known is a good person – a very good person and the acts he is in your court room [sic] for are completely at odds with what I believe his basic character to be.[14]

### D.    Sam Israel's Charitable and Community Work

Sam has done charitable and community work since he was a child. When he was in fifth, sixth and seventh grades, Sam spent two afternoons each week teaching underprivileged children to read. As a member of the student council in junior high school, Sam ran food drives. He was raised in a religious home, and during Christmas he brought baked turkeys and jams to the Irish Channel, which are very low income African American Communities in New Orleans. After Sam's family moved to New York, Sam volunteered at Mt. Sinai hospital, bringing flowers and toys to the pediatric ward and playing with the children.

Since 1990, Sam has been involved in coaching children in sports. Thus, he has coached soccer, basketball and baseball most years, including years when his own children were not participants. The only years that he has not coached children are years when he was incapacitated due to his back condition and surgeries. Some years, he coached while on crutches. Sam always volunteered to coach the children who were mentally challenged, and prided himself on teaching those kids to have fun even if they were not winning.

Sam also has hosted fundraising drives for the New York State Police, and has volunteered at his children's church. He served on the board of the 1331 Foundation, a charitable family foundation. Sam periodically volunteers at his son's school, and at one point, tried to form a tutoring program for at-risk children.

---

[14] See letter of Roger J. Weiss, Ex. G to Appx. A.

A friend of Sam's, who is also his mother's Rabbi, noted,

> I sincerely believe the criminal acts to which he has admitted are not consonant with his character. His previous behaviors have always been decent and deeply caring of others. I also know that he has dedicated much of his adult life to service to others, especially those in need, both on a private basis as well a[s] through engagement in numerous charitable causes.[15]

## II.    THE OFFENSE AND SAM ISRAEL'S ACCEPTANCE OF RESPONSIBILITY

### A.    The Scheme Is Devised

In 1995, Sam formed Bayou Fund and began getting the fund ready for trading. He invited Marquez to join him because he respected Marquez based on the work they did together at HMR Investors. From June 1996 through January 1997, they traded their own money. During 1997, they had only about $1 million to invest, and Marquez was the "lead guy." They obtained money to invest by asking their Wall Street contacts to give them $100,000 each. Marquez's strategy was that he would be responsible for large trades and Sam would engage in heavy, small trades over a short period. Sam traded on the short side in derivatives and options, whereas Marquez "theme invested."

During 1996 and 1997, co-defendant Daniel Marino did Bayou Fund's internal financial reconciliations. At the end of 1997, accounting firm Grant Thornton performed Bayou Fund's external audit. Bayou Fund suffered modest financial losses that year. By the end of 1998, the fund was marginally down because Marquez had lost money on his theme investments. Bayou Fund did not have an external auditor that year. Instead, Marquez and Marino devised a scheme whereby Marino would serve as the external auditor through an accounting firm that he

---

[15] See letter of Rabbi David S. Goldstein, Ex. H to Appx. A.

formed called Richmond Fairfield. They decided not to disclose the fund's losses, and instead they created charts and graphs that showed fictitious gains.

Sam learned about the proposed scheme during a conversation that he had with Marino and Marquez in December 1998. At the time, Sam was not close to Marino and knew him only through Marquez. At a meeting among the three, Marquez told Sam that Marino could do the audit and that if Sam and Marquez "buckled down" and made money, they could recoup the losses. Marquez explained to Sam that if they disclosed their losses, the firm would fold, Sam's reputation would be tarnished and Marquez would be unable to recover his status in the business. They agreed that Marino would perform the audit.

Sam believes, based on conversations he had with Marino in the late 1990s, that initially, Richmond Fairfield had a few other clients. In 1998, Bayou Fund's investors were told that Marino had sold his interest in Richmond Fairfield and joined Bayou Fund as Chief Financial Officer. From 1998 forward, Marino was responsible for Bayou Fund's books and records. Sam thinks that Bayou Fund had only one set of books, and that they contained accurate numbers, but that those books were closely kept and the information they contained was not disclosed to anyone. Bayou Fund's investors received quarterly net asset value statements (NAVs) and a copy of the year-end audit. The NAVs told each investor how he or she was doing; they did not disclose information about the fund as a whole. The NAVs and year-end audit sent to investors were not accurate.

From the beginning, Bayou Fund had a companion broker-dealer, Bayou Securities. Sam, Marquez and Marino, along with all employees, were compensated through Bayou Securities. At its height, Bayou Securities had 17 employees. The principals were also supposed to receive 20 percent of Bayou Fund's profits. Because there were no profits, Sam,

Marino and Marquez did not take anything from the fund. In most years, the investors probably did not know that Sam, Marino and Marquez did not receive any fees from Bayou Fund.

By 1999, the fund had about $20-25 million invested, and was having difficulty raising money because Marquez was known in the market community as volatile. Therefore, in the fall of 2000, Marino and Sam forced Marquez out of the fund. After Marquez left, Bayou Fund raised a lot of money. The typical investors were wealthy people who were worth more than $6 million and had invested in several funds. Many of them learned about Bayou Fund by word of mouth.

Marino instructed Sam never to talk with anyone about Bayou Fund's real financials. Marino "managed the numbers" and did not ask for any input from Sam. Between 1996 and 2002, Sam thinks that he lost about $55 million, but he is not certain.

**B.      Bayou Fund's Marketing Practices**

In the first few years, Bayou Fund had a brochure that was shown to potential investors. In later years, the promotional literature consisted of documents and synopses that purported to summarize how the fund was doing. These documents were inaccurate and did not disclose the real losses that Bayou Fund was experiencing. Bayou Fund's employees, most of whom were in their 20s and had no prior experience working at a hedge fund, did not know that the fund was experiencing losses because Sam was such a heavy trader that it was difficult for an inexperienced person to keep track of the trades, and Marino was careful about keeping the books confidential.

