# The Subjective Experience of Punishment

Prof. Adam Kolber*
Louis Marx Hall
Center for Human Values
Princeton University
Princeton, NJ 08544

University of San Diego
School of Law
5998 Alcala Park
San Diego, CA 92110

**DRAFT (2/5/08): Your feedback is welcome at akolber@princeton.edu.**

---

* Laurance S. Rockefeller Visiting Fellow, Princeton University, Center for Human Values and Associate Professor of Law, University of San Diego. For helpful comments, I thank Larry Alexander, Mary Anne Case, Adam Elga, Matt Evans, Elizabeth Harman, Paul Horton, Mark Kelman, Philip Pettit, Mitchell Polinsky, Peter Singer, Sandra Simkins, Walter Sinnott-Armstrong, and Robert Uriarte, as well as colloquia participants at Princeton University, the University of Pennsylvania, Arizona State University, Rutgers University, and the University of San Diego. This project was generously supported by the Princeton University Center for Human Values and the University of San Diego School of Law.

Electronic copy available at: http://ssrn.com/abstract=1090337

## ABSTRACT

Suppose two people commit the same crime and are sentenced to equal terms in the same prison facility. I argue that they have identical punishments in name only. One may experience incarceration as challenging but tolerable while the other is thoroughly tormented by it. Our sentencing policies seek to equalize the duration of their incarceration, yet largely ignore the differences in their experiences of isolation, stigma, and confinement. In this article, I argue that, according to our prevailing theories of punishment, the subjective experience of punishment matters. There is, therefore, a disconnect between our punishment practices and our best attempts to justify those practices.

There are three possible responses. First, we could try to modify or expand our theories to avoid the obligation to calibrate punishment. I show why this approach is unlikely to succeed. Second, we could conclude that, even though we ought to calibrate our punishments, doing so would be too costly or difficult to administer. This response is too hasty. In civil litigation, we *do* make subjective assessments of damages. Advances in neuroscience may someday make these assessments more accurate and less expensive. Even if we cannot individually calibrate punishments, we can surely enact sentencing policies that are more subjectively-sensitive than the policies we have now. We are left, then, with only the third response: to recognize that subjective experience matters in assessments of punishment severity and to take at least modest steps toward calibrating punishment, either through individual measurement or, more feasibly, by enacting punishment policies that are subjectively sensitive.

Electronic copy available at: http://ssrn.com/abstract=1090337

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................3
PART I: OUR PUNISHMENT PRACTICES ................................................................5
   *A. The Intermediate Problem of Punishment Variation ........................5*
   *B. The Deeper Problem of Punishment Variation ...............................7*
PART II: OUR THEORETICAL COMMITMENTS ....................................................13
   *A. Retributivism ...................................................................................13*
      (1) Experiential-Suffering Retributivism ...................................14
      (2) Loss-of-Liberty Retributivism ..............................................17
      (3) Expressive Features of Retributivism ..................................20
      (4) The "Forewarned is Forearmed" Response..........................22
      (5) The Deliberateness Response...............................................23
   *B. Consequentialism ............................................................................26*
PART III: BROAD POLICY OBJECTIONS ...............................................................29
   *A. Cost and Administrability Objections .............................................29*
   *B. Privacy Objections ..........................................................................36*
   *C. Notice Objections............................................................................36*
   *D. Wealth Discrimination Objections..................................................38*
CONCLUSION .......................................................................................................41

## INTRODUCTION

Suppose that Sensitive and Insensitive commit the same crime, under the same circumstances. They are both convicted and sentenced to spend four years in identical prison facilities. In fact, their lives are alike in most respects, except that Sensitive is tormented by prison life and lives in a constant state of fear and distress, while Insensitive, living under the same conditions, finds prison life merely difficult and unpleasant. Though Sensitive and Insensitive have sentences that are identical in name—four years of incarceration—and the circumstances surrounding their punishments appear identical to a casual observer, their punishment experiences are quite different in severity.

Many theorists provide a retributive justification for punishment. They believe that offenders deserve to suffer for their crimes. They typically also believe that an offender's suffering should be proportional to the seriousness of his offense. For example, murderers should be punished more than thieves, who should be punished more than jaywalkers. Sensitive and Insensitive, however, have committed crimes of equal seriousness, and, on this view, they should suffer the same amount. Retributivists seem committed to the perhaps surprising outcome that we ought to take account of the differences in the punishment experience of people like Sensitive and Insensitive.

Many consequentialist punishment theorists believe that we should punish in order to deter crime, incapacitate offenders, and rehabilitate criminals. They do not seek to maximize punishment because punishment itself has negative consequences. Among those negative consequences, many consequentialists would quite directly incorporate offenders' negative subjective experiences into their assessments of the costs of punishment. More generally, for reasons that I will explain, consequentialists cannot optimize their deterrence strategies without taking account of people's anticipated subjective experiences. Therefore, consequentialists are also committed to the view that we ought to consider the differences in the punishment experiences of people like Sensitive and Insensitive.

Punishment theorists have focused their attention on judgments of culpability, while largely ignoring judgments of comparative punishment severity.[1] When we consider differences in offenders' punishment

---

[1] This is so, even though Jeremy Bentham recognized the basic issue: "[O]wing to the different manners and degrees in which persons under different circumstances are affected by the same exciting cause, a punishment which is the same in name will not always either really produce, or even so much as appear to others to produce, in two different persons the same degree of pain." JEREMY BENTHAM, AN INTRODUCTION TO THE PRINCIPLES OF MORALS AND LEGISLATION 182 (Prometheus Books ed. 1988) (originally published 1789,

experiences, however, we highlight some puzzling features of our prevailing theories of punishment. I will argue that our prevailing theories, for quite different reasons, demand that we calibrate punishments in a way that takes account of offenders' actual or anticipated subjective experiences, at least when we can do so in a cost-effective, administrable manner.

If this claim is successfully defended, theorists will be left with three options. First, they may seek to revise their views of punishment to avoid the obligation to calibrate punishments. While this is certainly possible, I find it difficult to imagine a plausible theory of punishment that is immune from the obligation to calibrate. Second, theorists may decide that, while we ought to have a more calibrated system of punishments, we cannot do so for reasons of cost and administrability. This response has the unpleasant implication that our current punishment practices perpetuate inequalities or inefficiencies in treatment that we are unable or unwilling to correct. With over two million people incarcerated in the United States (almost as many as live in college dormitories),[2] modestly inaccurate punishment of every defendant amounts to massively inaccurate punishment overall. Furthermore, while we cannot perfectly calibrate punishments in accord with subjective experience, in some areas of the law—personal injury cases for example—we do make individualized assessments of experiences like pain and emotional distress. New technologies will make the calibration process progressively more precise and better at detecting cheaters. Even if we are currently unable to make accurate individual calibrations, we can surely craft broad policies that are more subjectively sensitive than those we have now. We are left, then, with only the third response: to recognize that subjective experience matters in assessments of punishment severity and to take at least modest steps toward calibrating punishment, either through individual measurement or, more feasibly, by enacting punishment policies that are more subjectively sensitive.

