under careful scrutiny.[52]  But even if consequentialists take account of the actual meaning people ascribe to incarceration, flawed as it may be, they cannot do so to the exclusion of the many subjective-experience-dependent consequences that I will identify in section I.B.  Furthermore, where widely-held societal beliefs promote insensitivity to suffering (e.g., racism, sexism), we generally seek to change those underlying beliefs rather than enshrine them in official policies.

(4) The "Forewarned is Forearmed" Response

Some retributivists might respond to charges of inequity, inconsistency, and arbitrariness as follows: True, Sensitive and Insensitive receive different punishments from a subjective perspective. But each knew or could anticipate his experience in prison, and each decided to commit the crime anyhow.   Sensitive should not be able to complain about his punishment because he could have anticipated what it would be like.

There are two problems with this response. First, people tend to be rather poor predictors of their future affective responses.[53]  So, it is not at all clear how accurate people are at assessing their own sensitivity before offending.   Second, even if we were excellent predictors of our own sensitivity, we generally think it unfair to give people different sentences for the same crime, even if they have accurate advance notice.  Recall the punishment of truncation, where afterward, some are unharmed, some are dangerously sliced, and some are decapitated.   Giving people advance notice that they will be truncated for some offense only partly alleviates the unfairness of the punishment.[54]

To take a real world example, many have criticized federal sentencing policies for punishing crack cocaine crimes much more harshly than powder cocaine crimes.   In fact, the United States Sentencing Commission has recently revised its policies to modestly reduce the

---

[52] *Cf.* Dan M. Kahan, *What Do Alternative Sanctions Mean?*, 63 U. CHI. L. REV. 591 (1996) (arguing that theorists ought to take seriously people's beliefs about the expressive nature of different forms of punishments).

[53] *See* George Loewenstein & David Schkade, *Wouldn't It Be Nice? Predicting Future Feelings*, in WELL-BEING: THE FOUNDATIONS OF HEDONIC PSYCHOLOGY 85 (Daniel Kahneman et al., eds., 1999); Jeremy A. Blumenthal, *Law and the Emotions: The Problems of Affective Forecasting*, 80 IND. L. J. 155, 165-81 (2005); DANIEL GILBERT, STUMBLING ON HAPPINESS (2006).

[54] *See* Larry Alexander, *Consent, Punishment, and Proportionality*, 15 PHIL. & PUB. AFF. 178, 179 (1986) (arguing that it would violate principles of proportionality to deem a particular level of punishment justified simply by virtue of the fact that a person has voluntarily engaged in the pertinent offense, even if the person knows the applicable sanction).

disparity.[55]  Even though drug offenders have notice of the differences in penalties, many people continue to advocate a reduction in the sentencing disparity, in part, because it seems to exceed the disparity in the culpability of the underlying crimes.  When punishments do not seem to match the seriousness of their corresponding offenses, principles of proportionality are violated and highlight possible discriminatory effects of the law.  So, while it is true that advance notice of one's potential criminal liability mitigates certain fairness-related concerns, they certainly do not eliminate them.

(5) The Deliberateness Response

In *Punishment and Responsibility*, H.L.A. Hart stated that a "standard or central" feature of punishment is that it is "intentionally administered."[56]  One might argue that we are not obligated to calibrate because variations in punishment experience are not intentionally inflicted and are, therefore, not properly considered part of people's punishments. So if Warden puts Inmate in jail and a fire subsequently breaks out in Inmates's cell (through no fault of Warden or Inmate), the fire does not constitute part of Inmates's punishment because it was not intentionally administered.  Similarly, if Warden puts Inmate in jail and Inmate suffers in an unusually severe way, Inmate's additional suffering, so the argument goes, should not be thought of as retributive punishment imposed by Warden.

Not infrequently, courts must decide cases like this.  When deciding whether prison officials' treatment of an inmate on some occasion constitutes punishment, courts frequently attempt to distinguish between officials' intentional and unintentional actions:

The infliction of punishment is a deliberate act intended to chastise or deter. . . . If a guard decided to supplement a prisoner's official punishment by beating him, this would be punishment, and "cruel and unusual" because the Supreme Court has interpreted the term to forbid unauthorized and disproportionate, as well as barbarous, punishments. . . . But if the guard accidentally stepped on the prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word. . . .[57]

Thus, the argument continues, in order to constitute punishment, hard treatment must be imposed deliberately and "the unique stigma of

[55] United States Sentencing Commission, Press Release, *U.S. Sentencing Commission Votes Unanimously to Apply Amendment Retroactively for Crack Cocaine Sentences,* Dec. 11, 2007, *available at* http://www.ussc.gov/PRESS/rel121107.htm.

[56] H.L.A. HART, PUNISHMENT AND RESPONSIBILITY 5 (1968)

[57] Duckworth v. Franzen, 780 F.2d 645, 651-52 (7th Cir. 1985) ({Posner op.}); *see also* Wilson v. Seiter, 501 U.S. 294, 300 (1991) (quoting *Duckworth*).

punishment will attach only to those burdens intended to serve as punishment and generally understood by the public to serve as punishment."[58]  When we incarcerate offenders, the state takes no position on inmates' differential subjective experiences of punishment.  Therefore, the differential effects of punishment are not part of the state's act of punishment and need not be considered relevant to determinations of punishment severity.

The problem with this argument is that, as I have demonstrated, the subjective disutility of punishment is not some mere aftereffect of punishment.   Rather, it is largely or entirely the punishment itself. Subjective disutility is a necessary component of retributive punishment and constitutes, if not the sole reason for retributive punishment, certainly a major part of it.   Moreover, punishment terms are set through the interactions of legislatures, sentencing commissions, judges, prosecutors, and defense attorneys.  These sophisticated actors need not talk to many prisoners or even contemplate the prospect of going to prison for very long to recognize how central emotional distress is to the punishment of incarceration.  Though the secluded nature of the prison system shelters us from the suffering of prisoners, and criminal justice systems have evolved so as to separate from view those who impose sentences from those who administer them,[59] those who manage our punishment apparatus must be aware that punishments inflict disutility and that this disutility is not experienced in uniform ways.  Thus, when we are insensitive to punishment variation, we act less like the executioner who accidentally steps on the toes of a condemned person (not punishment) and more like the executioner who fails to recognize that his method of execution is excruciatingly painful (punishment).[60]

I suppose I leave the door open for someone to develop an elaborate view about the sorts of suffering that should count for retributive purposes, such that not all experiential suffering should factor into proportionality analysis.  But even if some experiential suffering should not count, we will

---

[58] Alice Ristroph, *The Dog's Distinction: State Intentions and the Regulation of Violence*, unpublished manuscript at p. 32 (on file with author) (describing, though not necessarily endorsing, an expressivist view of punishment).