After Marquez left, Bayou Fund hired several people to market the fund and raise money; they were paid a percentage of the money that they raised. The new marketing employees revamped the marketing materials and put the fund on a schedule of monthly NAVs

21

and quarterly conference calls. Sam conducted the calls, and Marino gave him the false financials for the calls immediately before the calls took place. By 2003, investors were receiving weekly email updates on trades and positions, in addition to the monthly NAVs. The information they received was not accurate.

Until 2002, Sam helped make pitches to potential new investors. Thereafter, he met with only three or four investors, and did not give any pitches. Indeed, for most of 2002 Sam was out of the office and at home as a result of his back surgeries and struggles with addiction.

**C.    Sam Israel's and Marino's Compensation**

Because Bayou Fund was not making any money, Sam and Marino lived off of the money they received from Bayou Securities. As noted, all employees were paid out of Bayou Securities, and Bayou Securities's audits were done by a legitimate external firm; they were accurate. In the early years, the broker dealer had $400,000 in profit, but that grew to $8 million in later years.

Compared to Marino, Sam did not have an extravagant lifestyle. He was salaried, and most of the Bayou Securities profits went into the hedge fund. Sam estimates that he received a total of $4-5 million from Bayou Securities, including a $2.2 million payment that he gave to his wife. Sam leased, rather than owned, cars. After he and his wife separated in 2002, he rented a property in Bedford for $20,000 per month. That property included an office for Bayou, and $8,000 of the $20,000 covered the office.

Sam filed tax returns for his compensation. Marino prepared and filed the tax returns for Bayou Fund, and the business properly withheld taxes for its employees.

22

### D.    The Fund Stops Trading and Sam Israel Is the Victim of Fraud

In its last year, Bayou Fund did not do any trading, and Sam was at the office only five or six times. Sam stopped trading in March or April of 2004. Thereafter, Marino invested some of the fund's remaining cash in investments, kept a few people at the trading desk and had employees do administrative tasks.



### E.    Sam Israel Accepts Responsibility and Pleads Guilty

Sam pled guilty to the instant offenses on September 29, 2005. He recognizes that he is responsible for his criminal conduct and understands that his poor judgment is the primary reason for his current circumstances. Indeed, during Sam's first meeting with representatives from the United States Attorney's Office, Sam stated that he had committed crimes and deserved to go to prison. He has accepted responsibility for his conduct by pleading

guilty, and he is remorseful.  Peck Hayne, a retired stockbroker who has been a close friend of

the Israel family for many years, said

> For the past 7 yrs. I've been an active part of the Kairos Prison Ministry.  In
> that capacity I've spent a lot of time in Louisiana's State Penitentiary
> (Angola) and have gotten to know many "hard" criminals – murderers, armed
> robbers, etc.  I've seen complete remorse and transformation in many of them
> — others I've seen filled with hatred and anger – no remorse nor
> transformation, etc. (these that, I feel, should remain incarcerated long term).
> Sam is not like the latter – he does show remorse, shame, etc.[16]

## III.    SAM ISRAEL'S CONDUCT POST PLEA

Beginning before his plea, and continuing through March of 2008, Sam has taken

further steps to accept responsibility for his unlawful conduct.  Thus, Sam has participated in

dozens of conferences with representatives of the U.S. Attorney's Office and the Federal Bureau

of Investigations (FBI) to provide information concerning Bayou Fund, its employees, investors

and investments, as well as information concerning Sam's co-defendants and their conduct.  Sam

also met with representatives of the Securities and Exchange Commission, the Commodities

Futures Trading Commission and the Internal Revenue Service.  At the request of the U.S.

Attorney's Office, Sam met with law enforcement from the Cayman Islands.  He also met with

investigators from Kroll in an effort to assist in the recovery of investor funds, and agreed to be

interviewed by counsel for Creditors' Committee in the related bankruptcy proceeding.

---

[16] See letter of Peck Hayne, Ex. I to Appx. A.



## IV.    SENTENCING CONSIDERATIONS

Section 3553(a) of Title 18 of the United States Code provides, "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes [of sentencing]." In determining an appropriate sentence, sentencing courts must consider, among other things, "the nature and circumstances of the offense and the *history and characteristics of the defendant*," the need to address "the seriousness of the offense," and the "need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a) (emphasis added).[17]

---

[17]    Section 3553(a) of Title 18 provides, in pertinent part, as follows:
     (a) Factors to be considered in imposing a sentence.... The court, in determining the particular sentence to be imposed, shall consider-
     (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
     (2) the need for the sentence imposed -
          (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
          (B) to afford adequate deterrence to criminal conduct; ....
     (4) the kinds of sentence and the sentencing range established for-
          (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines-
               (i) issued by the Sentencing Commission ...;
     (5) any pertinent policy statement-
          (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code ...; ...
     (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; ...

The standards promulgated by the American Bar Association, which were designed to assist sentencing authorities in reaching the proper balance between the community's interest and that of the defendant, support the consideration of the section 3553(a) factors. Thus, the ABA standards provide, "[a]ll impositions of punishment should be no more than necessary for the attainment of identified societal goals." ABA Standards for Criminal Justice Sentencing, Commentary to § 18-2.4 (3d ed. 1994). The American Bar Association has emphasized that "[t]he sentence imposed in each case should be the minimum sanction that is consistent with the gravity of the offense, the culpability of the offender, the offender's criminal history, and the personal characteristics of an individual offender." Id. at 18-6-1(a).