Even though people vary substantially in their experiences of punishment, our sentencing laws pay little, if any, attention to such

---

chap. 14, para. 14). Bentham's observation occasionally receives passing attention, *see, e.g.,* Michael Tonry, *Obsolescence and Immanence in Penal Theory and Policy,* 105 COLUM. L. REV. 1233, 1264 (2005); Andrew von Hirsch, et al., *Punishments in the Community and the Principles of Desert,* 20 RUTGERS L. J. 595, 607-08 (1989); Douglas N. Husak, *Already Punished Enough?,* 18 PHIL. TOP. 79, 82 (1990); NIGEL WALKER, WHY PUNISH? 99-105 (1991) but rarely more than that. Notable exceptions include JESPER RYBERG, THE ETHICS OF PROPORTIONATE PUNISHMENT 102-09 (2004) and NORVAL MORRIS & MICHAEL TONRY, BETWEEN PRISON AND PROBATION: INTERMEDIATE PUNISHMENTS IN A RATIONAL SENTENCING SYSTEM 94-108 (1990).

[2] Sam Roberts, *College Dwellers Outnumber the Imprisoned,* N.Y. TIMES, Sept. 27, 2007, at A29; *see also* Solomon Moore, *Justice Dept. Data Show Prison Increases,* N.Y. TIMES, Dec. 6, 2007 (reporting Department of Justice data showing that, in 2006, "[a]n estimated 2.38 million people were incarcerated in state and federal facilities").

differences. Judges may surreptitiously calibrate sentences, but if so, the analysis is usually hidden from the public eye and cannot be challenged on appellate review. We provide defendants with many substantive and procedural protections when assessing their guilt, yet largely ignore the ways in which they are likely to experience punishment once guilt has been decided. While I do not describe here precisely how we ought to change our theories or practices, I do argue that failing to take seriously the fact that offenders vary in their subjective experiences of punishment leaves us with flawed theories, flawed practices, or both.

## PART I: OUR PUNISHMENT PRACTICES

### A. The Intermediate Problem of Punishment Variation

Offenders can be sentenced to punishments that are identical in name but that differ substantially in their severity. Such punishments might differ in easily observable ways. Imagine a somewhat fanciful punishment called "truncation." People sentenced to truncation are forced to stand upright while the sharp end of a blade speeds horizontally toward them at a height of precisely 6 feet above the ground. Those shorter than 6 feet merely feel the passing breeze of a blade above their heads. Those about 6 feet tall receive a very imprecise haircut. Those much above 6 feet tall are decapitated. Each person sentenced to truncation receives the same punishment in name; they are all "truncated."[3] Yet, in the most important ways, truncation punishments differ in severity, and they differ based on a very arbitrary characteristic, namely the offender's height.

As with truncation, the punishment of incarceration also varies substantially. Aside from duration, incarcerative punishments vary in the wide-variety of conditions under which inmates are confined. One inmate may be sentenced to a facility that has large, individual prison cells with windows while another is sent to a facility with small, shared cells with no natural light. Some prisons have higher rates of physical and sexual violence than others. Such variations in treatment reflect objectively-observable features of punishment. We need not carefully assess the psychological states of those who are truncated to realize that they can receive very unequal punishments. There is similarly no debating that a prisoner with a dark, tiny cell and no outside sources of stimulation has a more severe punishment than a prisoner with a well-lit, spacious cell and an internet connection.

---

[3] The truncation method of punishment was suggested to me by Adam Elga.

These inequities in treatment raise an intermediate problem about punishment variation. Namely, as a statement of our actual practices, there is a great deal of variation in easily observable, objective features of our punishments that are not formalized in criminal statutes or sentencing guidelines. Such differences in treatment receive some attention, and on occasion, courts do make accommodations based on objective differences in prisoners' likely conditions of confinement.[4]

In United States v. Blarek,[5] for example, the defendants were, in the court's words, "two talented decorators whose desires to rise in the ranks of their profession while having access to unlimited funding for their creative endeavors induced them to become the facilitators, through money washing, of a ruthless and notorious Colombian drug cartel's operations."[6]   The defendants sought a downward departure from sentencing guidelines on a number of grounds, one of which was that they were more likely to be assaulted in prison because they were "homosexual lovers in a case that has been broadly publicized."[7] They were, therefore, more "vulnerab[le]" in prison and more likely to be removed from the general prison population for safety reasons. According to the court, "[t]his would amount to a sentence of almost solitary confinement, a penalty more difficult to endure than any ordinary incarceration."[8]   Notably, the court was willing to recognize that certain objective features of the defendants' situation made them differently situated than others.[9]   They were more likely to be assaulted and more likely to be placed in particularly austere prison conditions.

---

[4] The cases which follow were decided prior to the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), which increased judges' discretion under the federal sentencing guidelines. These pre-Booker cases still inform the relevant issues and would probably differ little even if decided today.  On the *Booker* line of cases generally, *see* Douglas A. Berman, *Rita, Reasoned Sentencing, and Resistance to Change*, 85 DENV. U. L. REV. 7 (2007).

[5] 7 F. Supp.2d 192 (E.D.N.Y. 1998), aff'd, U.S. v. Blarek, 166 F.3d 1202 (2d Cir. 1998).

[6] *Id.* at 195.

[7] *Id.* at 211.

[8] *Id.*

[9] Sentencing courts may depart downward to address circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b).  On this basis, a number of courts, like the court in *Blarek*, have permitted downward departures for offenders particularly vulnerable to abuse in prison. "These decisions rest on the proposition that defendants subjected to repeated physical or sexual assault are, in effect, punished more severely than others." United States v. Graham, 83 F.3d 1466, 1481 (D.C.Cir. 1996). *See* United States v. Wilke, 156 F.3d 749, 752 (7th Cir. 1998) (noting district court's decision to depart downward where possessor of child pornography claimed heightened vulnerability to abuse); Graham, 83 F.3d at 1481 (permitting extreme vulnerability to assault as a ground for departure but noting that "a defendant's vulnerability must be so extreme as to substantially affect the severity of confinement, such as where only solitary confinement can protect the defendant from

*B. The Deeper Problem of Punishment Variation*

My central focus, however, is not on this intermediate problem, as most people would agree that two prisoners who commit the same crime but are sent to radically different prison facilities are, indeed, treated unequally. Such prisoners differ both in their objective conditions of confinement as well as their subjective experiences of their circumstances.

My central concern is with what I take to be a deeper, more controversial problem of punishment variation. Namely, punishments vary in their severity based on the subjective experiences of even those punishments that appear identical to a casual observer.[10] So, for example, even if the defendants in *Blarek* were in objectively the same conditions as other prisoners, as interior designers who seem to care quite a bit about their aesthetic surroundings, it is possible that they would have a more difficult time coping in prison than others. Such differences are generally not accommodated in the criminal justice system, at least not in any formal way that is open to public scrutiny.