[59] *See* Markus Dirk Dubber, *The Pain of Punishment*, 44 BUFF. L. REV. 545, 548-61 (1996) (describing historical developments in criminal justice systems to shelter those who impose sentences from observing or otherwise participating in the delivery of punishment.)

[60] *See generally* Deborah W. Denno, *The Lethal Injection Quandary: How Medicine Has Dismantled the Death Penalty*, 76 FORDHAM L. REV. 49 (2007).  Suppose a person has an unusual biological reaction to a drug used in lethal injection regimes that makes the injection excruciatingly painful.  We are likely to say that he received the same objective punishment as others who have been executed, except that he experienced it much more severely.  Admittedly, however, lethal injection punishments test the boundaries between subjective and objective features of punishment.

still be obliged to consider the suffering that does. Only if one believes that experiential suffering should not count at all are we relieved of the obligation to calibrate. Such a view, however, is implausible, as it violates the common intuition that we ought not intentionally cause people distress without justification.[61] It is this very concern about inflicting distress, I think, that leads us to seek a justification for punishment in the first place.

(6) Retributivism Summary

H.L.A. Hart also stated that the standard or central case of punishment "must involve pain or other consequences *normally considered* unpleasant."[62] While it may be typically true that punishment involves consequences normally considered unpleasant, Hart's comment could be read to suggest that what matters about a punishment is not how it is experienced by an individual but rather how it is normally experienced. I have argued otherwise. To be retributively punished, the person punished must find the punishment aversive and the severity of the punishment is at least partly a function of how aversive he finds it.

When considering fundamental questions about positive value in life, some people hold that everything valuable is experiential (like pleasure, happiness, or other combinations of mental states). Others believe that states of affairs can have objective value, quite apart from our experiences. So, it has been claimed, one is quite possibly harmed when one's spouse cheats, even if the adultery is never detected.[63] Nevertheless, those who adopt an objective approach to value still count certain positive experiences among the objectively valuable things in the world.[64]

Similarly, one can be an objectivist about the things in the world that have negative value. Surely, however, the objectivist must also count certain kinds of negative experiences as having disvalue. Thus, even if one

---

[61] Occasionally, opponents of retributivism have charged retributivists with punishing the innocent because retributivists condone the suffering of the family members of people imprisoned. *See* A.C. EWING, THE MORALITY OF PUNISHMENT 43 (1929); Joel Feinberg, *supra* note 49; Russell L. Christopher, *Deterring Retributivism: The Injustice of "Just" Punishment*, 96 NW. U. L. REV. 843, 879-80 (2002). Retributivists might respond to the charge by claiming that the suffering of family members was not deliberate. Such retributivists wish that the family members did not have to suffer, but alas, their pain simply goes with the territory. Whatever merits such a response might have, the response is even less appealing when the suffering that needs to be justified is experienced by the very person who is intended to suffer from punishment. The offender's additional suffering does not merely go with the territory, because calibration makes it possible, in principle, not to inflict the additional, unjustified portion of the punishment.

[62] HART, *supra* note 56, at 5.

[63] R.M. HARE, ESSAYS ON PHILOSOPHICAL METHOD 131 (1971).

[64] {insert Kymlicka/Parfit cite}

believes that punishment consists of more than just negative subjective experiences, those negative experiences are still a necessary and usually substantial component of retributive punishment. Inflicting such negative experiences is a harm that requires justification. In order to meet the proportionality requirement, retributivists must measure punishment severity in a manner that is sensitive to individuals' experiences of punishment or else they are punishing people to an extent that exceeds justification.

## B. Consequentialism

In the philosophical literature, consequentialism is understood as a broad theory or class of theories that determine morally right actions based on the consequences of those actions. Many consequentialists understand subjective distress (or something closely correlated with it) to be precisely the sort of consequence we should seek to avoid. These consequentialists will quite readily accept the prima facie case for attending to variations in punishment experience.

Some consequentialist theories, however, are opaque about their underlying sources of value and disvalue.[65] These more narrow versions of consequentialism, common in the criminal law and criminology contexts, focus on their shared effort to prevent crime. Rather than offering a general view of all moral behavior, consequentialist punishment theorists seek to justify incarceration based on its instrumental ability to deter crime, incapacitate dangerous criminals, and rehabilitate those likely to reoffend.[66]

Even these versions of consequentialism are obligated to attend to the subjective experience of punishment. Virtually all consequentialists focus particularly on the ability of punishment to deter criminal behavior, both by specifically deterring the particular offender who suffers the punishment from reoffending ("specific deterrence") and by deterring the public in general from engaging in crimes by making the citizenry aware of the likelihood that they will be punished if they engage in prohibited

---

[65] And some consequentialist theories are also retributivist. For example, one can be the sort of retributivist who finds deserved suffering to be intrinsically good and also believes that we should seek to promote the consequence that those who deserve to suffer actually suffer. Plausible versions of retributive consequentialism will likely be obligated to calibrate for the reasons given in both Section I.A and Section I.B of this article.

[66] Braithwaite and Pettit have used the term "preventionism" to describe the form of consequentialism common to criminal law literature. *See* BRAITHWAITE & PETTIT, *supra* note 36, at 32. I will speak of consequentialism at a sufficient level of generality that the difference is unlikely to matter.

conduct ("general deterrence").[67]   The more negatively people anticipate experiencing punishment, the more likely they are to be deterred.

Given how central deterrence is to most consequentialists,[68] closely-related subjective experiences (like perceived punishment aversiveness) are similarly central.  This can be demonstrated in two steps.  The first step is illustrated by Sensitive and Insensitive.  When they have equal terms of incarceration, it is quite likely that their punishments achieve different levels of specific deterrence because they differ in their aversiveness to prison.   Similarly, from a general deterrence perspective, people like Sensitive and Insensitive are, it is safe to assume, differentially deterred by the prospect of punishment. Sensitive can, to some extent, anticipate that he will have a particularly difficult time in prison and thereby be more easily deterred.  Granted, people may not be very good predictors of their own subjective responses to punishment.[69]  But even if they are bad at it, we will still find substantial variation in the amounts that people are deterred by the prospect of punishment.