In United States v.Crosby, 397 F.3d 103 (2d Cir. 2005), the Second Circuit explained that the excision of the provision in the Federal Sentencing Guidelines that made them mandatory places a new emphasis on the other factors enumerated in section 3553(a). 397 F.3d at 113. Courts in this district have held that consideration of the Guidelines range is only entitled to the same weight each other factor enumerated in section 3553(a) is accorded. See Simon v. United States, 361 F. Supp. 2d 35, 40 (S.D.N.Y. 2005). As explained in Simon:

> One of the many reasons to afford the same weight to the Guidelines sentence and the other factors is that the Guidelines permit a court to grant a departure based on certain offender-specific characteristics only in exceptional circumstances. For example, age, educational and vocational skills, mental and emotional conditions, physical condition, employment record, and family ties and responsibilities are not normally relevant. Yet there are the sort of characteristics a court is likely to find relevant when determining the history and characteristics of the defendant as required by 3553(a)(1).

Id. at 40.

Thus, as explained in Crosby, sentencing judges are free to consider and required to focus on the facts particular to the defendant who is being sentenced. In this case, the

26

compelling facts and circumstances surrounding Sam's improper conduct, ███████████ ███████████ the fact that he was under the influence of painkillers and other drugs during the period of the offense, and the fact that he suffers from serious, debilitating and painful medical conditions, demonstrate that the 30-year maximum sentence recommended in the PSR[18] would be inappropriate, and that the Court should exercise moderation in sentencing Sam.

### A.    The Court Should Exercise Moderation Based On Sam Israel's Extraordinary Physical Impairment

Pursuant to section 5H1.4 of the Sentencing Guidelines, "[a]n extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range." U.S.S.G. § 5H1.4. Although the sentence is capped at 30 years, and the calculated Guidelines range therefore does not apply to him, the principles underlying section 5H1.4 apply, and the Court should exercise moderation based on Sam's physical condition. Indeed, in light of Sam's extraordinary debilitating medical condition, even a sentence substantially less than 30 years will be very significant for Sam, as he will suffer far more than the average inmate during any period of incarceration.

---

[18]  By Order dated February 6, 2008, the Court directed the Department of Probation "to make sure that Mr. Israel's Pre-Sentence Report is on my desk by March 7, 2008." 2/6/08 Order at 2. The Department of Probation conducted its interview on February 6. On February 19, 2008, the Department of Probation issued its initial report. On February 27, 2008, the Department of Probation issued a "Corrected Disclosure." The February 27 report was substantially different, and included substantially more information, than the February 19 report. Pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, a defendant has 14 days to submit written objections to the Department of Probation. Therefore, upon receipt of the February 27, 2008 report, counsel contacted the Department of Probation to inform the Probation Officer that objections would be submitted on or before March 12, 2008. In subsequent email correspondence and during a telephone conference, the Probation Officer informed counsel that because the Court had ordered the Probation Department to submit its Pre-Sentence Report to the Court by March 7, 2008, any objections should be submitted to the Department of Probation by March 4, 2008, at the latest. Counsel pointed out that under Rule 32(f), a defendant is entitled to 14 days to respond to the February 27, 2008 Report. The Probation Officer responded by stating that she deemed the Court's February 6 Order to supersede Rule 32(f)'s provisions in this case. Because the Court had instructed the parties that it did "not care to receive any further correspondence concerning" this sentencing, 2/6/08 Order at 2, counsel did not contact the Court regarding this violation of the Federal Rules of Criminal Procedure. Instead, objections were submitted to the Department of Probation on March 4, 2008, and the Department of Probation issued its final Pre-Sentence Report, which included the objections as required by Rule 32(g), to the Court on March 14, 2008.

Under section 5H1.4, a defendant's sentence may be reduced if he demonstrates that his condition is extraordinary and/or that the federal prison system is incapable of adequate treatment. Id.; "[T]o warrant a departure resulting in a nonincarceratory sentence on the basis of an extraordinary health condition, the 'defendant must be seriously infirm with [a] medical condition that cannot be adequately cared for by [the] Bureau of Prisons." United States v. Cutler, -- F.3d --, Nos. 05-2516, 05-3303, 05-6178, 2008 WL 706633, (2d Cir. 2008) (quoting United States v. Martinez, 207 F.3d 133, 139 (2d Cir.2000); citing United States v. Altman, 48 F.3d 96, 104 (2d Cir.1995); see also United States v. Napoli, 179 F.3d 1, 18 (2d Cir. 1999). Moreover, "as the Supreme Court recognized in Estelle, serious medical conditions can result in cruel and unusual punishment if not properly addressed." Pabon v. Wright, 459 F.3d 241, 253 (2d Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Sam's serious medical conditions present these very issues.

## 1.  Sam Israel Suffers From an Extraordinary Physical Impairment



---

19  See 7/10/06 letter of Dr. Howard B. Eison, Ex. B to Appx. B.

20  See 1/29/08 letter of Dr. Howard B. Eison, Ex. A to Appx. B

While undoubtedly there are other federal inmates who suffer from back pain, or from ███████████████████████████████████████████████, it is unlikely that many have suffered as much or have undergone as many surgeries as a result of these conditions as has Sam. Indeed, Sam's circumstances are particularly unique because there is no cure for his pain, so he is forced to rely on the medications that assist him, and has learned to simply bear the constant, excruciating discomfort that he cannot escape. Given that Sam is 48-years-old, his medical circumstances and the discomfort with which he is forced to live every day, and with which he has lived for many years, are truly extraordinary.

Because of his medical condition, Sam's life expectancy is shorter than the life expectancy of an average, middle to upper class Caucasian, adult male. Specifically, Sam's life expectancy, as calculated by a professional underwriter, ███████[21] This calculation is an average; some men with Sam's conditions will live more years, and some will live fewer years. Given that Sam likely will be incarcerated for a significant period, and in light of the Bureau of Prison's limitations on treatment and the conditions in federal penitentiaries, Sam's life expectancy likely will go down as a result of his incarceration. As such, a 20 year sentence is, for all practical purposes, a life sentence for Sam.