Claustrophobes present a much more compelling case for taking account of punishment experience. Claustrophobia is a kind of anxiety disorder[11] associated with an irrational fear of enclosed spaces.[12] Claustrophobes experience distress, often including panic attacks, arising from fears of entrapment and suffocation.[13] While estimates vary, about 4% of people will develop clinical claustrophobia during their lifetimes.[14] Symptoms are often triggered by a wide variety of enclosed spaces, such as

---

abuse"); United States v. Lara  905 F.2d 599, 601, 605 (2d Cir. 1990) (affirming a downward departure based on defendant's likelihood of victimization given his "diminutive size, immature appearance and bisexual orientation").

[10] I use the expression, "subjective experience," in a very broad sense, such that what matters about subjective experience might include not only moment-to-moment psychological states like pleasure or fulfillment but also more complicated experiences that involve evaluations of past and future states. For a discussion of some of the relevant complexities, see Mark Kelman, *Hedonic Psychology and the Ambiguities of "Welfare"*, 33 PHIL. & PUB. AFF. 391 (2005). I also leave aside discussion of the death penalty and whether capital punishment can or should be understood as a deprivation of positive subjective experiences.

[11] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 429, 443-50 (4th ed. text rev. 2000). In particular, it is a "situational-type" of specific phobia. *Id.*

[12] *See* Adam S. Radomsky et al., *The Claustrophobia Questionnaire*, 15 ANXIETY DISORDERS 287, 288 (2001).

[13] Adam S. Radomsky et al., *supra* note 12, at 288.

[14] Lars-Goran Ost, *The Claustrophobia Scale: A Psychometric Evaluation*, 45 BEHAVIOUR RESEARCH & THERAPY 1053, 1053-54 (2004).

"[s]mall or locked rooms, tunnels, cellars, elevators, subway trains, and crowded places."[15]

In 1933, Thomas Parker, an unemployed former British soldier, was caught sleeping on a highway and sent to jail.[16]  Parker was so disturbed by being in jail that he fell into a "frenzy" and was ordered to enter solitary confinement.  As he was being transported to what was called the "silence cell," he frantically struggled with two guards and somehow injured himself; he died soon afterwards.[17]  Though the prison physician declared that Parker had been of sound mind and body, "Brigadier-General Edward Louis Spears . . . spoke the shocked opinion of many an Englishman when he uprose in Parliament to berate the prison [warden].  General Spears declared that Thomas Parker had unquestionably suffered from claustrophobia, the fear of confined places."[18]  The General's comment seems to imply that Parker's claustrophobia was a disabling condition for which Parker deserved special treatment.

More recently, on May 4, 2007, Paris Hilton, wealthy socialite and television personality, was sentenced to 45 days in jail for violating her probation associated with an earlier no contest plea to alcohol-related reckless driving.[19]  A friend of Hilton's said that when Hilton is in jail, she "can't breathe, her heart races and she feels like she's going to pass out."[20]  Within a few days of arriving in jail, the Los Angeles County Sheriff reassigned Hilton to home confinement due to an undisclosed medical condition (later purported to be claustrophobia).[21]  The sentencing judge was dismayed by this turn of events, believing that her release violated the terms of her sentence, which specifically provided that she not be granted work release or home electronic monitoring.[22]  Hilton was taken back into

---

[15] Adam S. Radomsky et al., *supra* note 12, at 288.

[16] *Claustrophobia*, Time Magazine, August 14, 1933, *available at* http://www.time.com/time/printout/-0,8816,745921,00.html.

[17] *Id.*

[18] *Id.*

[19] Sharon Waxman, *Celebrity Justice Cuts Both Ways for Paris Hilton*, N.Y. TIMES, June 9, 2007; Lawrence van Gelder, *Arts, Briefly*, N.Y. TIMES, Jan. 23, 2007.

[20] Tina Dirmann, *Closet Case?*, The Hum Blog, E!Online, June 9, 2007, available at http://www.eonline.com/gossip/hum/detail/index.jsp?uuid=71adcb92-4731-4b0d-9889-4158655ec581.

[21] William Booth, *Sheriff Releases Paris Hilton . . . For Now Anyhow*, WASH. POST, June 8, 2007, at C1; Susie Boniface, *Paris Illness is Claustrophobia*, SUNDAY MIRROR, Oct. 6, 2007, at 14; BANG Showbiz, *Paris Hilton Was Discharged From Prison Because of Claustrophobia*, AZCentral.com, *available at* http://www.azcentral.com/ent/celeb/articles/0628parishilton0628phobia-CR.html (stating that, according to Hilton, doctors observing her in jail said she "was having severe anxiety, panic attacks, claustrophobia").

[22] Associated Press, *Prosecutor, Judge Object to Hilton's Early Release*, USA TODAY, *available at* http://www.usatoday.com/life/people/2007-06-07-paris-prosecutor_N.htm.

custody, where she was briefly placed in a medical facility before returning to the jail where she was previously incarcerated.[23]

    Thomas Parker and Paris Hilton are real-life versions of Sensitive. Both Parker and Hilton received short sentences of incarceration, yet the facts suggest that they experienced their sentences as practically unbearable. Parker, due to his claustrophobia, and Hilton, due to claustrophobia or the fact that she is used to living in luxurious surroundings, experienced confinement in a much more frightened and tormented way than would the average person (or so we may assume).  Only rarely are courts sympathetic to claims that an offender should receive a shorter sentence due to claustrophobia.[24]    Similarly, given the limited resources available for

---

[23] Scott Michels, *Hilton Transferred From Jail Medical Ward*, ABC News, June 14, 2007, *available at* http://abcnews.go.com/TheLaw/story?id=3278824.

[24] I have not found a single case where a judge has mitigated a defendant's sentence solely due to claustrophobia. In United States v. LiButti, however, a federal district court judge departed downward from established federal sentencing guidelines due to a variety of factors, one of which was the defendant's claustrophobia. 1994 WL 774647, *1 (D.N.J. 1994). Also, in United States v. Farley, a former air force officer was convicted of "a single wrongful use of marijuana," and requested a non-custodial sentence because of her documented history of claustrophobia. 1995 WL 261943, *1 (A.F.Ct. Crim. App. 1995). She did, in fact, receive a non-custodial sentence, though it is not clear whether it was granted because of her claustrophobia or for other reasons, like her acceptance of responsibility or her expressions of regret. *Id.*