The argument requires a second step, however.  Consequentialists have no general obligation to deter all potential offenders equally.  Nor do they seek to maximally deter offenses.  Rather, incarceration is costly from a consequentialist perspective—it is financially expensive, it prevents offenders from engaging in more productive activities, and it causes suffering that is itself a consequence generally to be avoided.  Consequentialists, therefore, seek to use the punishment of incarceration economically.  They seek to punish optimally not maximally.

The fuller story for consequentialists looks at both the costs of setting a particular sentence or range of sentences (and we generally have to follow through with our announced punishments) along with the amount of crime we are likely to deter by setting the punishment at that particular level.   Suppose that S is a group of people anticipatorily sensitive to

---

[67] We typically increase the deterrent effect of incarceration by increasing sentence duration, though there is growing evidence that doing so has only a limited incremental deterrent effect. *See* John Darley and Adam Alter, *Behavioral Issues of Punishment and Deterrence*, at 14-15 of manuscript, to appear in *The Behavioral Foundations of Policy* (Eldar Shafir ed., 2008).  On the other hand, there is increasing evidence that prison has a greater deterrent effect when the conditions of confinement are harsher.  *See* Lawrence Katz, Steven D. Levitt, & Ellen Shustorovich, *Prison Conditions, Capital Punishment, and Deterrence*, 5 AMER. L. & ECON. REV. 318 (2003).  Examples in the text focus on the incremental deterrence of longer sentences but could easily be reframed in terms of the incremental deterrence of harsher conditions of confinement.

[68] *See* Paul H. Robinson & John M. Darley, *The Role of Deterrence in the Formulation of Criminal Law Rules: At Its Worst When Doing Its Best*, 91 GEO. L. J. 949, 956-76 (2003) (detailing the pervasiveness of deterrence-related arguments in criminal law and sentencing policies).

[69] *See* note 53, *supra*.

incarceration and that I is a group of people anticipatorily insensitive to punishment. Suppose further that we can optimally deter members of group S by establishing an objectively-specified punishment scheme S*. Suppose too that we can optimally deter members of group I by establishing some objectively-specified punishment scheme I* that is longer (or in other ways harsher) than S*. If we can costlessly calibrate punishments, then we can optimally deter both groups by using both punishment schemes. But if S and I are subject to the same punishment scheme, we cannot optimally deter both groups.[70]

A punishment system that cannot customize its deterrent effect at a more individualized level is an awfully blunt instrument. Putting aside for now the costs of the calibration itself, an uncalibrated system will be less effective on consequentialist grounds than a calibrated system. In fact, given that it costs well over $20,000 per year to house an inmate,[71] even if calibration is quite costly, it may prove cheap if it allows us to more precisely specify deterrence levels and shorten the total amount of time people need to spend in prison.

Unlike the goal of deterrence, other consequentialist goals may be little furthered by calibration. For example, interests in incapacitating offenders are largely independent of the subjective experience of the incapacitated. We prevent car thefts by imprisoning potential car thieves regardless of how they experience their confinement. Similarly, rehabilitationist goals need not depend in any direct or obvious sense on the disutility of prisoners' punishment experiences. While it is quite plausible that prison experiences affect rehabilitation efforts, it makes more sense to measure the extent of rehabilitation directly, rather than to measure prisoner

---

[70] So, for example, if we can optimally deter borderline claustrophobes from dumping hazardous waste by setting a penalty of 2 years of confinement and optimally deter everybody else by setting the penalty at 4 years of confinement, cost-free punishment calibration allows us to optimally deter everyone. On the other hand, if we must set a single term of incarceration, say 3.5 years, then by stipulation, we are no longer optimally deterring either group (assuming that the optimal terms of incarceration that I have provided here and in the text are unique optima).

[71] Bureau of Justice Statistics, *State Prison Expenditures*, 2 (2004), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/spe01.pdf (stating that, in 2001, state prison operating expenditures per prison had a national average of $22,650); Florida Department of Corrections, 2005-2006 Annual Report: Budget Summary, *available at* http://www.dc.state.fl.us/pub/annual/0506/budget.html (stating that it costs approximately $19,000 per year to house a Florida inmate). Some estimates are much higher, depending presumably, on what sorts of costs are included in the calculation. *See* Massachusetts Governor's Commission on Corrections Reform, *Strengthening Public Safety, Increasing Accountability, and Instituting Fiscal Responsibility in the Department of Correction*, at 31,                                   *available*                                   *at* http://www.mass.gov/Eeops/docs/eops/GovCommission_Corrections_Reform.pdf (stating that it costs an average of $43,000 per year to house a Massachusetts inmate).

experiences in order to estimate rehabilitation. Nevertheless, deterrence plays a central role in the standard consequentialist worldview, and so, standard consequentialists are committed to cost-free calibration.

Furthermore, were a consequentialist theory to focus exclusively on incapacitating and rehabilitating criminals, it would likely require us to have much less distressing forms of confinement than we do now. In fact, it is not at all clear that a consequentialist theory of punishment stripped of its deterrence aim should still even be thought of as a theory *of punishment*.

## PART III: BROAD POLICY OBJECTIONS

In part I, I argued that our prevailing practices ignore variations in punishment experience, at least as a matter of formal policy. In part II, I argued that, cost and administrability concerns aside, both retributivists and consequentialists are obligated to take account of our actual or anticipated subjective experiences when setting punishments. Whether the suffering imposed by punishment is intrinsically good, a typical retributivist claim, or instrumentally good, a typical consequentialist claim, subjective experience matters. Theorists may seek to revise their views to avoid this implication, but I think it will prove difficult to do so.

Alternatively, theorists might accept the theoretical implications that I have identified but challenge the feasibility of actually creating a system to better calibrate punishment. In particular, they may raise concerns about the costs and administrability of calibration, as well as the possibility that calibration would infringe cognitive liberties, violate principles of advance notice, and encourage wealth discrimination. In this part, I address these concerns, arguing that we should not hastily assume that better calibration is infeasible. This part is meant to put theorists in a bit of a pickle. They are committed on theoretical grounds to the view that subjective experience matters and, furthermore, it is feasible to better take it into account. One is left to conclude either that we should better calibrate our punishments or that something has gone wrong with our prevailing justifications for punishment.

### A. Cost and Administrability Objections

The seemingly obvious explanation for our focus on objectively-defined punishments is that a system of subjectively-calibrated punishments would be impossible or too expensive to fairly administer. For example, it would be difficult to predict in advance how a particular prisoner will experience punishment; to measure a prisoner's subjective experiences while punishment is being imposed; to determine when a prisoner contrives

to appear more distressed by punishment or the prospect of punishment than, in fact, he is; and to reach consensus over the kinds of subjective experiences that matter for assessing punishment. I take this to be the strongest objection to punishment calibration.