### 2. Case Law Supports a More Moderate Sentence on the Basis of Sam Israel's Extraordinary Physical Impairment

As noted by numerous courts, the sensible notion of modifying a sentence to account for a defendant's poor medical condition has strong roots. The principle often provides the basis for a sentence that falls short of what might otherwise be a life sentence or what could

---

[21] See life expectancy calculation for Samuel Israel III, calculated by AR Hart Consulting, attached as Ex. I to Appx. B.

approach cruel and unusual punishment. In <u>United States v. Rioux</u>, 97 F.3d 648 (2d Cir. 1996),

the Court Appeals for the Second Circuit noted that although "[p]hysical condition is not

ordinarily relevant" in determining a defendant's sentence, an 'extraordinary physical

impairment' may be reason enough to impose a sentence below the guideline range. Such

conditions are ones that render the defendant 'seriously infirm.'" <u>Id.</u> at 663 (quoting U.S.S.G. §

5H1.4; <u>Altman</u>, 48 F.3d at 104). In that case, the Second circuit held that the district court

properly took into account the defendant's health when imposing sentence. Defendant Rioux

had a kidney transplant 20 years prior to his sentencing, his new kidney was diseased and

"[a]lthough his kidney function remains stable, he must receive regular blood tests and

medications. As a complication of the kidney medications, Rioux contracted a bone disease

requiring a double hip replacement. Although the placement was successful, it does require

monitoring." <u>Rioux</u>, 97 F.3d 663. <u>See also</u> <u>United States v. Carmona-Rodriguez</u>, No. 04 Cr.

667, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (sentencing court considered the

defendant's age and health, including the fact that she had been "suffering from high blood

pressure and diabetes and that she has received psychiatric treatment for anxiety and depression

since 1994" to be factors relevant to sentencing); <u>United States v. Allen</u>, 250 F. Supp.2d 317,

321-22 (S.D.N.Y. 2003) (imposing a reduced sentence based on the defendant's personality

defects, borderline intellectual functioning, and mental and emotional deficits caused by a car

accident that occurred seven years prior to sentencing); <u>United States v. Jimenez</u>, 212 F. Supp.2d

214, 218-19 (S.D.N.Y. 2002) (imposing a reduced sentence because the defendant's physical

condition was "exceptional" due to her "Amnestic Disorder and psychotic hallucinations

consequent on brain aneurism."); <u>United States v. Hammond</u>, 37 F. Supp.2d 204, 208-10

31

(E.D.N.Y. 1999)[22] (imposing a reduced sentence because the defendant suffered from AIDS and

the defendant's "medical status would make service of a long sentence exceptionally onerous.");

United States v. Gigante, 989 F. Supp. 436, 442-43 (E.D.N.Y. 1998) (noting that "the principle

of modifying a sentence to take account of a defendant's frailty has strong and ancient roots,"

and imposing a substantially reduced sentence in part because it "would probably be short of a

life sentence" (citing The Code of Maimonides, Book XIV, Treatise One: Sanhedrin, chap. 17,

para. 1, Mishna Torah, The Book of Judges (Abraham M. Hershman, trans., Yale Univ. Press

1949)(emphasis omitted) ("How many stripes are inflicted ... as it is said: to be beaten ...

according to the measure of his wickedness ... (Deut.25:6)... But the number is reduced in the

case of a frail man ....")); United States v. Roth, No. 94 Cr. 726, 1995 WL 35676 at *1 (S.D.N.Y.

Jan 30, 1995) (imposing a substantially reduced sentence because the defendant "suffers from

amyotrophic lateral sclerosis, a progressive, incurable, debilitating neuro-muscular disease.  His

mobility is already substantially limited and further physical decline is expected."). See

generally Stacey M. Studnicki, Individualized Sentencing: Federal Sentencing Departures Based

Upon Physical Condition, 1994 Det. C.L. Rev. 1215, 1215-44 (1994).

The defendant in United States v. Barbato, No. 00 Cr. 1028, 2002 WL 31556376

(S.D.N.Y. Nov. 15, 2002), suffered from ███████████████████████████████.

Specifically, Barbato had "severe hypertension, transient ishemic attacks, carotid artery disease,

spinal stenosis, degenerative disc disease and lumbar radiculopathy, markedly elevated PSA

levels, hypercholesterolemia, coronary artery disease, and t[ook] several medications a day to

---

[22]  In Hammond, the Court identified, through case citations, "some of the disabilities warranting a downward departure." 37 F. Supp.2d at 208, 209.  These conditions include, "degenerative hip and knee condition with non-active tuberculosis and Hyperactive Adjustment Disorder, amyotrophic lateral sclerosis (Lou Gehrig's Disease), liver cancer, kidney cancer, a polio-crippled leg, a double amputation below the knee due to war wounds, and pregnancy." Id. (citations omitted).

32

deal with the attendant symptoms. Barbato also suffered from a mini-stroke in 1996." Id. at *4 (citations omitted). Though Barbato was older than Sam, it appears that Barbato's back condition was not nearly as severe as Sam's back condition, and moreover, Barbato apparently did not suffer from ███████████████████████████████████████████████ ██████████████████████████████████████████████ The court in Barbato concluded that based on the defendant's age and medical condition, his sentence should be reduced by half. Id. at *5.

Additionally, in United States v. Blarek, 7 F. Supp.2d 192 (E.D.N.Y. 1998), Judge Weinstein observed that when a defendant who has serious medical conditions is reliant a particular treatment regimen, there is considerable risk that adherence to that regimen will be impossible within the custody of the Bureau of Prisons. In Blarek, the defendant maintained a strict diet, exercised regularly, received acupuncture frequently, and took a combination of vitamins and other supplements under the supervision of a doctor in an effort to control his HIV. "Since cruelty and its perception is as much a state of mind as a physical reality, he will suffer at least emotionally from the deprivation of his choice of treatment." Id. at 212. Sam undoubtedly will suffer from deprivation of his choice of treatment. ███████████████████████████ ████████████████████████████████████[23] But these treatments likely will not be available to Sam when he is incarcerated.[24] ███████████████████████████████ █████████████████████████████████████████████

---

[23] See 2/29/08 and 3/27/08 letters of Dr. Carol J. Weiss, Exs. G and F to Appx. B, respectively.