In many more cases, judges have denied defendants' requests for special treatment due to claustrophobia.  In *Goetsch v. Berge*, Goetsch challenged the conditions of his confinement under § 1983 and the Eighth Amendment, claiming that prison officials failed to adequately address his claustrophobia. 3 Fed. Appx. 551 (7th Cir. 2001) (unpublished opinion).  To make out the claim, he had to allege: (1) "that there was an objectively serious danger that posed a substantial risk of serious harm to his health or safety" and (2) "that the prison officials were deliberately indifferent to the risk." *Id.* at 553. The court doubted that his claustrophobia satisfied the first requirement.  Importantly, the court stated, "Goetsch has not cited, and we could not find, any cases holding that placing an individual with claustrophobia in such a cell creates an objectively serious danger, and given that confinement of prisoners in cells of limited size is inherent in imprisonment, we are hesitant to make such a finding outside of an extreme case." *Id.*  More decisively, however, Goetsch failed to satisfy the second prong:

> Goetsch needed to allege recklessness on the part of the defendants, not mere negligence or poor judgment. . . . Goetsch asserted merely that he told [a prison crisis worker and a prison doctor] that he was suffering from feelings of claustrophobia and that he wanted to be moved to a bigger cell. He does not allege that he told these defendants that he was clinically diagnosed with claustrophobia, nor that he complained to either of the defendants more than once. *Once again, given the small size of cells in prisons, we fail to see how a prison official's refusal to transfer a prisoner in response to one complaint of feelings of claustrophobia suggests deliberate indifference.*

3 Fed. Appx. 551, 553 (7th Cir. 2001) (unpublished opinion) (emphasis added).  The court also denied his claim because a prison doctor did order that a window in Goetsch's cell be

prisoner mental health treatment, prison bureaucrats are likely very hesitant to provide claustrophobes with special accommodations for any length of time.[25] And even if we occasionally calibrate treatment of bona fide claustrophobes, there seem to be no theoretical grounds for calibrating their treatment but not the treatment of those with symptoms that fall just short of the clinical requirements for the disorder. The distress of confinement in small spaces surely extends along a spectrum.

The highly influential United States Sentencing Guidelines ("USSG") specifically instruct judges not to depart downward from the guidelines based on a number of factors that likely correlate with offenders' experiences in prison. For example, the very process of calibrating punishment with subjective experience seems to be discouraged by a USSG policy which states that, unless mental or emotional conditions affect offenders' culpability, they "are not ordinarily relevant in determining whether a departure is warranted."[26] This policy discourages all sorts of data about an offender's likely experience of punishment from being used to justify a downward departure. Similarly, though particularly small or meek offenders may feel more frightened in prison, "[p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted."[27] Moreover, although the suffering

---

opened, a step which helped to ameliorate his condition. *Id.* at 552. *See also* United States v. Kwong, 877 F. Supp. 96, 103 (E.D.N.Y. 1995) (stating that even if the court accepted the defendant's claim that his claustrophobia will recur, "no reason has been given by the defendant to indicate why this condition should be considered extraordinary" enough to warrant a downward departure from sentencing guidelines); State v. Guiendon, 113 N.J.Super. 361 (1971) (denying defendant's claim that 90 days' imprisonment was cruel and unusual punishment in light of his asserted claustrophobia because the court doubted the veracity of his assertion).

[25] The federal Bureau of Prisons states, "To ensure *consistent treatment* throughout the system, each institution shall develop a comprehensive approach for managing mentally ill inmates which emphasizes the management of these cases *in a regular correctional setting, rather than in a hospitalized setting, as the preferred treatment strategy whenever and wherever feasible.*" United States Department of Justice, Federal Bureau of Prisons, Program Statement 5310.13 (1995), *available at* http://www.bop.gov/policy/progstat/5310_013.pdf (emphasis added). Apparently, the Bureau construes the "consistent treatment" requirement in objective rather than subjective terms.

[26] U.S.S.G. § 5H1.3 (2007) ("Mental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted, except as provided in Chapter Five, Part K, Subpart 2 (Other Grounds for Departure)."). The other grounds for departure most likely to relate to mental and emotional conditions are for a "diminished capacity" that "contributed substantially to the commission of the offense." U.S.S.G. § 5K2.13 (2007).

[27] U.S.S.G. § 5H1.3 (2007). "However, an extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." *Id.* *See, e.g.,* United States v. Rabins, 63 F.3d 721, 728-29 (8th Cir. 1995) (holding that even if the defendant

an offender experiences in prison likely varies with age, "[a]ge (including youth) is not ordinarily relevant in determining whether a departure is warranted."[28]

Of course, defendants may still present evidence that prison will be uniquely difficult for them.[29] And even if judges are loathe to accept such

---

were eligible for a downward departure for an extraordinary physical impairment, it was not clearly erroneous for the district court to determine that defendant's HIV positive status failed to qualify); United States v. Johnson, 318 F.3d 821, 826 (8th Cir. 2003) (reversing the district court's decision to depart downward on the basis of the defendant's coronary condition). While courts sometimes discuss this requirement in terms of the "hardship" presented by a physical impairment, Rabins, 63 F.3d at 729, courts often do their best to objectivize the requirement by focusing on medical resources available in prison and the effect of incarceration on the inmate's lifespan. *See* United States v. Albarran, 233 F.3d 972, 979 (7th Cir. 2000) ("[W]hen considering a departure based upon a physical impairment," the district court "must ascertain, through competent medical testimony, that the defendant needs constant medical care, or that the care he does need will not be available to him should he be incarcerated.") (quoting United States v. Sherman, 53 F.3d 782, 787 (7th Cir.1995)); United States v. Krilich, 257 F.3d 689, 693 (7th Cir. 2001) ("An ailment also might usefully be called 'extraordinary' if it is substantially more dangerous for prisoners than non-prisoners. Then imprisonment would shorten the defendant's life span, making a given term a more harsh punishment than the same term for a healthy person.").

[28] U.S.S.G. § 5H1.1 (2007). "Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." *Id.*

[29] Consider, for example, the case of the so-called "30-year-old Virgin." Douglas Berman, *Judge Posner and Sentencing the 30-year-old Virgin*, Sentencing Law & Policy Blog (Jan. 10, 2008). In that case, United States v. McIlrath, __ F.3d __, 2008 WL 90084 (7th Cir. 2008), the defendant was convicted of traveling across state lines to have sex with a minor (actually a police detective pretending to be a 15-year-old girl). Evidence was also presented that the defendant had, on another occasion, "persuaded a 12-year-old girl to agree to have sex with him, although apparently they never did." The defendant's 46-month prison sentence was at the bottom of the applicable guideline range, but the defendant claimed it should have been lower still.

Notably, a forensic psychologist "opined that prison would be devastating for the defendant; he 'would have almost no resources for coping with prison life' and would be a 'target for predators.'" Some of the evidence for the claim that the defendant had poor coping skills seems to have been that the 31-year-old "was a loner who had not had sex until the previous year, with a woman who then rejected him, breaking his heart and (he claimed) precipitating the incidents with the 12- and (supposed) 15-year-old girls."