Here are six brief responses meant to soften the objection: First, outside the criminal context, we often make difficult assessments of subjective experience in the courtroom. In tort law, for example, we attempt to value subjective feelings of physical pain and emotional distress. Rather than using an objective pricing mechanism (e.g., $5,000 for a broken arm and $10,000 for a broken leg), we attempt to determine how much pain or distress a particular defendant has experienced and will experience as a result of the plaintiff's tortious conduct.[72] We do so, even though plaintiffs have incentives to portray themselves as suffering more than they actually do. Experts routinely testify about plaintiffs' physical and emotional damages and help jurors weed out malingerers. We certainly disagree about how we ought to aggregate the value of various kinds of unpleasant mental states (e.g., physical pain, mental anguish, upsetting memories) and distill them all into a single dimension represented in dollars, but we nevertheless make such valuations all the time. When calculating damages of, say, false imprisonment, we estimate the disvalue of subjective mental states like anguish and humiliation associated with involuntary confinement.[73] True,

---

[72] "There is no direct correspondence between money and harm to the body, feelings or reputation. There is no market price for a scar . . . since the damages are not measured by the amount for which one would be willing to suffer the harm. The discretion of the judge or jury determines the amount of recovery, the only standard being such an amount as a reasonable person would estimate as fair compensation." RESTATEMENT (SECOND) OF TORTS § 912 cmt. b (1977). By contrast, workers' compensation programs often have rather specific pricing schedules that correspond to particular forms of injury or disability. *See, e.g.*, Federal Employees' Compensation Act, § 8107(c), *Compensation Schedule* (providing a workers' compensation pricing schedule for federal employees, including 312 weeks' compensation for a lost arm and 288 weeks' compensation for a lost leg).

[73] *See, e.g.*, Prosser & Keeton on Torts, *False Imprisonment*, § 11, at 48 (1948) ("The plaintiff is entitled to compensation for loss of time, for physical discomfort or inconvenience, and for any resulting physical illness or injury to health. Since the injury is in large part a mental one, the plaintiff is entitled to damages for mental suffering, humiliation, and the like.") (footnotes omitted); Kerman v. City of New York, 374 F.3d 93, 125 (2d. Cir. 2004) (quoting Prosser and Keeton). Damages associated with wrongful convictions are often, though not always, calculated using objective measures. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. § 103.105 (West 2005) (providing statutory redress to people convicted in error for expenses, lost wages, counseling, and child support payments up to $500,000) *with* Limone v. United States, 497 F. Supp. 2d 143, 234-49 (D. Mass. 2007) (engaging in a detailed analysis of the pre- and post-conviction lives of wrongfully imprisoned plaintiffs that "consider[s] the particular story of this case and these plaintiffs' suffering"). *See also id.* at 243-44 (describing multimillion dollar awards in wrongful conviction cases).

much of the cost of civil litigation is borne by the parties to the litigation. However, even these costs are subsidized by the state. Moreover, given the state's role in inflicting the harms of imprisonment, we typically give criminal defendants *more* procedural protection than civil litigants, not less.

Second, we already spend considerable, if insufficient funds, on psychological evaluations of individual offenders. Disposition plans for juvenile offenders are often based, in part, on detailed psychological evaluations, as are evaluations of mitigating factors in the death penalty context. Upon admission, many prisons administer at least cursory psychological evaluations of all inmates. And as I mentioned earlier, given that it costs so much to confine a prisoner, more accurate sentencing procedures could shorten sentences in the aggregate and potentially reap cost savings.[74] In any event, better individualized calibrations of punishment, while expensive, are not beyond the pale.

Third, while administrability concerns may preclude us from calibrating all punishments, there may be classes of crimes or offenders where individualized calibration is appropriate. For example, psychiatrists have made progress in diagnosing and assessing the severity of claustrophobia and in detecting those who malinger the condition. If so, perhaps subclinical levels of claustrophobia could be taken into consideration as well. Others are more prone to depression or suicidal ideations than others, and psychiatrists have substantial experience measuring changes in these psychological states and attempting to discover malingerers.[75] Even under the current system, inmates held in general prison populations sometimes fake physical and mental illness in order to be confined in the modestly better conditions that are typically available in prison medical or psychiatric facilities.[76] We ought to recognize that decisions about confinement conditions are not just medical decisions. They affect fundamental interests in distributing just punishment.

Fourth, emerging neuroscience technologies hold out the promise that our assessments of individuals' subjective experiences may become more accurate. Using functional magnetic resonance imaging ("fMRI"), researchers can observe a subject's brain while the subject experiences emotions like happiness, sadness, anger, fear, and disgust and attempt to

---

[74] *See* Part II.B, *infra.*

[75] *See generally* MALINGERING AND ILLNESS DECEPTION (Peter W. Halligan et al. eds, 2003).

[76] *See* Globe Spotlight Team, *A Clash of Cultures: Behind Bars, Security Trumps Treatment*, Dec. 11, 2007, *available at* http://link.brightcove.com/services/link/bcpid1321280271/bclid1333278073/bctid1339217 300 (noting that some prisoners intentionally swallow nails and spikes in order to be removed from the general population of prisoners).

find the neural correlates of such emotions.[77]  A number of studies purport to have found brain regions that are more active when subjects experience physical pain,[78] and I have argued elsewhere that, in the not-too-distant future, neuroimaging may provide helpful evidence in tort cases in detecting malingered pain.[79]  Neuroscientists have also noted structural differences in the brains of people who have experienced chronic depression and in the brains of those under long-term stress.[80]

By all means, current technology leaves much to be desired and intersubjective comparisons of utility are notoriously difficult to make.[81] We are likely a long way from having accurate, practical means of assessing the complicated, evolving sets of experiences associated with punishment. As I have noted, however, we already make assessments of distress in the courtroom, and so new technologies hardly need to be perfect in order to improve on methods that we already use.

Fifth, to the claim that we cannot assess the subjective experience of punishment, at least on some views about punishment, we already do.  If one believes that we have a retributive system of punishment based on experiential suffering, then we implicitly make determinations about typical punishment experiences when we place different kinds of punishments along a graded spectrum of punishment options.  For example, suppose crime A is more serious than crime B.  If crime A is punished with 2 months' incarceration and crime B is punished with two years' probation, we are implicitly determining that the former penalty is more severe than the latter.  Indeed, some courts have been called upon to evaluate exactly these sorts of judgments of comparative punishment severity.[82]  Less

---

[77] *See* Lisa Feldman Barrett & Tor D. Wager, *The Structure of Emotion: Evidence from Neuroimaging Studies*, 15 CURRENT DIRECTIONS IN PSYCHOLOGICAL SCI. 79 (2006); Richard J. Davidson, *Well-Being and Affective Style: Neural Substrates and Biobehavioural Correlates*, 359 PHIL. TRANS. R. SOC. LOND. B. 1395 (2004).