[24] See Affidavit of Phillip S. Wise, attached as Ex. A, ¶ 7(c).



Moreover, the Bureau of Prisons may not permit Sam to take the medications to which he has

been converted because of his history of substance abuse.

      Finally, in <u>United States v. Boy</u>, Nos. 93-30100, 93-30133, 1994 WL 59781 (9th

Cir. Feb. 25, 1994), the defendant was a sex offender.  The district court imposed a sentence that

was 30 percent lower than the bottom of the Guidelines range because the defendant suffered

from a degenerative hip and knee condition, nonactive tuberculosis and Hyperactive Adjustment

Disorder.  In affirming the sentence, the Court of Appeals for the Ninth Circuit emphasized that

the defendant's hip and knee condition "will likely get progressively worse with time." <u>Id.</u> at *3.

Similarly, Sam's medical condition, and particularly his █████████████████, likely will get

worse over time.  Indeed, it consistently has worsened over the past 20 years.

      The combination of Sam's ████████████████████████

████████████████████████████████████████

---

[25]  <u>See</u> 3/27/08 letter from Dr. Carol J. Weiss, Ex. F to Appx. B.

████████████████████████████████████████████, bring this case

outside the "heartland of cases," <u>United States v. Koon</u>, 518 U.S. 81, 95-96 (1996), and certainly

constitute an "extraordinary physical impairment," U.S.S.G. § 5H1.4.  <u>See also</u> 18 U.S.C. §

3553(a).

    3.    **<u>Sam Israel's Medical Condition May Cause Him to Experience<br>Greater Suffering From Incarceration Than Is Typical</u>**

Indeed, due to his medical condition, Sam's prison experience likely will be far

more difficult and painful than the prison experience of the average inmate.  The sixth factor that

a sentencing judge must consider in sentencing a defendant is "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct." 18 U.S.C. § 3553(a)(6).  Thus, both section 3553(a) and the Sentencing

Guidelines are intended to "help[] [] avoid excessive sentencing disparities while maintaining

flexibility sufficient to individualize sentences where necessary." <u>United States v. Booker</u>, 543

U.S. 220, 264-65 (2005) (citing 28 U.S.C. § 991(b)).  Even a 20-year sentence for Sam would

result in an unwarranted sentence disparity because of the extreme suffering that Sam

undoubtedly will endure in prison.  Typically, we view our prison system as "principally

inflict[ing] emotional distress rather than physical distress.  But incarceration is also a

punishment 'of the body' in the very broad sense that it imposes negative experiences on actual

human bodies.  So, in an important respect, all of our punishments are corporal punishments."

Adam J. Kolber, <u>The Subjective Experience of Punishment</u>, Columbia Law Review,

Forthcoming, at 16, available at http://ssrn.com/abstract=1090337.[26]

---

[26]  A draft copy of this article is attached as Ex. B.

For Sam, incarceration undoubtedly will be a form of corporal punishment: he will deprived of medications that most effectively control his pain; the conditions of confinement and sleeping accommodations, the transportation requirements, including practices related to handcuffs and leg irons, and even the shoes he is permitted to wear, likely will exacerbate his pain; he will have no interaction with the physicians who know his history of pain and have experience treating him. Simply put, Sam's subjective experience of punishment will be far worse than the experience of the average inmate. See generally id.; see also Hammond, 37 F. Supp.2d 204 at 208-210 (E.D.N.Y. 1999) (defendant's "medical status would make service of a long sentence exceptionally onerous."). As a result, even a 20-year sentence for Sam will result in a sentencing disparity with the average 20-year sentence because his experience will be far more difficult than the experience of an average inmate.

Given these circumstances, we respectfully request that the Court exercise moderation in imposing sentence based on Sam's extraordinary physical and mental impairment.

**B.**     **Sam Israel Is Less Culpable than Marino**

      **1.**     **Sam Israel's Judgment Was Impaired Due to His Mental and Physical Condition** ███████████████████

For much, if not all, of the relevant period, Sam's judgment was significantly impaired due to his dependence on painkillers and other medications that interfered with his thought processes. Additionally, Sam's conduct, ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████cannot, and do not, excuse Sam's conduct, they certainly serve to explain it, at least in part.

### a.     <u>Sam Israel's Pain, Surgery and Addictions Interfered with His Judgment</u>

As discussed above, Sam has struggled with addiction since he was a teenager. Following shoulder surgery in college, he developed a dependence on potent painkillers. During that time, he also used cocaine periodically, and regularly abused marijuana. After Sam left college, he became dependent on alcohol, and continued to smoke marijuana regularly. He remained dependent on painkillers. When Sam's back began to deteriorate in 1988, his addiction spiraled out of control. At times, the quantity and potency of the painkillers put him in a fog. He was unable to overcome his dependency on painkillers because the pain he suffered due to his back condition was unbearable.

Dr. Carol Weiss, Sam's psychiatrist who also handles his pain management, has concluded that ██████████████████████████████████████████ ████████████████████████████:



---

27   <u>See</u> 3/27/08 letter of Dr. Carol J. Weiss, Ex. F to Appx. B.