Nevertheless, the sentencing judge refused to reduce the sentence, and the Seventh Circuit affirmed. Judge Richard Posner, writing for the panel, acknowledged that "[t]he defendant's history and characteristics were relevant in possibly suggesting both that imprisonment would be a more severe punishment for him than for the average Internet sexual predator." However, he added, "[a]s far as we know or the defendant's lawyer or psychologist attempted to show, the average man who trolls for young girls in Internet chat rooms is no better adjusted than the defendant." Furthermore, "[t]he guidelines sentencing ranges are designed with reference to the average offender in each crime category to which a given range applies. So if a particular defendant is average, his case for a sentence below

arguments explicitly, they may surreptitiously calibrate punishments at sentencing.[30] Judges typically have discretion to impose a sentence within certain boundaries, and they may consciously or unconsciously use that discretion to adjust a sentence based on the subjective experience of punishment that they anticipate an offender will have. Yet, even if they do, we might well be troubled by judges who use their discretion to make such determinations, particularly when our current regime offers no rules to guide these assessments and no record of them to subsequently present for appellate review.

Courts also have rather limited control over the kinds of facilities to which inmates are assigned. Sentencing decisions are usually made by judges while decisions about conditions of incarceration are usually made by prison bureaucrats (under conditions that are generally less open, accountable, and reviewable than they are in the courtroom).[31] Judges can recommend prison assignments, but at least in the federal system, the Bureau of Prisons is under no obligation to follow the recommendation. By giving primary responsibility for sentencing decisions to judges and primary responsibility for decisions about conditions of confinement to prison bureaucrats, we dramatically limit opportunities to calibrate punishments.[32]

While judges can generally make good inferences at sentencing about the likely conditions of confinement that an offender will face, these

---

the range is weak. As far as the record (or our independent research) discloses, the psychological characteristics of our defendant are average for Internet sexual predators." (citations omitted). Thus, even though this defendant failed to obtain a downward departure using a "subjective experience defense," the reasoning in the opinion suggests that such arguments can be publicly made and, perhaps, accepted.

[30] In detailed interviews with over fifty federal judges from the 1980s, many judges expressed the belief that indictment and incarceration have differentially severe impact on white collar criminals. *See* STANTON WHEELER ET AL., SITTING IN JUDGMENT: THE SENTENCING OF WHITE COLLAR CRIMINALS 144-150 (1988) ("The consensus among judges is that the suffering inflicted by the criminal process is an important factor in the sentencing calculation."). Often the differences were expressed in objective terms (e.g., the white collar criminal can no longer practice his former profession), while sometimes, differences were expressed in more subjective terms (e.g., the white collar criminal is likely to experience higher levels of shame). *Id.* at 146-50. Given the increasing severity of white-collar criminals in recent years, one suspects that judges today would be less likely to express these views today. *See* Ellen Podgor, *The Challenge of White Collar Sentencing*, 97 J. CRIM. L. & CRIMINOLOGY 731 (2007) (criticizing the trend toward longer sentences for white collar criminals).

[31] *See* 18 U.S.C. § 3621(b).

[32] An unusual bit of overlap between the prison system and the sentencing process is permitted by 18 U.S.C. § 3582(c)(1), which states that, under certain circumstances, the director of the Federal Bureau of Prisons can move a sentencing court to reduce a term of imprisonment that has already been imposed. *See* 18 U.S.C. § 3582(c)(1); United States v. Rabins, 63 F.3d 721, 729 n.15 (8th Cir. 1995) (noting that if the defendant's illness progresses, the director of the Bureau of Prisons can seek a sentence reduction).

inferences are sometimes wrong, and offenders bear the brunt of these mistakes. Some jurisdictions have parole boards that are empowered to release prisoners early under certain circumstances,[33] providing an opportunity to correct punishments that are experienced in excessively severe ways. In fact, it is possible that parole boards do adjust sentences based on perceptions of inmates' actual punishment experiences. As a formal matter, however, parole release criteria focus on considerations of public safety, not punishment experience.[34] Thus, if parole boards do calibrate, like judges, they do so surreptitiously and in a manner that is unguided by publicly-disseminated rules.

## PART II: OUR THEORETICAL COMMITMENTS

### A. Retributivism

Retributive theories of punishment hold that offenders *deserve* to suffer for their crimes.[35] On this view, we are either permitted or, according to some theorists, required to punish offenders in accordance with

---

[33] On parole generally, see Frank O. Bowman III & Michael Heise, *Quiet Rebellion? Explaining Nearly a Decade of Declining Federal Drug Sentences*, 86 IOWA L. REV. 1043, 1051-52, n.18-21 (2001).

[34] *See, e.g.*, Cal. Penal Code § 3041(a) (West 2005) (stating that, in addition to other requirements, parole "release date[s] shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public"); Texas Board of Pardons and Paroles, Revised Parole Guidelines, *available at* http://www.tdcj.state.tx.us/bpp/new_parole_guidelines/new_parole_guidelines.html (presenting the Texas parole point system that seeks to determine the risk level associated with offender release).

[35] *See, e.g.*, JOHN KLEINIG, PUNISHMENT AND DESERT 67 (1973) ( "The principle that the wrongdoer deserves to suffer seems to accord with our deepest intuitions concerning justice."); A.M. Quinton, *On Punishment*, 14 ANALYSIS 133, 137 (1954) (stating that "punishment is infliction of suffering on the guilty"); John Rawls, *Two Concepts of Rules*, 44 PHIL. REV. 3, 4-5 (1955) (describing retributivists as holding that "[i]t is morally fitting that a person who does wrong should suffer in proportion to his wrongdoing. That a criminal should be punished follows from his guilt, and the severity of the appropriate punishment depends on the depravity of his act. The state of affairs where a wrongdoer suffers punishment is morally better than the state of affairs where he does not; and it is better irrespective of any of the consequences of punishing him."). Some retributivists focus on deserved *suffering*, while others focus on deserved *punishment*. *See, e.g.*, Douglas Husak, *Retribution in Criminal Theory*, 37 SAN DIEGO L. REV. 959, 972 (2000) ("If I am correct, our retributive beliefs only require that culpable wrongdoers be given their just deserts by being made to suffer (or to receive a hardship or deprivation). These beliefs do not require that culpable wrongdoers be given their just deserts by being made to suffer by the state through the imposition of punishment."); LEO ZAIBERT, PUNISHMENT AND RETRIBUTION 214 (2006) ("To be a retributivist is to recognize that deserved *punishment* is an intrinsic good.") (emphasis added).

their "just deserts."[36]  Most retributivists also subscribe to a principle of proportionality,[37] whereby appropriate punishment severity increases with the seriousness of the pertinent offense.[38]  Thus, appropriate punishment severity generally escalates respectively for petty theft, aggravated assault, rape, and murder.