[78] *See, e.g.*, E.A. Moulton et al., *Regional Intensive and Temporal Patterns of Functional MRI Activation Distinguishing Noxious and Innocuous Contact Heat*, 93 J. NEUROPHYSIOLOGY 2183 (2005).

[79] Adam Kolber, *Pain Detection and the Privacy of Subjective Experience*, 33 AMERICAN J. OF LAW & MED. 433 (2007).

[80] Sonia J. Lupien et al., *Stress Hormones and Human Memory Function Across the Lifespan*, 30 PSYCHONEUROENDOCRINOLOGY 225 (2005); Yvette I. Sheline, *Depression Duration But Not Age Predicts Hippocampal Volume Loss in Medically Healthy Women with Recurrent Major Depression*, 19 J. NEUROSCIENCE 5034 (1999).

[81] *See, e.g.*, INTERPERSONAL COMPARISONS OF WELL-BEING (Jon Elster & John E. Roemer eds., 1993); JAMES GRIFFIN, WELL-BEING: ITS MEANING, MEASUREMENT, AND IMPORTANCE 106-124 (1986).

[82] For example, some countries have given appellate courts the power to reduce punishment severity but not to increase it. *See* S. White, *Assessing the Severity of Sentences on Appeal*, 36 MODERN LAW REVIEW 382 (1973); Leslie Sebba, *Some Explorations in the Scaling of Penalties*, 15 J. OF RESEARCH IN CRIME AND DELINQUENCY 247, 254 (1978);*se e also* old

obviously, we make the same sorts of determinations even when we compare punishments of the same modality. For example, suppose crime C is twice as serious as crime D. Then, we must make the punishment for crime C twice as severe as the punishment for crime D. (If one believes that the research on hedonic adaptation speaks to the kind of suffering that matters for punishment purposes, then crime C may require a duration that is more than twice the duration for crime D. Indeed, we may already make such adjustments: surveys show that perceptions of punishment severity do not increase linearly as terms of incarceration get longer).[83]

In any event, any retributive punishment system we use will make implicit determinations about how punishments relate to each other in severity. Because subjective experience constitutes at least part of what makes a sentence severe, we need methods of comparing subjective experiences. The only real choice is whether the calibration occurs at a very general level that applies to everyone or at a more refined level that applies more individually.

Finally, even if we cannot develop an individualized punishment calibration scheme, we can certainly develop more experientially-sensitive punishment policies than we have now. I have already discussed some of these policy areas in passing. For example, by separating those who sentence from those who administer punishments, we make it very difficult to calibrate sentences. Similarly, when parole decisions are limited to considerations of blameworthiness and dangerousness, we also limit opportunities to engage in calibrations (or recalibrations) of retributive punishments.

Of course, the details of any policy changes will depend on whether one adopts a retributive or a consequentialist justification of punishment. Assuming one adopts a retributive view, here are two more areas where we could develop more experientially-sensitive punishments: The first concerns the debate among retributivists about whether repeat offenders should be

---

versions of English Court of Appeal Act, 1968, sections 4(3) and 11(3); Israeli Criminal Procedure Law, 1965, section 197 ("The court shall not *increase* the penalty imposed on the accused except where the leniency of the sentence was appealed against.") (emphasis added){v}. Such determinations might be important, for example, when a court must decide whether a longer term of parole is more or less severe than a shorter term of incarceration.

[83] Some psychological studies have sought to measure the way we judge the comparative severity of punishments. *See* Sebba, *supra* note 82; *see also* Mara F. Schiff, *Gauging the Intensity of Criminal Sanctions: Developing the Criminal Punishment Severity Scale (CPSS)*, 22 CRIMINAL JUSTICE REVIEW 175 (1997); Robert E. Harlow, John M. Darley, & Paul H. Robinson, *The Severity of Intermediate Penal Sanctions: A Psychophysical Scaling Approach for Obtaining Community Perceptions*, 11 J. OF QUANTITATIVE CRIMINOLOGY 71 (1995); Pierre Tremblay, *On Penal Metrics*, 4 J. OF QUANTITATIVE CRIMINOLOGY 225 (1988).

viewed as more blameworthy (hence deserving of a longer sentence) than first-time offenders.[84]    The debate often neglects another relevant dimension, namely that a return visit to prison is typically experienced in a less severe way than a first visit.  Humans tend to "hedonically adapt" to their circumstances, such that disabling conditions or distressful circumstances tend to get easier over time.[85]  In the context of incarceration, prisoners have a very difficult time making an initial adjustment.  Men who have been recently jailed report life satisfaction scores below those of homeless Californians and Calcutta sex workers and just above those of Detroit sex workers.[86]  In time, however, most prisoners manage to adjust:

> [A study of British prisoners] observed generally successful long-term adjustment (although prisoners reported that specific stressors, such as the loss of relationships with people outside the prison, became increasingly difficult to deal with as time passed). . . . [Researchers have also] reported declining dysphoria, a reduction in stress-related problems such as sleep disturbances, and decreasing boredom over the course of prison sentences. Even inmates placed in solitary confinement for long periods adapt to their circumstances. . . . Indeed, some found it difficult to adjust to release from solitary confinement.[87]

Thus, if one believes that repeat offenders and first-time offenders are equally blameworthy when they commit the same crime, then the repeat offender may nevertheless deserve a more severe sentence in objective terms in order to obtain an equally severe sentence in subjective terms. Alternatively, if one believes that the repeat offender is more blameworthy, then a retributivist has two reasons to increase the duration or harshness of the repeat offender's punishment.   The full picture is likely more

---

[84] *See* GEORGE P. FLETCHER, RETHINKING CRIMINAL LAW 460-66 (1978) (describing the debate and arguing against augmented punishments for retributivists).

[85] *See generally* Shane Frederick & George Loewenstein, *Hedonic Adaptation*, in WELL-BEING: THE FOUNDATIONS OF HEDONIC PSYCHOLOGY 302 (Daniel Kahneman et al., eds., 1999); DANIEL GILBERT, STUMBLING ON HAPPINESS (2006).

[86] OWEN J. FLANAGAN, THE REALLY HARD PROBLEM: MEANING IN MATERIAL WORLD 153 table 5.1 (2007).