Those close to him also believe, uniformly, that his terrible back condition, combined with his addictions, partially explain Sam's conduct. Sam's brother, said,

> After my brother started having physical problems which included spine, back, neck, and structural deterioration, he was operated on numerous times, a couple of the life threatening variety. Subsequently, he became addicted to various prescription drugs and went to rehabilitation to rid himself of those addictions. The trauma, drug use, rehabilitation, and anesthesia involved with the operations definitely played a role in Sam's troubles. His wife divorcing him at the same time added much distress and pressure that seems to have sent him over the edge and to do things that he would never have done had he been healthy.[28]

Bill Kilmer, a friend of the Israel family for 40 years, emphasized that, "Sam has had numerous surgeries on his back, is in a lot of pain, and has been under constant stress and pressure for at least 15 years."[29] Pam Hayne, who has known the Israel family for years, said, "I can only guess [that Sam's offense conduct] was a result of events that got out of hand after numerous very painful and debilitating back surgeries."[30] E.V. Benjamin, who has also known Sam for may years, said,

> It may turn out that Sam was not himself when these events were taking place: he has been dealing with a bitter divorce with a child involved. In addition, during at least some of this time, he was undergoing treatment for a really bad back including surgery and pain management. Anyway, when I heard what he had done these are the things that I thought of to explain his actions.[31]

---

[28] See letter of Lawrence J. Israel, Jr., Ex. B to Appx. A.

[29] See letter of Bill Kilmer, Ex. J to Appx. A.

[30] See letter of Pam Hayne, Ex. K to Appx. A.

[31] See letter of E.V. Benjamin, Ex. L to Appx. A.

Similarly, Roger Weiss, the Bayou Fund investor and securities lawyer who has known Sam since Sam was a child, said,

> The events have [sic] come to light ... are not only shocking to me, they are completely at odds with my knowledge of Sam. I know him to be a good father and a loving son. How he could have breached a trust given to him is inexplicable to me. Having thought intensely about this, the only possible explanation that I find plausible is that the continuous and almost annual horrendous back operations that he has had to endure over the last decade, and the prescribed strong medication that he has had to take, somehow triggered a switch that led him to lose balance, judgment and an understanding of wrong from right.[32]

### b. Sam Israel's Inability to Admit Bayou Fund's Failure █

Sam's improper conduct was not motivated by greed. It was not an attempt to get rich, but rather an effort to succeed in a field in which his family is extraordinarily well-known and well-respected. ████



---

[32] See letter of Roger J. Weiss, Ex. G to Appx. A.

39



serve to explain, at least in part, Sam's conduct with respect to Bayou Fund.

Sam's older brother Larry, ███████████ said,

> It was never easy growing up an Israel. My family has achieved success of titanic proportion in both their businesses and communities. For many generations my family has been known as good citizens. This history of our family has been one of charitable contribution at many Hospitals, Universities, and community service. We all felt the pressure to succeed, perhaps Sam the most as he was named after our Grandfather. ████████████

And Dr. J. Kenneth Saer, a friend of the Israel family for many years who lost more than $400,000 in the Bayou Fund, ████████████████████, said,

> As a retired, busy Orthopaedic Surgeon, as an amateur psychologist (necessary for success in my field), I have noted repeatedly the difficulty that children, not as talented as successful forebearers, have in living up to their expectations. They are often adversely affected by their attempts and failures to live up to the standards set by their predecessors. Both of Sam's grandparents were very successful, highly respected, and influential in the business, professional, civic, and charitable causes in the New Orleans community. His paternal grandfather, and namesake, was one of the most

---

[33] See 3/27/08 Letter of Dr. Carol J. Weiss, Ex. F to Appx. B.

[34] See letter of Lawrence J. Israel, Jr., Ex. B to Appx. A.

esteemed gentlemen in our city. His parents continued to occupy similar roles. It is my feeling that Sam III did not possess the same level of ability, was desperate to achieve, was unable to face failure and began on a road of deception from which there was no turning back.[35]

In sum, ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

## 2.  Marino Was the Lynchpin and the Mastermind

As discussed above, in December 1998, Marquez and Marino devised a scheme whereby Marino would serve as the external auditor through an accounting firm that he formed called Richmond Fairfield. With the help of this faux accounting firm, Bayou Fund's principals would conceal the fund's losses.

Sam learned about the proposed scheme during a conversation that he had with Marino and Marquez in December 1998. While Sam agreed to go along with the plan, and bears responsibility as a result of that decision, he was not the mastermind. In fact, at the time, Marino and Sam were not close, and Marino likely would not have agreed to the plan had it not been hatched by Marino and Marquez.

---

[35] See letter of J. Kenneth Saer, Ex. M to Appx. A.

Moreover, as the fraud was carried out, and as the Court recognized during

Marino's sentencing, Marino was the lynchpin:

> There is no way that the Bayou fraud would have been perpetrated or could
> have been perpetrated.  No way it could have grown to its immense
> proportion without [Marino].  [Marino was] the but for causation in the
> scheme that was Bayou. [] Daniel Marino [was] the linchpin of this fraud, the
> pivot on which it hung.  Without [Marino's] cooperation, [Sam and Marquez]
> could not have pulled it off and [Marino] cannot escape that terrible truth.
> [Marino's] attorney says that Israel and in the early morning [sic] Marquez
> determined the degree of deception that would appear in the financial reports.
> They could not create and certify false and fraudulent financials.  Only
> [Marino] could do that and [Marino] did it.[36]

Indeed, though Sam and Marquez were responsible for the trading losses, and Sam participated

in the conference calls with investors and made false statements to investors, Marino was

responsible for compiling and maintaining the financial records, generating the NAVs,

monitoring the losses and manufacturing the audits.  Marino instructed Sam never to talk with

anyone about Bayou Fund's real financials.  In sum, Marino "managed the numbers" and told

Sam what to say about Bayou Fund's financials, to whom it should be said, and when to say it.