Precisely what sort of suffering offenders deserve can vary among retributivists.  One could hold a straightforward view that offenders should be made to suffer in experiential ways; they should feel physical and emotional pain and distress.  Alternatively, one could attempt a more objective understanding of suffering, largely identifying appropriate punishment with deprivations of liberty while still recognizing experiential distress as a form of retributive suffering.  To be free of the calibration requirement, however, one must adopt a thoroughgoing objective account of retributive suffering, a view that I argue is very unappealing.

(1) Experiential-Suffering Retributivism

When we speak of people suffering, we ordinarily refer to their negative experiential states, like pain, distress, discomfort, anxiety, and

---

[36] *See* MICHAEL MOORE, PLACING BLAME 79 (1997) ("Of the possible functions for criminal law, only the achievement of retributive justice is its actual function.  Punishing those who deserve it is good and is the distinctive good that gives the essence, and defines the borders, of criminal law as an area of law.").  Some theorists distinguish "mandatory" retributivists who believe that we are *required* to punish in accordance with offenders' desert from "permissive" retributivists who believe that we are permitted but not required to punish in accordance with desert.  JOHN BRAITHWAITE & PHILIP PETTIT, NOT JUST DESERTS: A REPUBLICAN THEORY OF CRIMINAL JUSTICE __ (1990).  *Compare* Herbert Fingarette, *Punishment and Suffering*, 50 PROC. & ADDRESSES OF THE AM. PHIL. ASS'N 499, 499 (1977) ("I would like to expound a retributivist view of punishment - one that shows why the law must punish lawbreakers, must make them suffer, in a way fitting to the crime.") *with* J. Angelo Corlett, *Making Sense of Retributivism*, 76 PHILOSOPHY 77, 78 ("[S]ometimes the guilty need not be punished at all, or may be punished at a level significantly lower than proportionality dictates.").

[37] *See* RYBERG, *supra* note 1, at 5 (2004) ("Sometimes proportionalism is even presented as a necessary condition for the classification of a theory as retributivist."); *see also* Husak, *supra* note 1, at 82.

[38] Retributivists vary over how we ought to determine the seriousness of an offense.  Some focus exclusively on the culpability of the offender, while some also consider unforeseen harms caused by his offense.  Some consider an offender's prior good or bad acts as relevant to desert, while others do not.  These distinctions will not matter here.  Interestingly, our judgments of criminal *blameworthiness* also tend to be objective in sometimes puzzling ways.  For example, we might punish assault more harshly than the theft of heirloom jewelry, even if the crime victim would prefer to be assaulted than to have his heirlooms stolen.  *See* LEO KATZ, ILL-GOTTEN GAINS: EVASION, BLACKMAIL, FRAUD, AND KINDRED PUZZLES OF THE LAW 145-157 (1996).

boredom.[39] If offenders deserve experiential suffering, then it is easy to see why retributivists must attend to our subjective experiences when assessing punishment severity.    When Sensitive and Insensitive spend the same amount of time in prison, Sensitive experiences more distress than Insensitive.    Therefore, Sensitive and Insensitive are punished unequally under this view.

The problem can also be formulated without reference to concerns about equality.    Not only are they punished unequally, they are also punished incorrectly according to the experiential-suffering retributivist. Sensitive and Insensitive committed the same offense.    Assuming that we should punish offenders in proportion to the seriousness of their offenses, failing to consider their subjective experiences of distress means that we are inappropriately punishing at least one of them.[40]

The notion that retributive punishment requires calibration comes more naturally to us in the context of corporal punishment, a practice that used to be widespread but has largely, though not entirely, fallen out of favor.[41]    If one contemplates corporal punishment, one likely thinks that the

---

[39] K.G. Armstrong, *The Retributivist Hits Back*, 70 MIND 471, 478 (1961) (stating that, according to retributivists, "[p]unishment is the infliction of pain"); NILS CHRISTIE, LIMITS TO PAIN 1 (1981) ("[I]mposing punishment within the institution of law means the inflicting of pain, intended as pain."). Christie elaborates: "The receiving institutions do not like to be regarded or to regard themselves, as 'pain-inflicting' institutions. Still, such a terminology would actually present a very precise message: punishment as administered by the penal law system is the conscious inflicting of pain. Those who are punished are supposed to suffer. . . . It is intended within penal institutions that those at the receiving end shall get something that makes them unhappy, something that hurts." *Id.* at 4.

[40] Permissive retributivists, who take the principle of proportionality to provide a cap on punishment, are subject to the equality concern but not the inconsistency concern.    To avoid inconsistency, such retributivists need only be sure that Sensitive's experience of punishment is below the maximum level permitted by a principle of proportionality. Permissive retributivists, however, cannot account for our common intuition that more serious crimes should be punished more severely than less serious crimes, unless, as is typical, they subscribe to a hybrid theory of punishment that incorporates consequentialist reasons for calibrating punishment. I describe these consequentialist reasons in section I.B.

[41] For example, a Saudi woman who was abducted and raped by seven men was recently sentenced to 200 lashes for violating the country's sex segregation laws by being with an unrelated male just prior to the abduction. Associated Press, *Saudis Defend Punishment for Rape Victim*, Nov.    21,    2007,    *available    at* http://news.yahoo.com/s/ap/20071121/ap_on_re_mi_ea/saudi_rape_2.        She    was subsequently pardoned by the Saudi king, presumably before the punishment was inflicted. *See* Abdullah Shihri, *Saudi King Pardons Rape Victim*, WASH.P OST (AP Story), Dec. 17, 2007; *see also* Lynda Polgreen, *Nigeria Turns from Harsher Side of Islamic Law*, N.Y. TIMES, at A1, Dec. 1, 2007 (describing recent practices of stoning and amputation in Nigeria); Leslie Kaufman, *Parents Defend School's Use of Shock Therapy*, NY TIMES, Dec. 25, 2007 (describing the electric shock "therapy" used at a Massachusetts school that is intended to help socialize students with severe mental and emotional disorders).

severity of corporal punishments should be graded according to the experience the offender has when punishment is inflicted rather than some independent standard that attaches only to the punishment in the abstract. For example, suppose some community punishes people with painful electric shocks of variable voltage. Suppose too that the pain of a shock at a particular voltage is largely a function of the weight of the offender. People who weigh 100lbs feel far more pain at a given voltage than do people who weigh 300lbs. Should a retributivist committed to proportionality punish all people who commit the same crime at the same voltage? Of course not. In order to punish people *equally* for committing the same crime, they must be punished at *different* voltages.