[87] Frederick & Loewenstein, *supra* note 85, at 311-312.  Research on hedonic adaptation suggests that, after a long enough period of time, prisoners' affective experiences may not be so different from what they would have been had they not been in prison.  If subjective experience is a fundamental part of retributive suffering, then one ought to seriously question the value of long prison sentences to retributivists.  On the other hand, perhaps a retributivist could defend long sentences on the ground that suffering becomes increasingly difficult to extract as years in prison go by.

complicated still, because the very fact that one is a repeat offender may be evidence that a person has poor coping skills.[88]  In any event, one cannot be a consistent retributivist without taking into account the psychological realities of punishment.

Here's another policy proposal for those who believe that monetary fines are a form of retributive punishment (as opposed to a tax or a pricing mechanism).  There seems to be little retributive justification for our general practice in the United States of imposing punitive fines that are independent of offenders' experience of those fines.[89]  Most billionaires who receive a $100 speeding ticket suffer far less from the punishment than those struggling to make ends meet.  Our practice of fixed fines is hardly universal, however.[90]  In some countries, fine amounts are calculated as a function of income.[91]

For example, in 2002, a Nokia executive in Finland was fined approximately $100,000 for traveling on his motorcycle at 46 miles per hour in a 30-miles-per-hour zone.[92]  The fine was calculated as a fraction of his multimillion dollar annual income.  Strictly speaking, nobody measured the executive's subjective experiences to determine how he perceived the fine.  Nevertheless, fines that are a particular fraction of an offender's annual income (or net worth) likely serve as good first approximations of the severity of fine punishments and are relatively easy to implement.  The change is easy enough to implement that resistance to the idea may represent resistance to the foundational notion that fines should serve as retributive punishments.

To sum up, cost and administrability concerns certainly present a powerful objection to the creation of a highly-individualized system of punishment calibration.  Nevertheless, these concerns are tempered by the fact that we explicitly engage in an assessment of subjective experience when making tort damage assessments and implicitly do so when trying to arrange a proportionate punishment system.  Our assessments of subjective distress need not be perfect in order to be meaningful and helpful.  They just

---

[88] *See* EDWARD ZAMBLE & FRANK J. PORPORINO, COPING, BEHAVIOR, AND ADAPTATION IN PRISON INMATES 101-02 (1988).

[89] {Insert some more exceptions to general practice.}  The Securities and Exchange Commission sometimes reduces disgorgement amounts for those with a demonstrated inability to pay.  *See, e.g.*, SEC v. Lloyd E. Wollmershauser, Civ. No. 1:01CV530 (N. Dist. Ohio 2001).  In some cases, this may be a roundabout way of calibrating punishments, though disgorgement penalties are not supposed to be punitive.

[90] According to ancient Jewish law, offerings made to repent for sins were a function of the sinner's means. Leviticus, 5:1-11.

[91] {Cites re: Israel, Finland, Maricopa County (U.S.) studies, etc}

[92] Alan Cowell, *Not in Finland Anymore? More Like Nokialand*, N.Y. TIMES, Feb. 6, 2002, at A3.

need to be more accurate than what we have now. To the extent that individualized calibration is too expensive, we can craft general policies that do a better job of calibrating punishment than do current policies. Finally, we already have some technologies to help us make inferences about others' subjective states of distress, and the technology is certain to get better in the future.

### B. Privacy Objections

Suppose there were a perfect "hedonimeter" that could accurately predict, at sentencing, a defendant's future suffering or accurately measure an inmate's suffering during the course of a sentence. One might object that, even if this were possible in principle, such a device would violate offenders' important interests in mental privacy. On this view, our thoughts and feelings are our own in a fundamental sense, and the state should not have privileged access to them.

This is an odd objection, at least for retributivists. It is like saying, "We are engaged in an enterprise designed to inflict suffering on you, but we are not permitted to measure that suffering for reasons of privacy." There are four additional reasons why the objection is weak. First, at least in the incarceration context, we already greatly limit privacy rights, including the privacy of offenders' subjective experiences. For example, we greatly limit prisoners' opportunities to cry in private or otherwise hide evidence of their subjective states. Second, it is unlikely that measuring prisoner subjective states of disutility is more invasive than other kinds of already common invasions of prisoner privacy—prisoners are forced to use toilets in public view and are routinely strip searched.[93] Third, there may be plausible health and safety rationales for assessing prisoner emotional distress that outweigh whatever interests prisoners have in keeping their distress private. Finally, even if detailed measures of prisoner subjective experience were deemed to threaten important privacy interests, many prisoners might waive their privacy rights, such that we could still better calibrate punishment experience than we do now.

### C. Notice Objections

---

[93] *See, e.g.*, Kate Murphy, *After Enron, A Sunless Year in a Tiny Cell*, N.Y. TIMES, June 24, 2004; Johnson v. Phelan, 69 F.3d 144 (7th Cir. 1995) (dismissing a prisoner's claim that his constitutional rights were violated by prison policies allowing female guards to see male prisoners naked "in their cells, the shower, and the toilet"); Mary Anne Case, *All the World's the Men's Room*, 74 U. CHI. L. REV. 1655 (2007) (discussing *Phelan*); *see also* Limone v. United States, 497 F. Supp. 2d 143, 235 (D. Mass. 2007) (noting that prisoners are strip searched after visits with relatives).

As a matter of fairness and of federal constitutional law, we cannot punish people for their criminal conduct unless they had adequate advance notice of the range of criminal sanctions associated with it.[94]  While many offenders actually have very little awareness of the punishments they may face before committing a crime, some know in advance, and all could, at least in principle, investigate the potential punishments for particular crimes.  If we provide different punishments for different offenders that are in some way calibrated based on subjective experience, it is not at all clear if people will know or understand in advance the possible sanctions for engaging in criminal conduct.   Thus, one might object, a system that calibrates punishment experience would fail to give proper notice to potential offenders.

The objection is difficult to address in the abstract, as there are many ways in which to give potential offenders advance notice, even if punishment is subjectively-calibrated.   Here is one impractical response:  Suppose we provide for punishments in units of disutility as opposed to, say, dollar fines or years of incarceration.  For example, suppose we had a punishment system that assigned 500 disutiles to the crime of arson.[95]  For Sensitive, let us suppose, 500 disutiles could be experienced with a prison term of two years, while Insensitive would have to spend three years in prison to receive a punishment that imposes equal disutility.  What happens if, under such a system, Sensitive or Insensitive claims that he had inadequate notice of the potential punishment associated with arson, given that the statute does not state a precise term or range of years?