Sam does not claim that he is without fault, or that he was Marino's puppet.  To

the contrary, Sam has accepted full responsibility for the offense conduct and the criminal

activity that occurred at Bayou Fund.  However, though Sam was the CEO, he held the highest

rank in title only.  Given the manner in which the fraud was perpetrated, the respective roles of

Sam and Marino, and the fact that throughout the relevant period Sam was struggling with major

---

[36] See 1/30/08 Sentencing Tr. for Daniel Marino.

medical conditions and addicted to powerful medications, he certainly cannot be viewed as more culpable than Marino, and in fact, was less culpable.[37]

**C.** **Sam Israel Has Provided Substantial Assistance to the Government in the Prosecution of Marquez** █████████████████████

Sam has cooperated with the Government since he attended his first meeting at the U.S. Attorney's Office prior to his plea. Since that time, Sam has been extensively debriefed, █████████████████████████████, has met with representatives from the U.S. Attorney's Office, the SEC, the CFTC, the IRS and Cayman Islands law enforcement, and agreed to testify in a hearing in connection with the sentencing of his co-defendant, James Marquez.[38] Sam has also met with representatives from Kroll, the entity that is charged with recovering Bayou Fund's assets, as well as attorneys for the plaintiffs in the civil actions. He has provided detailed information to all of these individuals to assist them in recovering Bayou Fund's assets. On March 27, 2008, Sam was deposed by counsel for the receiver in United States v. Jack O'Halloran, 3:04-cv-01651 (JCH), an action pending in District of Connecticut pursuant to which the Government is seeking to recover Bayou Fund's assets. Sam's cooperation has been complete and uninhibited. Indeed, in connection with the

---

[37] On January 30, 2008, Marino was sentenced to 240 months incarceration. His Pre-Sentence Report recommended a sentence of 50 years incarceration. Thus, the Court sentenced Marino to a sentence that was 40% of the sentence recommended by the Department of Probation. With respect to Sam, the Department of Probation has recommended a sentence of 30 years incarceration. Thus, even if Sam and Marino are equally culpable, a commensurate sentence for Sam would be 144 months incarceration, or 40% of the sentence recommended by the Department of Probation. Indeed, 144 months incarceration would also be consistent with the sentence imposed on Edward Strafaci, who pled guilty to conduct that was very similar to the conduct that led to Sam's guilty plea. Strafaci was the Director of Fixed Income and the Chief Compliance Officer for Lipper Investments, a hedge fund firm. Strafaci inflated the value of the firm's portfolio by more than $300 million. A year after he was indicted on a three count indictment in the Southern District of New York, he pled guilty to securities fraud. He was sentenced to 72 months incarceration. See United States v. Strafaci, 03 Cr. 1182 (LTS).

[38] Ultimately, no hearing took place and Sam was not required to testify. However, Sam did attend a meeting at the U.S. Attorney's Office during which he was asked questions in connection with the proposed hearing, and prepared to testify.

43

deposition, Sam appeared voluntarily without subpoena. We have been told that the Government intends to submit a letter, under separate cover, pursuant to section 5K1.1 of the United States Sentencing Guidelines, detailing Sam's substantial assistance in these various matters.

### 1.    Sam Israel Meets the Requirements for a Departure Pursuant to Section 5K1.1

Pursuant to section 5K1.1, the Court is authorized to grant a downward departure "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." In determining the extent of the departure, the Court may take into consideration the following factors:

> (1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into account the government's evaluation of the assistance rendered;
>
> (2)    the truthfulness, completeness and reliability of any information or testimony provided by the defendant;
>
> (3)    the nature and extent of the defendant's assistance;
>
> (4)    any injury suffered, or any danger or risk of injury to the defendant or his family resulting from the assistance;
>
> (5)    the timeliness of the assistance.

U.S.S.G. § 5K1.1(a)(1)-(5).

It is axiomatic that there is no limit to how far the Court may depart once the Government has submitted a letter pursuant to section 5K1.1. See 18 U.S.C. § 3553(e) (stating that courts may impose less than mandatory minimum in cases of substantial assistance); see also United States v. Speed Joyeros, S.A., 204 F. Supp.2d 412, 427 (E.D.N.Y. 2002) (noting that

44

if Government submits a section 5K1.1 letter, the court can grant probation even in the most serious case). In the instant case, the Court is authorized to exercise moderation in connection with Sam's sentencing. A moderate sentence is not only permissible, but also justified based on Sam's substantial assistance (as well as other factor discussed above and below).

Sam's conduct since August of 2005 fulfills all of the factors that the Court may consider in granting a downward departure. During the course of his cooperation, Sam has consistently and unhesitatingly given extensive and substantial assistance to the Government in accordance with the Government's needs and time schedule. Because Sam was intimately involved in Marquez's conduct, ███████████████████████ ████████████████████████████████████ ██████████████████████. His timely, useful, truthful cooperation make self-evident the satisfaction of factors one, two, three and five.

███████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████████
████████████████████████████████
██████████████████████

### 2.     Sam Israel Meets the Requirements for a Departure Pursuant to Section 3553(a) of Title 18

Pursuant to section 3553(a),

> [I]n formulating a reasonable sentence a sentencing judge must consider the 'history and characteristics of the defendant' within the meaning of 18 U.S.C. § 3553(a)(1), as well as the other factors enumerated in § 3553(a), and should take under advisement any related arguments, including the contention that a defendant made efforts to cooperate . . . Section 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what 'history and characteristics of the defendant' are relevant. *This sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation.*

United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006) (emphasis added).  See also United States v. Huerta, 878 F.2d 89, 93 (2d Cir. 1989) ("[C]ourts may weigh a wide array of factors including 'the nature and circumstances of the offense and the history and characteristics of the defendant, to arrive at a sentence that 'reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.'  We perceive no reason why a defendant's cooperation is not a relevant factor in applying those standards." (citations and alterations omitted)).

Based on section 3553(a) as well as section 5K1.1 of the Guidelines, then, the Court should exercise moderation in sentencing Sam in light of the assistance that he has rendered to both the Government and the victims.  In addition to meeting repeatedly with representatives of law enforcement, Sam met with counsel for the Creditors' Committee in the bankruptcy proceeding.  During a lengthy session, Sam was questioned by attorneys from Kasowitz Benson Torres & Friedman LLP with respect to virtually every aspect of Bayou Fund's business.  He answered their questions fully and volunteered information that he believed would assist them in recovery Bayou Fund's assets.