When we move from corporal punishment to incarcerative punishment, less changes than meets the eye. True, incarceration principally inflicts emotional distress rather than physical distress. But incarceration is also a punishment "of the body" in the very broad sense that it imposes negative experiences on actual human bodies. So, in an important respect, all of our punishments are corporal punishments.[42] Or, if you prefer, all of our punishments are punishments of the mind, since that's ultimately where we feel punishment. Indeed, some kinds of purely emotional distress are more severe than some kinds of physical distress. A prisoner incarcerated for life has written, seemingly without hyperbole, that he would cut off his right arm just to be able to hug his mother again.[43] There is no obvious reason to calibrate punishments of physical distress but not punishments of emotional distress.[44]

---

Compare GRAEME NEWMAN, JUST AND PAINFUL (2d ed., 1995) (supporting the use of electric shocks in lieu of incarcerative punishment) *with* DAVID GARLAND, PUNISHMENT AND MODERN SOCIETY 241-47 (1990) (arguing that, despite some seemingly plausible arguments in favor of corporal punishment, such punishments violate modern sensibilities).

[42] Corporal punishment is illustratively blended with punishment that restricts liberty in Weems v. United States, 217 U.S. 349 (1910). Weems was convicted of falsifying an official document and was sentenced by authorities in the Philippines to, *inter alia*, at least twelve years of "cadena temporal," requiring offenders to be imprisoned in chains and to labor for the state. *Id.* at 364. The Supreme Court held that the punishment was disproportionate to the crime and thereby violated the Eight Amendment prohibition on cruel and unusual punishment. *Id.* at 375-82. A number of commentators have focused their analysis of the case on the physical aspect of Weems' punishment. *See, e.g.*, Leonard P. Edwards, *Corporal Punishment and the Legal System*, 36 SANTA CLARA L. REV. 983, 1017 (1996). Yet, the wearing of chains is both a corporal punishment and a deprivation of liberty. Modern incarceration also imposes both distress and deprivation, just less graphically than does the punishment of cadena temporal.

[43] *See* Adam Liptak, *Behind Bars, He Turns M&M's Into an Art Form*, N.Y. TIMES, July 21, 2006 (quoting prison artist Donny Johnson).

[44] Of course, there may be difficult questions about how to compare and aggregate different kinds of suffering. For example, one inmate may find his surroundings emotionally distressful, while another finds the same surroundings distressful but also derives a sort of

## (2) Loss-of-Liberty Retributivism

Other retributivists focus less on the subjective experience of suffering and more on certain deprivations that we impose on offenders in a more objective sense. In a relatively common formulation, offenders deserve, not the experience of suffering, but rather deprivations of liberty.[45] On this view, incarcerated criminals deserve to lose certain rights of citizenship (like their rights to vote, to associate, and to move about freely) because of their prior criminal behavior. At first glance, it might seem like loss-of-liberty retributivists are not committed to the belief that subjective experience is an essential factor in measuring punishment severity. Rather, they might suggest, punishment severity is a function of the degree to which we deprive offenders of their liberty.

Yet, in order to fill in the details about why loss of liberty constitutes punishment, we soon recognize the importance of considering the offender's *subjective experience of the lost liberty.* I argue that loss-of-liberty retributivists cannot provide an appealing account of punishment without taking subjective experience into consideration. Thus, loss-of-liberty retributivists face the same problems as experiential-suffering retributivists. I defend this claim by arguing that: (1) a person cannot be punished by a loss of liberty without subjective awareness of the loss of liberty, (2) we must attend to subjective experience in order to determine which losses of liberty constitute punishments, and (3) offenders will experience losses of liberty quite differently from each other, such that one must consider the subjective experience of a loss of liberty or else one's

---

spiritual or higher-order pleasure out of his penance. Such cases may require experiential-suffering retributivists to flesh out more of the details of their theory. *Cf.* Steven Tudor, *Accepting One's Punishment as Meaningful Suffering*, 20 LAW & PHIL. 581, 589 ("In compassion and remorse as modes of meaningful suffering, the suffering are 'in themselves' 'unwelcome', but no one who lucidly grasped their proper objects in experiencing such sufferings would simply wish the suffering be gone."). {Perhaps insert masochism discussion: Distinguish between masochists who enjoy what are traditionally considered punishments versus masochists who enjoy punishment in the abstract. The former are probably easier to punish than the latter.}

[45] *See, e.g.,* David Dolinko, *Retributivism, Consequentialism, and the Intrinsic Good of Punishment*, 16 LAW & PHIL. 507, 508 (1997) ("Criminal punishment involves the infliction on the offender of deprivations, restrictions, and disabilities whose imposition would in other contexts be morally improper and illegitimate."). Some have described losses of liberty as a kind of suffering. *See* Tudor, *supra* note 44, at 583 ("I take it to be uncontroversial that punishment, by definition, involves suffering (whether 'positively' through the imposition of something unpleasant or 'negatively' through the deprivation of something valued).).")

punishment system will favor objectively-defined punishments over subjectively-defined punishments for reasons that seem quite arbitrary.

### a. Unknowing Arrestee

First, in order to be punished in a manner recognized by retributivists, the recipient must be aware of the punishment. Consider the case of Unknowing Arrestee, who is convicted of some crime and sentenced to a week of house arrest. When his sentence commences a month later, let us assume, his front door is barricaded and a guard stands watch to make sure he does not leave his house. Due to a miscommunication between Unknowing Arrestee and his attorney, however, Unknowing Arrestee is unaware that he was sentenced and that his sentence has begun. In fact, over the course of the week, Unknowing Arrestee decides to stay in his house and never discovers that he was locked-in. Under such circumstances, most will agree that Unknowing Arrestee has not truly been punished in a retributive sense. If he subsequently discovers that he had been confined and he suffers ongoing stigma for having been so, he may be punished by the ongoing stigma. He has not, however, been subjected to retributive punishment until he becomes aware of the house arrest, and he is never subject to custodial punishment.[46]

### b. Selecting Liberties to Lose

Second, one must consider subjective responses to punishment when deciding *which* liberty deprivations to use as punishment. Depriving opera-haters of the right to listen to opera *does* restrict their liberties. It does not, however, constitute punishment. The kinds of liberty deprivations that can constitute punishments must be deprivations that the offender finds aversive.

In the O. Henry short story, "The Cop and the Anthem," the protagonist deliberately violates the law in order to be fed and sheltered

---

[46] In the context of the false imprisonment tort, there is virtually universal agreement that the plaintiff must have been aware of the restriction on his liberty. Restatement (Second) Torts, § 42; *see also* Note, 68 U. PA. L. REV. 360, 361 (1920) ("It is a contradiction in terms to say that a man is restrained of his liberty to move as he wills, when in fact he is permitted to move in the direction in which he desires to go, though had he attempted to move in any other way he would have been prevented. There is, properly speaking, no restraint of liberty without submission of the will . . . ."). *But cf.* Prosser & Keeton on Torts, *False Imprisonment*, § 11 at 48 (1984) (suggesting that the position of the Restatement (Second) of Torts is "unduly restrictive," where, for example, a baby is locked in a bank vault and suffers physical illness or death as a result). {Consider also cases where a defendant falls into a coma that lasts the duration of his entire sentence.}

upon capture. Even though his liberty will be restricted when caught, he is not retributively punished when he is subsequently imprisoned,[47] nor are his real life counterparts.[48]   It is simply implausible that a person can be criminally culpable and *thereby deserve* to receive treatment that the offender affirmatively desires.