If the aversive features of punishment are principally about the subjective disutility they impose, then a sentencing system measured in disutiles might actually provide better notice than a system of punishment measured in years of incarceration.   Our current punishment system specifies terms of incarceration in years to people who may have very little conception of what it is like to spend time in prison.  By contrast, *if* people could come to know what a certain quantity of disutility feels like, they

---

[94] Justice Oliver Wendell Holmes stated, "Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." McBoyle v. United States, 283 U.S. 25, 27 (1931); *see also* Paul H. Robinson, *Fair Notice and Fair Adjudication*, 154 U. PA. L. REV. 335 (2005).

[95] There are some tricky issues raised by the conversion of disutiles into objective terms like duration and condition of confinement.  For example, disutiles can be experienced: (1) intensely and quickly or (2) less intensely but over a longer period.  Perhaps, when disutiles are properly understood, people will be indifferent between these possibilities, though I take no position on the matter in this article.

could, perhaps, more accurately envision what a penalty of 500 disutiles is like.

Here is a much more practical solution to the notice objection: We currently use objective time frames, like years in custody, to specify incarcerative punishment ranges. A subjectively-sensitive punishment scheme could simply set objectively-defined punishment ranges that correspond, on the low end, with a term appropriate for very sensitive offenders and, on the high end, with a term appropriate for very insensitive offenders. While this solution may actually give offenders less notice than they would have in the system defined in terms of disutility, it will still satisfy our very modest constitutional notice requirements.

### D. Wealth Discrimination Objections

Those with greater wealth are generally accustomed to more spacious environments, more personal property, better food, better medical care, and so on. All else being equal, as an empirical matter, they are probably more likely to suffer in prison than those with less wealth who are placed in the same prison conditions. Yet, "[f]ew suggestions are more distasteful to the public than that the privileged, in virtue of their elevated status, should be punished less severely than the disadvantaged."[96] "[M]iddle-class offenders should not be placed on probation while ghetto youth are imprisoned for comparable infractions simply because they have 'less to lose'."[97] Such sentiments are embodied in federal statutes requiring that when the federal Bureau of Prisons makes prisoner facility assignments, "there shall be no favoritism given to prisoners of high social or economic status."[98] Such sentiments are also reflected in public opposition to so-called pay-to-stay jails that permit inmates to pay a daily fee and receive their own cells in modestly more comfortable surroundings.[99]

Thus, an objection to calibration, perhaps the most powerful one, is that doing so will unfairly favor the rich. The objection is motivated by the following sort of case: Suppose that Hoity-Toity, a well-to-do man of leisure, commits the same crime as Insensitive, a man who has lived his whole life in cramped living conditions with meager financial resources. Should Hoity-Toity really spend less time in prison (or have an easier

---

[96] Husak, *supra* note 1, at 82.
[97] *Id.* at 93 (describing the view presented in ANDREW VON HIRSCH ET AL., DOING JUSTICE: THE CHOICE OF PUNISHMENTS 90 (1976)).
[98] 18 U.S.C. § 3621(b).
[99] *See* generally Symposium on Pay-To-Stay Programs In Correctional Facilities, FIRST IMPRESSIONS, MICHIGAN LAW REVIEW (2007), available at http://www.michiganlawreview.org/index-fi.htm (collecting articles on the topic).

sentence in other ways) because he has grown accustomed to a higher living standard and will find ordinary incarceration to be much more distressing than Insensitive will? The counterintuitive answer, from a retributivist perspective, is "yes." In fact, we may well be discriminating *against* Hoity-Toity when we punish him in objectively the same way that we punish Insensitive.[100] Giving Hoity-Toity a shorter sentence or better accommodations than Insensitive is not *favoritism* but rather is precisely what is required to treat them *equally*, if one takes seriously the notion of retributive suffering.

There are several reasons why this result seems more counterintuitive than it is. Many people have the intuition that Hoity-Toity should be in prison *at least* as long as Insensitive. The intuition may be explained, however, by the fact that people view Hoity-Toity as more *blameworthy* than Insensitive even when they commit the same crime. People believe that Hoity-Toity, because of his wealth, had better alternatives to a life of crime than Insensitive had and that he is, therefore, more culpable. Furthermore, in scenarios that are closer to real life, the wealthy typically have better legal representation than the poor. If a rich person and a poor person are given the same sentences, one might plausibly believe that the rich person is more blameworthy, since he ended up with the same sentence as the poor person, despite having better advocacy. So it may be that our intuitions about Hoity-Toity reflect our views about his augmented blameworthiness for engaging in crime in the first place or for using his wealth to tamp down his formal sentence.

Surely the mere fact of being wealthy does not change our basic intuition that the subjective experience of punishment matters. Suppose that Farmer and Insensitive commit the exact same crime under identical circumstances and are sentenced to identical terms of incarceration. Farmer is particularly sensitive to being locked up because he has spent his life as a subsistence farmer, living in wide-open spaces with lots of natural light. Being in prison will be harder for him than for most others. He will grow

---

[100] *See also* John R. Lott, Jr., *Do We Punish High Income Criminals Too Heavily?*, 30 ECON. INQUIRY 583 (1993) (arguing that wealthy people may be overpunished relative to less wealthy people because the wealthy have dramatically reduced postconviction earning potential); Richard A. Posner, *Optimal Sentences for White Collar Criminals*, 17 AM. CRIM. L. REV. 409, 415 (1979) ("Since the disutility of imprisonment rises with income, this form of punishment will deter the rich man more than the poor one. Stated differently, a nominally uniform prison term has the effect of price discrimination based on income.").

Interestingly, Adam Smith claimed that we are particularly sympathetic to the misfortunes of the "great": "Every calamity that befals them, every injury that is done them, excites in the beast of the spectator ten times more compassion and resentment than he would have felt, had the same thing happened to other men." ADAM SMITH, THE THEORY OF MORAL SENTIMENTS, chap. 2, I.III.17 (1759). Presumably, a very different set of sentiments is apt to arise when the "great" fall because of their own misdeeds.

more depressed than others, he will frequently wake up sweating in the middle of the night, and he will periodically bang on his cell door in fits of panic. So far, we are likely to be rather sympathetic to Farmer, particularly if we're sympathetic to the claustrophobia-type cases. If we add the additional fact that Farmer wins the lottery just before he is sentenced (so his wealth doesn't affect his culpability or the quality of his legal representation), then we are likely to treat the case just as we do the more general case of Sensitive and Insensitive.