Sam took full advantage of the opportunity the Government and Bayou Fund's victims provided to him to help him atone for some of the damage his actions may have caused. He warrants a sentence that reflects his cooperation.

## V.    SAM ISRAEL SHOULD BE PERMITTED TO SURRENDER VOLUNTARILY BECAUSE (1) HE IS NOT A FLIGHT RISK OR A DANGER TO THE COMMUNITY AND (2) HIS MEDICAL NEEDS CANNOT BE MET BY THE U.S. MARSHALS SERVICE

In the PSR, the Department of Probation recommends that Sam be permitted to surrender voluntarily, noting that, "[h]e has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release. As such, he is not viewed as a flight risk or a danger to the community. If a term of imprisonment is imposed, Mr. Israel should be permitted to voluntarily surrender to a Bureau of Prisons facility or the U.S. Marshal [sic] Service within 45 days of the sentence date."[39] For the reasons that follow, the recommendation is fully supported by the facts and circumstances of this case. Given Sam's medical situation, voluntary surrender is not an accommodation; it is warranted by notions of decency and fairness.

Section 3621 of Title 18 provides, "A person who has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior . . ." However, the Code does not provide a standard to be considered by courts in determining whether to allow a defendant to voluntarily surrender to the Bureau of Prisons. In making this determination, courts consider whether the defendant is flight risk or a danger to the community. See, e.g., United States v. Tanasi, No. 02 Cr. 96, 2003 WL 328303, at *5 (S.D.N.Y. Feb. 11, 2003) ("The

---

[39] See 3/14/08 PSR at 42-43.

defendant will be permitted to surrender voluntarily as he is not viewed to be a flight risk or a danger to the community.").

There is no question that Sam is neither a flight risk nor a danger to the community. Indeed, since his plea in September 2005, Sam has been out on bail. He has made no effort to flea, and consistently has reported to all meetings with pre-trial services. Even since learning of Marino's 20 year sentence, Sam has not attempted to flea. Additionally, at the Government's request, Sam repeatedly has appeared for meeting with various Government representatives. To the extent Sam has sought to travel outside the Southern and Eastern Districts of New York, he has always made the requisite application to the Court and sought (and received) the consent of the U.S. Attorney's Office. Moreover, Sam's son and daughter, as well as his life partner, are all located in New York, which makes him highly unlikely to flea. Finally and indisputably, Sam is not a danger to the community. He did not commit a violent crime and has never engaged in violent behavior. He has been treated by a psychiatrist for years, and she has expressed no concern regarding Sam being a danger to the community.

Given that Sam is neither a flight risk nor a danger to the community, he should be permitted to voluntarily surrender. If Sam is not permitted to surrender voluntarily, his health and well-being may be at risk. This is because upon remand, Sam will be placed in the custody of the U.S. Marshals Service, not the Bureau of Prisons.[40] He will remain in the custody of the U.S. Marshals service until he is designated to a BOP facility, which typically takes six to eight weeks. Upon designation, he will be transported to the BOP facility by the U.S. Marshals Service. During the transportation phase, Sam will be handcuffed and placed in leg irons, and

---

[40] See Affidavit of Phillip S. Wise, attached as Ex. A, ¶ 7(e).

likely will be housed in facilities that are not BOP facilities. County jails and contract facilities that house prisoners in the custody of the U.S. Marshals Service "are not bound by the health care policies of the Bureau of Prisons, and often provide minimal medical care, based on the transient nature of their primary populations."[41] Moreover, "during transportation, full inmate medical records may not be immediately available. As a result, interruptions in medications or medical treatment are fairly common during these periods."[42]

   A disruption in Sam's medications and medical treatment would be devastating, and potentially fatal. As discussed above, see supra, Parts I.B and IV.A, Sam suffers from excruciating, debilitating pain as a result of ████████████████████ ██████████████████████████ Without his medication, he cannot function because the pain is so overwhelming, ████████████████████████. Moreover, even with his medications, Sam likely will not be able to withstand that pain of being handcuffed and in leg irons during transportation to a BOP facility. "These conditions are uncomfortable for an unhealthy inmate, and may exacerbate the condition of an inmate who suffers from significant back and neck pain."[43] Simply put, because the U.S. Marshals Service likely will not be able to sufficiently address Sam's medical conditions needs prior to his arrival at the designated BOP facility, there is a significant risk that Sam will suffer cruel and unusual punishment. See Pabon, 459 F.3d at 253 ("[A]s the Supreme Court recognized in Estelle, serious medical conditions can

---

[41] See id.

[42] See id. ¶ 7(d).

[43] See id. ¶ 7(b).

49

result in cruel and unusual punishment if not properly addressed." (citing Estelle, 429 U.S. at 104)).

In light of these facts and circumstances, we respectfully request that Sam be permitted to voluntarily surrender upon designation to a BOP facility.

## CONCLUSION

Sam Israel has great remorse for the offenses that have brought him before Your Honor. He recognizes the harm he has done, is ashamed of his conduct, and has committed himself to living his life as an upstanding and honorable person. As the letters submitted on his behalf demonstrate, he is a man who consistently puts others before himself, and who prides himself on kindness, charity and devotion to his loved ones. Though Sam's physical and psychological conditions, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, do not excuse his conduct, they certainly serve to partially explain what drove an otherwise honorable man to commit these crimes.

For the reasons set forth above, we respectfully urge the Court to exercise moderation in sentencing Sam Israel, and allow him to surrender voluntarily to serve his sentence.

Dated: New York, New York
          March 31, 2008

                                        MORVILLO, ABRAMOWITZ, GRAND,
                                        IASON, ANELLO & BOHRER, P.C.

                              By         /s/ Barry A. Bohrer
                                        Barry A. Bohrer (BB-0557)
                                        Barbara L. Trencher (BT-6722)
                                        Attorneys for Defendant Samuel Israel III
                                        565 Fifth Avenue
                                        New York, New York 10017
                                        (212) 856-9600

                                        50