### c. Avoiding Arbitrariness

Third, punishing by loss of liberty is arbitrary unless one recognizes the different ways that people can experience objectively-identical losses of liberty. For example, confinement in a cell of 25 square feet is objectively a more severe deprivation of the freedom to move about than is confinement in a cell of 50 square feet.   But what if Borderline Claustrophobe experiences confinement in a 50 square foot cell in the same way that Insensitive experiences confinement in a 25 square foot cell? If Borderline Claustrophobe and Insensitive are each placed in 50 square feet cells, they are not punished equally.  Borderline Claustrophobe will experience a much more severe deprivation than Insensitive will.  True, they will both have the same amount of space in which to pace in objective terms.  But restricting our space in which to move only constitutes punishment because we like to have such space.   Thus, purely objective assessments of punishment severity rely on arbitrary features of the physical world, like square feet and voltages.  Square feet and voltages are rough proxies for things that actually matter from a retributivist perspective.  They do not, however, have intrinsic significance.

To make the point more vivid, imagine that two people commit the same crime and that one is 8 feet tall and the other is 4 feet tall.  Putting them into the same tiny prison cell seems rather unfair.  Now suppose that Sensitive and Insensitive are the same height but that Sensitive experiences life in a prison cell as would an 8 foot person of average sensitivity, while Insensitive experiences life in a cell as would a 4 foot person of average sensitivity.  If actual height differences can demonstrate differential liberty deprivations, then so can perceptual differences that track everything that

---

[47] O. Henry, *The Cop and the Anthem*, in THE RANSOM OF RED CHIEF AND OTHER O. HENRY STORIES FOR BOYS 143 (ed. Franklin J. Mathiews 1918).

[48] *See* Kristen Wyatt, *Faced With Debt, Georgia Man Shot Postal Worker in Apparent Bid to Go to Prison*, Associated Press, July 14, 2005; Associated Press, *Jobless Man Asks Judge for Jail Time*, Oct. 12, 2006.  Former Assistant U.S. Attorney Stanley Alpert recounts the following comments by one of his captors during his 1998 kidnapping: "I don't care," Sen continued musing. He was philosophical. "Prison ain't so bad. The way I look at it, life is about living.  You alive, you living, that's it.  It don't matter much whether you're out here or inside, either way you are alive.  Prison ain't shit."  STANLEY N. ALPERT, THE BIRTHDAY PARTY: A MEMOIR OF SURVIVAL 60 (2007).

matters about actual height differences. Failing to consider the subjective experience of a loss of liberty makes one's punishment practices arbitrary. Therefore, even retributivists who focus on deprivations of liberty are still committed to some form of subjective experience calibration.

Is it possible to develop a purely objective account of loss-of-liberty retributivism that is non-arbitrary? I doubt that it is. Suppose we say that there are certain objectively-defined activities that one can do in a large space that one cannot do in a small space (like trace the contours of a regulation baseball diamond). While true, there are also activities that one can do in a small space but not a large one (like climb up one's cell by pressing one's legs against parallel cell walls). How do we decide which liberty deprivation is more severe? These intentionally odd examples illustrate that we cannot determine the value of a particular freedom without knowing how that freedom affects the life experiences of human beings. And even if we know how the activities affect a typical person, the objectivist will have to explain why we should apply an analysis developed for typical people to some actual human being about to be punished. Of course, our ability to calibrate will be limited for pragmatic reasons. But it is better to recognize the practical, ever-changing limitations on our ability to measure subjective experiences as contingent features of early twenty-first century living rather than to build these limitations into our theory of what punishment is really all about.

## (3) Expressive Features of Retributivism

Some punishment theorists claim that criminals deserve varying degrees of shame or other forms of community disapproval. According to Joel Feinberg, punishment is, in part, "a symbolic way of getting back at the criminal, of expressing a kind of vindictive resentment. . . . Not only does the [incarcerated] criminal feel the naked hostility of his guards and the outside world—that would be fierce enough—but that hostility is self-righteous as well. His punishment bears the aspect of legitimized vengefulness."[49]

Expressivists can focus on the symbolic significance of condemnatory messages in a variety of ways: as the messages are understood by offenders, by society in general, or by some combination of both of these. Yet, so long as expressivists recognize a proportionality requirement, they cannot avoid the implication that their theory requires them to consider punishment experience when evaluating punishment severity. If the severity of punishment depends on the message as understood by offenders, then it is easy to see why offenders' experience of

---

[49] Joel Feinberg, *The Expressive Function of Punishment*, 49 THE MONIST 397 (1965).

punishment matters. Those punished by disapproval are not successfully punished unless they are at least aware of their community's disapproval. Furthermore, the extent to which they are punished will vary based on their different reactions to expressions of disapproval. Some are prone to react strongly to feelings of shame, while others are not.

Suppose instead that an expressivist takes an entirely objective view of punishment, claiming that punishment consists in societal messages of disapproval, even where, implausibly on my view, the offender is entirely unmoved by the message or is never even told about it.[50] Such a view will suffer from the concerns that I raised in the last section that apply to any purely objective account of suffering. Namely, we are unlikely to think that an offender can get what he deserves by being punished without awareness of it or aversion to it. Moreover, he cannot be punished at the level that *he* deserves by setting punishment levels based on characteristics of typical people.

Expressivist accounts that are entirely objective have a further difficulty: we cannot evaluate the severity of a communal expression of disapproval unless we know how the offender will experience the punishment. For example, suppose that an offender is sentenced to truncation. Is that a very severe condemnation or a very light one? Unless we know more about the circumstances under which the punishment is imposed, the societal condemnation expressed by truncation is quite unclear. We can only gain more clarity by filling in relevant details about the offender's experience of the punishment (that is, by calibrating the punishment). Thus, it seems that society more severely condemns Sensitive than Insensitive when Sensitive is locked up for the same term as Insensitive. True, people may not investigate the more detailed facts about an objectively-defined punishment so as to know its true severity. But surely an offender cannot be said to deserve the vague punishment given by ill-informed societal condemnation any more than an innocent person deserves the culpability judgment of an ill-informed factfinder.

Many expressivist theories of punishment are better classified as consequentialist rather than retributivist.[51] From a consequentialist perspective, there may be reasons to take account of the meaning people ascribe to punishments, even when that meaning seems hard to defend

---

[50] *See, e.g.*, Jean Hampton, *The Retributive Idea*, 130 *in* JEFFRIE MURPHY & JEAN HAMPTON, FORGIVENESS AND MERCY (1988) (stating that retributivists should punish "even in a situation where neither the wrongdoer nor society will either listen to or believe the [condemnatory message], and where the victim doesn't need to hear (or will not believe) that message").

[51] Braithwaite & Pettit, *supra* note 36, at 48; MOORE, *supra* note 36, at 90.