Moreover, some people may be sneaking in broad views about distributive justice into their views about punishment. Sentencing laws certainly offer one method, among many, to rectify preexisting unjust distributions in society. For example, some people are fabulously wealthy, while others fight off crippling debt. We may even harbor the view that the wealthy, generally speaking, deserve their wealth. Yet, when the wealthy person and the poor person commit the same crime, we may take the wealthy person's criminal behavior as evidence that he never really deserved his advantaged life. So we may give him the same objectively-defined punishment as the poor person in order to rectify a preexisting inequality. This result, however, depends on some broad theory of distributive justice and cannot be derived from any of our leading theories of punishment. Furthermore, were we to give the rich man and the poor man the same sentences in objective terms, the best description would be that the rich man receives a *more severe punishment* than the poor man in order to satisfy broader redistributive goals.[101]

---

[101] When we distribute positive resources in society like money, bodily organs, and lifeboats, some have argued that we ought not use purely subjective criteria in assessing just distribution. The claims that others make on us, according to this view, are limited by objective considerations about the reasons supporting their claims. In particular, we need not accommodate people's "expensive tastes." *See* T.M. Scanlon, *Preference and Urgency*, 72 J. PHIL. 655, 659 (1975); Ronald Dworkin, *What is Equality? Part 1: Equality of Welfare*, 10 PHIL. & PUBLIC AFFAIRS 185 (1981). So, for example, Thomas Scanlon states "[t]he fact that someone would be willing to forego a decent diet in order to build a monument to his god does not mean that his claim on others for aid in his project has the same strength as a claim for aid obtaining enough to eat." Scanlon, *supra*, at 659-60. Similarly, if we seek to distribute valuable resources equally to Hoity-Toity and Insensitive, so the argument goes, we need not buy Hoity-Toity a bottle of fine wine when we buy Insensitive a bottle of root beer, even if we would have to give Hoity-Toity the wine in order for both of them to obtain the same improvement in well-being. Yet, if we do not accommodate "expensive tastes" when distributing positive resources, why should we accommodate them when distributing negative resources like punishment?

Until the argument is fleshed out in more detail, it is difficult to adequately respond to it. There is no immediate connection between the policies that guide us when distributing goods that people want and the policies that guide us when distributing punishment. I will, however, offer a few brief considerations: First, one may challenge the force of the "expensive tastes" argument even in its traditional context. One may think that equality of

Finally, the wealth discrimination argument does not even get off the ground for certain kinds of punishment. Under a system of subjectively-calibrated monetary fines, for example, the wealthy will suffer far more than they do under our current system of flat fees.[102] In the case of fines, the switch to subjectively-calibrated punishments is more demanding, in objective terms, of higher wealth offenders than lower.[103]

## CONCLUSION

I have not sought to defend any particular punishment justification nor any particular changes to our punishment practices. Rather, I have argued that there is a disconnect between our laws governing punishment and our theoretical attempts to justify punishment. Specifically, I have argued that subjective experience is almost never acknowledged in the law as a ground for calibrating punishment, even though subjective experience is an important part of the retributive conception of suffering and the consequentialist conception of deterrence.

I discussed three ways to resolve this disconnect. One is to revise or expand our theoretical justifications for punishment. Consequentialists are likely to be receptive to the claim that they are prima facie obligated to take account of actual or anticipated subjective experiences. But those consequentialists who think that even cost-free calibration is wrongheaded might decide that what they really care about is incapacitation, a punishment goal that does not require calibration. Retributivists opposed to

---

distribution should be understood on grounds of subjective welfare, acknowledging that we may then depart from equality so understood for certain consequentialist reasons (e.g., we want to discourage people from developing expensive tastes). Second, as an empirical matter, the "expensive tastes" offenders develop outside of prison are generally very *inexpensive* tastes from the perspective of criminal justice: the people who are most expensive to deter are those who find prison least objectionable. Third, at most, the expensive tastes response could lead us to discount some subjective distress (perhaps where we are partly responsible for the development of that distress), but it does not, by itself, relieve us of the obligation to calibrate distress in general.

[102] Husak, *supra* note 1, at 93.

[103] If you retain the nagging feeling that the rich and the poor should receive equal punishments in objective terms, consider the possibility that you are fixating on our conventional descriptions of punishments, which are typically phrased in objective terms. Consider, by contrast, the fictitious punishment of "boxing," where people who are boxed are confined to a cell that has dimensions n x n x n, where n equals the height of the offender. Is it *unfair* when people of different height are boxed (setting aside the horrendousness of the punishment itself)? In objective terms, people who are boxed receive quite different punishments. Nevertheless, it seems fair that taller people are placed in larger cells than shorter people. Simply by reframing the punishment description in subjective terms, we can ease perceptions of punishment inequality.

calibration may seek to adopt purely objective accounts of suffering, though I think these will ultimately prove unsatisfactory. Alternatively, retributivists may find the counterintuitive implications of calibration to be serious enough to lead them to question the foundational retributive premise that offenders deserve to suffer for their crimes.

A second response is to conclude that we cannot better calibrate our punishment system for reasons of cost and administrability. This claim is surely overstated, however, because we can relatively easily take findings from the mind and brain sciences and apply them to broad policy issues. The response is more plausible when addressed to efforts to calibrate punishment at the individual level. Either way, a do-nothing response should be troubling, especially for retributivists. Retributivists generally argue that one's punishment should be proportional to one's crime. If we punish people in excess of the amount of punishment dictated by the proportionality principle, it is as if we are taking people who no longer owe a punishment debt to society and are punishing them nonetheless. Retributivists believe it is anathema to punish the innocent, and this begins to sound awfully close. Consequentialists, on the other hand, can more readily trade off between imperfections in punishment calibration and the costs of improving those calibrations. Yet, even consequentialists who believe that, all things considered, we ought not calibrate punishment must still concede that subjective experience matters. Unless consequentialists have assessed the amount of variation there is among the punishment experiences of human beings, they cannot confidently conclude that the costs of improved calibration exceed the benefits.

The final, and perhaps most plausible response, is to recognize that subjective experience matters in assessments of punishment severity and to take at least modest steps toward calibrating punishment, either through individualized measurements or, more feasibly, by enacting punishment policies that are subjectively sensitive. We can surely do a better job of crafting policies that reflect what the mind and brain sciences tell us about punishment experience. We already give judges discretion to sentence within certain boundaries, and so they are probably already calibrating punishments to some degree. Our choice may be less about *whether* we calibrate punishment at all and more about whether we do so in a haphazard, clandestine way or in a manner that is open to review and criticism.