

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

April 10, 2008

**By Hand – To Be Filed Under Seal**

Honorable Colleen McMahon
United States District Judge
United States Courthouse
Southern District of New York
500 Pearl Street
New York, New York 10007

**REDACTED**

Re:    **United States v. Samuel Israel III**
       **05 Cr. 1039 (CM)**

Dear Judge McMahon:

  The sentencing of the defendant, Samuel Israel III, is scheduled for April 14, 2008. The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Israel has rendered in the investigation and prosecution of other persons and to respond to the sentencing memorandum submitted by the defense.

## I. APPLICABLE LAW

  In *United States v. Booker*, 125 S. Ct. 2531 (2005), the Supreme Court held that the system of enhancements established by the Sentencing Guidelines violated the Sixth Amendment. *United States v. Booker*, 125 S. Ct. 738, 749-50. To solve this problem, the Supreme Court excised the provisions of the Sentencing Reform Act that had made the Guidelines mandatory, rendering the Guidelines advisory. *Booker*, 125 S. Ct. at 756-57. In *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005), the Second Circuit explained that in light of *Booker*, sentencing judges now must: (a) consider the Guidelines and all of the other factors listed in 18 U.S.C. § 3553(a); (b) normally, determine the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consider the applicable policy statements; and (c) decide, after considering the Guidelines and all the other factors set forth in § 3553(a) whether to impose a sentence within the Guidelines range or within permissible departure authority, or a non-Guidelines sentence. Sentencing judges are entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*United States v. Crosby*, 397 F.3d at 113.

        In imposing a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a), in addition to taking into consideration guidelines and policy statements issued by the Sentencing Commission and bearing in mind the need to avoid unwarranted sentencing disparities among similarly situated defendants (*see* 18 U.S.C. § 3553(a)(4)A, (5) and (6)), some of the factors that the Court should take into consideration, pursuant to 18 U.S.C. § 3553(a), include, among other things, "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

        As the Second Circuit has instructed, District Court judges must consider the Guidelines "faithfully" when sentencing. *Crosby*, 397 F.3d at 114. "*Booker* did not signal a return to wholly discretionary sentencing." *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) citing *Crosby*, 397 F.3d at 113). Indeed, the Guidelines range for a particular defendant is "a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir.), *cert. denied*, 126 S. Ct. 388 (2005).

        Moreover, as the Second Circuit has observed, the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" *United States v. Rattoballi*, 452 F.3d at 133 (quoting *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*)). "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 192 (2006). *See also United States v. Rita*, 127 S. Ct. 2456 (2007)(holding that a federal appellate court may apply a presumption of reasonableness to a district court sentencing that is within a properly calculated Sentencing Guidelines range).

## II. FACTUAL BACKGROUND

### A. The Formation of the Bayou Funds

        In or about 1995, Israel formed a hedge fund named Bayou Fund LLC (hereafter the "Bayou Fund" or the "Fund") because, among other reasons, he was ready to implement a trading program he had developed. Israel had planned to run the fund with a colleague but that colleague backed out to pursue another opportunity and Israel asked James G. Marquez to run the fund with him. The Bayou Fund opened in or about 1996, with a little over $1 million and an office in the basement of Israel's newly built home in Harrison, New York. Two other companies were also formed to facilitate the operation of the business, Bayou Securities and Bayou Management.

Israel, Marquez and Marino believed that Bayou had a viable business plan that would be successful. According to Marino, the Bayou Fund did not charge investors the typical hedge fund management fee of 1% or 2%. Like other hedge funds, it charged an "incentive fee," whereby the Bayou Fund would pay 20% of the trading profits to another entity set up to manage the Fund called Bayou Management. From there, profits would be distributed to the partners. They also expected to make money through Bayou Securities, which was an introducing broker through which the Bayou Fund executed all of its trades. Bayou Securities generated profits by charging the Fund (and other customers) the standard rate of $.06 a share on trades, of which $.05 would go to Securities and $.01 would go to the clearing broker. Therefore, the very act of trading produced commissions. And, since they would be conducting mostly short term trading, they expected to earn a lot of money on commissions. Bayou Securities was subject to rules and regulations because it was registered with the Commodity Futures Trading Commission (CFTC) and the National Association of Securities Dealers (NASD). Consequently, Marino maintained proper records for Bayou Securities.

Israel and Marquez were solely responsible for Bayou's investment strategy and they recruited investors, who were required to invest at least $100,000 each. They did this by calling potential investors, sending marketing materials to them, and meeting with them. Israel and Marquez hired Daniel E. Marino, a certified public accountant who had previously done accounting for Marquez's prior hedge fund and was Marquez's personal accountant, to keep the books and reconcile the trading records.

According to Marino, in 1997, the first full year of its operation, the Fund lost money. Marino had the idea that Bayou Securities could rebate commissions back to the Fund, without disclosing the rebate and its purpose, in detail. Marino managed to get this by Bayou's auditor, Grant Thornton; and rebated the commissions.

**B.    The Scheme To Defraud**

In mid-1998, Bayou moved to offices at 40 Signal Road in Stamford, Connecticut. Israel, throughout Bayou's existence, traded from his residences in Westchester County and from the office in Stamford. Marino had his own office across the street from Bayou in Stamford. According to Marino, he saw the daily profit and loss runs (as did Marquez and Israel) and every other day he would input trading information into the computer. Thus, he was aware that the Fund was not doing well. By August of 1998, he believed Bayou was in a lot of trouble and could not survive an independent audit and he voiced his concerns to Israel and Marquez. By the end of 1998, Bayou had accumulated substantial losses and had not earned enough commissions to cover the losses. According to Marino, on or about December 30, 1998, Israel and Marquez met with Marino in a conference room at 40 Signal Road to discuss what they referred to as "the problem." According to Marino, during the meeting, Israel and Marquez told Marino that they wanted him to prepare the Fund's audit, instead of Grant Thornton. According to Marino, Marino said he was not independent but Israel told him that since Marino did not have an ownership interest in Bayou, he could do it.

Marino told Israel and Marquez that he wanted a videotape saying that he should do the audit and Israel said that he would swear on a video that Marino had nothing to do with

this plan. (According to Marino, the videotape was never made and Israel and Marquez later told Marino to go "f-- himself.") Marino asked what would be in it for him and Israel told him to do the audit and they (Israel and Marquez) would cover "the problem," which was how they all referred to the losses. Israel took out a life insurance policy naming Bayou Securities as the beneficiary, in order to pay everybody back in case he died before he had a chance to earn back the money.

Shortly after that meeting, Marino created a fictitious accounting firm named Richmond-Fairfield Associates ("RFA"), with supposed offices in Manhattan. Israel set up a web site for RFA. In furtherance of the scheme, Israel, Marquez and Marino issued statements (a) reporting fictitious positive rates of return and inflated net asset values in quarterly and subsequently monthly reports that were mailed to investors; and (b) annual financial statements, that were also mailed to investors and contained, among other misrepresentations: (i) inflated rates of return on trading; (ii) inflated net asset values, and (iii) certifications that Bayou had been audited by RFA, a supposed independent accounting firm. Over time, investors made calls to RFA, seeking, among other things, to verify the existence of the accounting firm and to obtain answers about Bayou's financial statements and K-1 tax forms. Marino fielded those calls.

In the beginning, according to Marino, Marquez and Israel, along with Marino, came up with the fake amount that was supposedly earned. The phony rates of return were decided by Marquez and Israel, taking into account market conditions. Israel and Marquez never made enough money in trading to cover the false numbers being reported.

According to Marino, in the second quarter of 1999, he was diagnosed with cancer. Between July and December of that year, he was receiving chemotherapy. At or around the same time, Marino's mother, who he lived with, was also diagnosed with cancer and he was her primary caretaker. As a result, he was only periodically going to work at Bayou. Marino's mother passed away on January 1, 2000 and during the early part of that year, Marino received radiation treatments and continued to work only sporadically. Some time in early 2000, Marino came back to work. Marquez and Israel were still losing money and still perpetrating the fraud by providing the investors with false numbers.

Meanwhile, in or about 2000, Bayou opened its first offshore fund in the Cayman Islands. The investors in that fund received the same false information as the onshore Bayou investors. When investors contributed to the offshore fund, the money did not stay in the Caymans, but was transferred to Bayou's account in the United States. The offshore Fund was subject to auditing so Marino employed accounting firms and others to handle accounting and money laundering compliance issues. Marino also attempted to manage the offshore fund by hiring a well known hedge fund administrator. To get by the auditing, Marino moved profitable trades from the domestic Fund to the offshore Fund. The offshore accounts were closed about 14 months after they were opened because the administrator was uncomfortable with the constant cancelling and re-booking of trades. Moreover, even assigning the profitable trades to the offshore accounts was not enough and they attempted to give back commissions. The auditors balked, however, and the offshore fund had to be closed.

In or about 2000, increasingly, Israel and Marquez were arguing about who was to

blame for Bayou's poor trading record and they had contradictory views about what kind of trading Bayou should be doing. Israel blamed Marquez for Bayou's losses, and came to believe that investors did not trust Marquez with their money and suspected that he could raise more money from investors if Marquez was no longer with Bayou. That belief became concrete when, in around mid to late 2000 or early 2001, a potential investor refused to contribute to the Fund if Marquez was there. Thus, Israel decided Marquez had to leave and Marino convinced Israel to have Marquez move across the street to 27 Signal Road, where Marino had an office. That way, Marquez could continue trading and helping to solve "the problem," as well as go into his own stock research business.

Shortly after moving across the street, Marquez sent three handwritten letters to Israel and Marino, in which he discussed his role at Bayou and laid out his view of his future relationship with Bayou and ultimately, the financial terms of his break with Bayou. Marquez believed he should be paid for his interest in Bayou. In a meeting during this time period, Israel refused to pay Marquez anything, telling him that until "the problem" was solved, Bayou was not worth anything.

Ultimately, Bayou set up Marquez in the office across the street, paid some of his expenses, and paid him $12,500 a month in "consulting fees" that mirrored the distributions he took at Bayou. He continued trading, sporadically, on behalf of the Fund but also he and his wife traded for their own clients to earn commissions to pay back the Bayou losses. Marquez's expenses and monthly consulting fees were netted against the commissions he earned and after that, there was little money left over to pay off the losses. Thus, rather than applying the leftover commissions to repaying the losses, Bayou paid Marquez the remaining commissions.

In July 2001, Marquez was retained to raise capital for an energy company then known as KFX and he proposed that Bayou buy stock in KFX on the assumption that when the value of the stock went up, Bayou would earn a great enough profit on the investment to cover Bayou's losses, which, by then, amounted to approximately $6 million. Israel ultimately agreed and Bayou purchased one million shares of KFX, along with 500,000 warrants to purchase additional share of KFX, for approximately $3.6 million. In 2004, three years after Bayou invested in KFX, KFX share prices finally rose and Bayou's shares in KFX were sold, netting Bayou approximately $12 million.

After Marquez moved across the street, Marino moved his office into Bayou's space and officially took over as Chief Financial Officer. From then on, Marino and Israel were the sole principals of Bayou, although there was no written partnership agreement. Prior to Marino's becoming CFO, Israel and Marquez received roughly the same distributions and Marino received less than they did (approximately half). Between January 2002 and August 2005, Israel and Marino received essentially the same compensation of approximately $4 million.[1] In 2002, Israel's wife also received two payments from Bayou totaling approximately $2.75 million in

---

[1] This does not include money that was contributed to venture capital investments, described below, or loans issued by Marino and/or Israel. It also does not include the return of approximately $500,000 to both Marino and Israel, in August 2005, in connection with a real estate investment they made with money that came out of a Bayou bank account.

connection with the Israel divorce.

Once Marquez left, Israel was responsible for the investment/trading activities of Bayou and Marino handled the accounting. Bayou grew as Israel and Marino used Bayou's false financial history to persuade potential investors that the funds had a profitable track record. Israel and Marino closed the original Bayou Fund LLC and opened four domestic hedge funds, Bayou Accredited Fund, LLC, Bayou Affiliates Fund, LLC, Bayou No Leverage Fund, LLC, and Bayou Superfund, LLC, as well as two different sets of offshore funds in the Cayman Islands. Investors in all the funds – onshore and offshore – were provided with the same false information. Israel and Marino hired numerous employees, including securities traders, sales and marketing personnel, accounting personnel and other administrative staff.

The newly named Bayou Funds fared no better with Israel in control of investment strategy. Over time, and particularly in 2002, Israel had personal problems. He suffered from serious back conditions that required surgery and rehabilitation, which took him out of the office for periods of time. He also was using substantial amounts of pain medication. In that same year, Israel and his wife split up and he had to move out of his home. When Israel was working, he was doing much of his trading from home and Marino was running the office in Stamford.

Marino continued to write the annual financial statements (using false numbers that Israel approved) that were falsely certified and issued by RFA. In addition, Marino created the monthly net asset valuations that informed investors what their investments were worth. Much of Marino's responsibilities involved keeping the fraud concealed. Thus, Marino answered calls from investors who had questions about Bayou or RFA. In order to keep the fraud concealed from employees, Marino kept the employees who worked in the trading room separate from those who handled administrative and investor related operations. Moreover, by compartmentalizing the trading operation and the administrative/investor related functions, Marino succeeded in preventing employees of one department from looking at documents relating to the operations of the other departments.[2] Israel conducted trading, wrote newsletters to investors, had conference calls with investors and continued recruiting investors.

## C.    The Collapse of the Bayou Hedge Funds

Throughout the years, apparently as a way to make money (both to make up for losses and to profit Israel and Marino personally), Israel and Marino invested Bayou investor money in numerous venture capital projects, which, in most cases, were legitimate deals but were very risky. The transactions involved movie deals, real estate deals, an international money transferring firm, a software company, a commuter aircraft manufacturer start-up, a clothing designer, and a French cable company, among others. In all, they invested approximately $40

---

[2] Marino helped conceal the fraud in other ways as well. When Israel became involved in divorce proceedings, Marino took charge of an effort to prevent Israel's wife's attorneys from gaining access to the Bayou Fund's records, for fear that they would discover the fraud. And, prior to Bayou's collapse, Marino had his brother draft a fraudulent document purporting to be an agreement indicating that Marino had sold RFA years before, which Marino intended to send to an inquisitive investor.

million. Marino was primarily responsible for administering these investments. These investments were not disclosed to investors nor were they investments that Bayou was supposed to be making with Bayou investors' money. Many of them were made through partnerships set up by Marino and Israel known as IM Partners and IMG LLC.

Starting in the spring and summer of 2004, as a way to make back the money that had been lost, Israel repeatedly attempted to invest in so called "high yield trading programs" (the "Programs") that promised to earn fantastic rates of return, which, in reality, were nothing more than "prime bank frauds."[3]

---

[3]  Apparently unbeknownst to Israel (or Marino), these "prime bank" schemes, which are also referred to as "high yield trading programs," are essentially Ponzi schemes in which the perpetrators claim that a secret trading market exists among the world's top banks or "prime" banks to which the perpetrators have unique access. The top, or, "prime" banks purportedly trade some form of bank security such as bank guarantees, notes, or debentures. These instruments can supposedly be bought at a discount and sold at a premium, yielding greater than market returns with no risk. In reality, no such instruments or markets exist.

Perpetrators often claim that only a few "traders" or "master commitment holders" are authorized to trade in these securities, which must be traded in large blocks, typically millions of dollars or more. Promoters represent that they have special access to trading programs and that potential investors, by pooling their funds with that of other investors, can participate in these programs. Promoters often tell potential investors that the programs participate in humanitarian causes and investors may participate in the programs only if they agree to give a share of the profits to the cause.

Hon. Colleen McMahon                                                                8

During this time period, as described in more detail below, Israel was traveling back and forth to Europe, meeting with dozens of people who were touting the "Programs" and trying to get the Bayou money invested in them. He was not doing his job, executing securities trades on behalf of the Funds. Israel and Marino were putting off Bayou employees by claiming that Israel was soliciting investors in Europe. Ultimately, in the spring of 2005, approximately $100 million of the money that Israel had attempted to invest in the Programs and that he had caused to be transferred to the .                    Account in New Jersey, was frozen in connection with an investigation being conducted by the Arizona Attorney General's Office.[4]

---

[4]    During the time period leading up to Israel's travels i           and after, Israel was approached by FBI agents who were investigating, along with the ·             authorities, the transfers of money abroad.  On several occasions, Israel answered questions about the transfers of Bayou investor money and provided information about the individuals involved in the Programs and his dealings with them.  He was not truthful, however, in that he

After the account containing Bayou's money was frozen in New Jersey, the last step toward the collapse of the funds came when one of the largest investors, Silver Creek Long/Short Holdings LLC (hereafter, "Silver Creek"), began inquiring about Bayou's purported auditor, RFA, and requesting to inspect Bayou's books and records. Because there had been rumors that the Bayou Funds were going to be liquidated, the Silver Creek representative called Israel and asked him if the rumors were true. Israel assured him that the rumors were not true.

According to the Silver Creek representative, shortly thereafter, Marino called the Silver Creek representative and indicated that Israel was not entirely correct, that they were going to liquidate two of the smaller funds but that additional assets were on the way, and that the total assets under management would be back to approximately $400 million. The Silver Creek representative asked Marino why Bayou was using a small accounting firm and questioned the independence of the firm, RFA, since it was the representative's understanding that it was Marino's old firm. Marino claimed that he had not been with RFA for five years and that Bayou would be changing auditors that year.

Thereafter, according to the Silver Creek representative, Israel spoke to the Silver Creek representative again, and said that he understood that Silver Creek had grown uncomfortable with Bayou and recommended that Silver Creek redeem its investment. He also represented that Bayou had hired the accounting firm, Hertz, Herson & Company, as its new auditors and that Hertz, Herson had already audited Bayou's brokerage company, Bayou Securities. That day, pursuant to the Bayou operating agreement, Silver Creek gave 15-day notice of its intent to withdraw its entire investment and accumulated profits. In addition, Silver Creek requested that Marino allow it to: inspect the books and records of Bayou; interview representatives of RFA; examine RFA's audit work papers; and confer with Hertz, Herson to review their work papers related to Bayou Securities and confirm their engagement. Marino agreed but said that he had to confirm this with Israel.

According to the Silver Creek representative, on July 13, 2005, Marino sent Silver Creek an e-mail acknowledging receipt of its withdrawal request and indicating that the withdrawal would be made effective in accordance with the terms of the Operating Agreement. Marino, however, refused to permit representatives of Silver Creek to inspect the books and records of Bayou as requested. In the next few days, Silver Creek and Marino exchanged e-mails and telephone calls about, among other things, RFA, and the fact that Silver Creek was gathering information indicating that it was not an independent accounting firm.

On or about July 27, 2005, all the Bayou investors, including Silver Creek, received a letter from Israel announcing that he was closing the Bayou Funds at the end of that month and promising that, upon completion of a final audit (which would not occur until ninety

---

claimed that he had done regular trading of stocks and bonds through .         and .                    ; he never indicated that he was participating in a fraud of the Bayou investors by reporting fictitious positive rates of return and inflated net asset values to the Bayou investors, or that annual financial statements were falsified and being certified by an accounting firm that was not independent and had not conducted an audit. Israel also was not truthful in that he informed the FBI agents that he would be closing the Bayou Fund because he had been diagnosed with and was being treated for non-Hodgkins Lymphoma.

days after the Funds closed), all investors would receive a 100% payout on their investments. According to the letter, investors who had already sent redemption notices would be subject to the final audit and those redemptions would be part of the final payments. Israel's letter indicated that the Bayou Funds were closing because he was in the process of a divorce and wanted to devote the majority of his time to his children.

According to the Silver Creek representative, after receiving Israel's letter, Silver Creek pressed Marino to honor his promised August 1st payment, but Marino refused. Thereafter, Silver Creek continued to insist on receiving its redemption and/or to inspect Bayou's records. Marino, however, refused the requests. On Friday, August 12, 2005, a Silver Creek representative flew from Washington state to Bayou's office and met with Marino. Marino gave him a check made out to Silver Creek in the amount of $53,089,300, its redemption. However, the check was postdated to Monday, August 15, 2005. When Silver Creek attempted to deposit the check on August 15th, there were insufficient funds in Bayou's account to cover the check.

### D.    Marino's Confession Note

At the end of the day on August 16th , the Silver Creek representative went back to Bayou's office to talk to Marino. Instead of finding Marino, however, he discovered a suicide/confession note apparently written by Marino (hereafter, the "Confession Note"). The Confession Note indicated that Marino, Israel and Marquez had perpetrated a fraud on the Bayou investors and provided a brief, chronological summary of the fraud. In sum, the Confession Note indicated that from in or about 1998 through in or about August 2005, Marino, Israel and Marquez had perpetrated a fraud on the Bayou investors, by, among other things, providing financial statements and other documents to investors and others, that contained materially false statements that overstated gains, understated losses, and reported gains where there were losses. Further, the note indicated that in furtherance of the scheme, Israel, Marquez and Marino decided to create a phony accounting firm, RFA; Marino created RFA; RFA was held out as an independent certified public accounting firm that audited and certified Bayou's false financial statements; and, in actuality, RFA conducted no audits, independent or otherwise.

Upon seeing the Confession Note, the Silver Creek representative alerted local police, who tracked down Marino and had him go to a hospital for a psychiatric evaluation. Marino was examined and released later that night. The next morning, FBI agents went to talk to Marino. Shortly thereafter, Marino retained an attorney who scheduled a proffer with the Government for the next day, August 18th, and Marino began proffering that day. On August 19th, Israel's attorney contacted the Government, indicated that Israel wished to proffer as well and that they were gathering records in Israel's possession in order to produce them to the Government. On August 22, 2005, Israel began proffering and produced documents

All told, based on an analysis of Bayou's records and bank records, among other things, there were approximately 392 investors in Bayou who contributed over $500 million to the Funds. Of those, approximately 288 investors lost over $309,000,000 in contributions to the

Bayou Funds.[5]  Of that money, however, approximately $110 million plus interest has been recovered.

## III. ISRAEL'S PROFFERS AND GUILTY PLEA

On August 22, 2005, Israel began participating in the first of numerous lengthy proffers with the Government.  During the proffers, Israel unequivocally admitted his criminal conduct in connection with the Bayou fraud, described Marino's and Marquez's roles, and corroborated, in a general sense, much of the more detailed information Marino had provided. Thus, he confirmed that: he started the Bayou Fund in or about 1996 when he believed his proprietary trading model was ready to be implemented; he invited Marquez to join him after another colleague backed out; by the end of 1998, Bayou had lost money and Israel and Marquez had Marino create RFA and do the audit;  no one, other than Israel, Marquez and Marino, participated in the fraud (although Israel maintained that, during the later part of the fraud, Marino had indicated to Israel that his brother knew more than Israel thought); and, how Bayou operated and the fraud was perpetrated.  Israel also described his decision to move Marquez out of Bayou and provided a detailed description of his relationship with Marquez and Marquez's role at Bayou.  Because, among other reasons, Marino had already begun proffering and providing a detailed account of how the fraud was perpetrated and Israel was the Chief Executive Officer of Bayou, the focus of Israel's proffers turned to

---

[5]  This includes investors who returned contributions in connection with their settlements of claims against them in bankruptcy court.

Hon. Colleen McMahon                                    12

Hon. Colleen McMahon                                                                                    13

Hon. Colleen McMahon                                                    14

**B.    Israel's Guilty Plea**

On September 29, 2005, less than two months after the collapse of the Bayou Funds, Israel waived indictment and pled guilty, without a plea agreement, to a three count Information charging him with one count of conspiring to commit mail fraud and investment adviser fraud, from in or about 1996 through in or about August 2005, in violation of Title 18, United States Code, Section 371; one count of investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and one count of mail fraud, in violation of Title 18, United States Code, Section 1341. As a result of his plea, Israel would have faced a Sentencing Guidelines range of life imprisonment. However, his sentence is capped by the statutory maximum sentence of thirty years' imprisonment. (PSR, at 37). The Government did not enter into a cooperation agreement

with Israel because, among other reasons, Marino began turning over Bayou records first; Marino began proffering first and provided detailed information about the fraud at Bayou; the Government entered into a cooperation agreement with Marino; and, it was very unclear that Israel would ever be able to provide substantial assistance in the prosecution of others.

## III. SUBSTANTIAL ASSISTANCE PROVIDED BY ISRAEL

### A.    The Convictions of Marino and Marquez

As described above, Israel had numerous proffer sessions with the Government and generally corroborated information provided by Marino, thus, saving the Government time and resources going through the lengthy and tedious process of examining almost a decade's worth of the Bayou Funds' trading records, financial disclosures and bank records to ascertain what had happened, who was involved, and what the losses amounted to.[8]  That analysis, alone, may have taken months, if not years.  Moreover, Israel turned over documents relating to Bayou that were at his home, saving the Government the time and resources it would have expended in obtaining and executing a search warrant there.  And, Israel identified assets that the Government ultimately forfeited from him, including silver bars, cash in bank accounts, and cash in his retirement account.

Marino pled guilty, pursuant to a cooperation agreement, on September 29, 2005, the same day as Israel, to a four count Information charging him with one count of conspiring to commit mail fraud and investment adviser fraud, from in or about 1996 through in or about August 2005, in violation of Title 18, United States Code, Section 371; one count of investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; one count of mail fraud, in violation of Title 18, United States Code, Section 1341; and one count of wire fraud, in violation of Title 18, United States Code, Section 1343.[9]  On January 29, 2008, Marino was sentenced principally to a term of twenty years' imprisonment.  The Government understands that prior to the time when either Israel or Marino began proffering with the Government, they consulted with counsel together and had discussed coming forward to cooperate.  Marino ultimately wrote the Confession Letter, consulted with his own counsel, and came in first.  Israel began proffering six days later.  It is probably fair to say that they each played a role in the other's decision to admit his guilt and enter a guilty plea.

Marquez pled guilty on December 14, 2006, pursuant to a plea agreement, to an information charging him with conspiring to commit investment adviser fraud and mail fraud, from in or about 1996 through on or about October 19, 2001, in violation of Title 18, United States Code, Section 371.  On January 22, 2008, Marquez was sentenced principally to a term of 51 months' imprisonment.  Israel's information was significant to the Government's prosecution

---

[8]  At the outset, these meetings included representatives from the SEC and CFTC as well.

[9]  As the Government noted at Marino's sentencing, Marino pled guilty to an Information charging him in four counts, rather than three, because he entered into a cooperation agreement with the Government and was required to plead guilty to charges relating to all of his conduct; it was not because the Government viewed Marino as being more culpable than Israel.

of Marquez and became especially important during the time leading up to Marquez's sentencing, when Marquez was disputing his role at Bayou and it appeared that a *Fatico* hearing would be necessary. At that point, Israel again met with the Government and provided a more specific, detailed account of his relationship with Marquez prior to the formation of Bayou and after he and Marquez teamed up to run Bayou. Israel's account helped to establish Marquez's equal participation in the operation of Bayou and the execution of the fraud.

Specifically, Israel described how he met Marquez in or about the mid-1980's at a securities trading concern where Israel was employed. Marquez was trading his own money under the entity JGM Management Inc. and renting an office that he shared with Israel. They became friends, seeing each other socially and commuting into New York together from the suburbs. In or about the early 1990's, Marquez started his own hedge fund, HMR (Half Moon Rising) Investors L.P. and Israel went to work there as a Limited Partner. Israel was there for less than a year when Marquez, who had been trading very successfully, took a gamble and lost a lot of money. Israel left and found another job and Marquez closed the fund. Thereafter, Israel had been talking to another colleague about opening the Bayou Fund. He began planning and taking steps to open the fund when his colleague went off to pursue another opportunity. Israel still wanted to go out on his own and he turned to his friend, Marquez, nine years his senior, who, had much more investment experience than he had, and who had run his own hedge fund (albeit unsuccessfully).

Israel was unequivocal in his description of Marquez as his partner. They worked together, side by side, in the same room, first from their basement office in Israel's Harrison home and then at their joint trading desk in Stamford. Indeed, as Israel disclosed, Bayou moved out of Israel's basement and into a spacious office, by the water in Stamford, at Marquez's behest. Israel further described how he and Marquez made major decisions together, each recruited potential investors, and received substantially the same pay. Israel also specifically identified certain investors that Marquez brought into the Fund.

Israel also described his perspective on how the fraud came about. According to Israel, by the end of 1998, Bayou had accumulated substantial losses and had not reported those losses to investors. Israel's recollection was that Marquez suggested that Marino could do the annual audit of Bayou's books, instead of Bayou's accounting firm, Grant Thornton. Marino agreed to do the audit and that was when the phony accounting firm, Richmond-Fairfield, was created. **Israel stated that Marquez and Marino came up with the false performance numbers, based on market conditions, that were passed on to the investors.**

Meanwhile, as time wore on and losses increased, tensions rose between Israel and Marquez, as Israel increasingly came to believe that Marquez was responsible for their losses and hindering Bayou's ability to raise more money from potential investors. Thus, Israel decided to force Marquez to leave Bayou and had him moved across the street. Israel was also able to provide some insight into Marquez's attitude when he left, *i.e.*, Marquez believed that he should be paid for his stake in Bayou and Israel's own view was that Marquez should be paid nothing because, until "the problem" (the losses) was solved, Bayou was not worth anything. Ultimately, they came to an agreement. Israel generally recalled that Bayou set Marquez up in the office across the street and paid some of his expenses. He also recalled that Marquez was retained to

raise capital for an energy company then known as KFX and Marquez proposed that Bayou buy stock in KFX on the assumption that when the value of the stock went up, Bayou would earn a great enough profit on the investment to cover Bayou's losses, which, by then, amounted to approximately $6 million. Israel ultimately agreed to buy the stock and Bayou purchased one million shares of KFX, along with 500,000 warrants to purchase additional shares of KFX, for approximately $3.6 million.[10] Although Israel was not clear on dates, he recalled that after Bayou invested in KFX, the share prices finally rose (after a much longer period of time than Marquez had predicted) and Bayou's shares in KFX were sold, netting Bayou approximately $12 million.

Israel's account of his relationship with Marquez before, during and after his employment at Bayou, and Marquez's role at Bayou, assisted the Government in its establishment of the facts relevant to Marquez's sentencing. As it turned out, a *Fatico* hearing was not necessary. However, Israel was willing to testify at such a hearing should the need have arisen.[11]

**B.**

Although the Government did not enter into a cooperation agreement with Israel, as it turned out, he was proffered extensively and he has proven to be helpful. As described above, his immediate decision to cooperate and to turn over documents in his possession saved the Government time and resources. From the beginning, he has been remorseful and, to the extent we have been able to corroborate his account, we believe he has truthfully recounted his role and the roles of Marino and Marquez in the fraud. His cooperation contributed to the guilty

---

[10] On 12/31/01, Marquez purchased the 500,000 warrants attached to Bayou's stock for $25,000. Marino signed the documents transferring the warrants to Marquez, in Israel's name. Israel disputes that he authorized the transfers.

[11] We note that Israel was proffered but the Government did not prepare him to testify at the hearing because the Government determined that it was not going to call Israel as a witness.

Hon. Colleen McMahon                                                                19

plea of Marino, assisted the Government in connection with Marquez's sentencing, resulted in a
⸴                                        Israel has also assisted in the ongoing recovery of investor funds
and, to that end, was recently deposed by counsel for the Government's receiver in connection
with a lawsuit to recover Bayou assets. Moreover, Israel always made himself available to the
Government and the Government's receiver, when it was requested, to proffer and answer further
questions.[12]

          For the foregoing reasons and assuming that the defendant continues to cooperate
with the Government, commits no additional crimes before sentencing, and appears for his
sentencing as scheduled, the Government moves, pursuant to 18 U.S.C. § 3553(a) and Section
5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors
set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## IV.    ISRAEL'S ARGUMENTS IN MITIGATION OF HIS SENTENCE

### A.    Health Based Arguments

          Citing Sentencing Guidelines Section 5H1.4, Israel argues that the Court should
"exercise moderation" in imposing sentence on Israel given what the defense contends is his
"extraordinary physical impairment." (Sent. Memo. at 27-36). According to Israel, he suffers
from ⸴

⸴                                        All of these disorders require monitoring and some require
treatment. (Sent. Memo. at 28-29).

          Post *Booker*, the Court may consider Israel's physical condition in determining an
appropriate sentence. Health-based departures, however, are "discouraged" under the Sentencing
Guidelines. Section 5H1.4 of the Guidelines provides:

> Physical condition . . . is not ordinarily relevant in determining
> whether a sentence should be outside the applicable guideline range.
> However, an extraordinary physical impairment may be reason to
> impose a sentence below the applicable guideline range; *e.g.*, in the
> case of a seriously infirm defendant, home detention may be as
> efficient as, and less costly than, imprisonment.

A district court, having recognized its power to depart under § 5H1.4, may refuse to do so if it
finds that a defendant has failed to meet his burden of proving that he has an "extraordinary
physical impairment" that warrants a departure. Recently, the Second Circuit held that "in order
to warrant a departure resulting in a nonincarceratory sentence on the basis of an extraordinary
health condition, the 'defendant must be seriously infirm with [a] medical condition that cannot be
adequately cared for by [the] Bureau of Prisons...'" *United States* v. *Cutler*, 2008 WL 706633 (2d

---

[12] Israel also met with                      law enforcement personnel conducting their own investigation in
connection with the

Cir. 2008), quoting *United States* v. *Martinez*, 207 F.3d 133, 139 (2d Cir.2000), citing *United States* v. *Altman*, 48 F.3d 96, 104 (2d Cir.1995). In *Cutler*, the defendant (Friedman) had a serious heart condition and had suffered from sepsis prior to his sentencing. The Second Circuit reversed the District Court's granting of a downward departure, finding that the Court had erroneously assessed the medical evidence and that there was no support for the Court's view that the BOP could not care for the defendant. *Cutler*, 2008 WL 706633 at *38.

Health problems -- even severe ones -- that simply require monitoring and are capable of being monitored and treated by the BOP are not extraordinary physical impairments warranting a departure. See *United States* v. *Napoli*, 179 F.3d 1, 17 (2d Cir. 1999). Those health problems include serious coronary ailments. *United States* v. *Altman*, 48 F.3d 96, 104 (2d Cir. 1995).

Viewed against the foregoing standards, Israel's health condition does not call for a departure. The BOP has been informed of the precise health claims made by Israel and has plainly indicated that it "will be able to provide appropriate care for Mr. Israel" should he be incarcerated in a federal correctional facility. (April 7, 2008 Letter of Barbara J. Cadogan, Health Systems Administrator at BOP (annexed hereto as Exhibit A)). That care, as explained in the Cadogan letter, would include the necessary medications that Israel maintains he needs for his conditions.

The defense further argues that even if the BOP can adequately care for Israel, in several instances, Courts have imposed reduced sentences due to defendants' physical impairments, and should do so here because the combination of all Israel's ailments is extraordinary, he may not be able to receive the same regimen of pain medications he receives now, he may have a shorter life expectancy than other men his age, and he may experience greater suffering in prison than other inmates because of his medical condition. (Sent. Memo. at 30-36). As the case law makes clear, this Court should consider all of the health-related facts, brought to the Court's attention, in determining an appropriate sentence pursuant to 18 U.S.C. § 3553(a).[13] And, unquestionably, Israel suffers from well documented physical ailments. However, the BOP has indicated that it can provide care for Israel; Israel's ailments are longstanding; they were occurring during the time period in which he perpetrated the fraud; and, he still managed to travel abroad and continue to participate in the fraud. Furthermore, despite his ailments, since August 2005, Israel appears to have been leading a relatively normal life living with his girlfriend,

_____

[13] Some of the cases cited by the defense (Sent. Memo at 31-33 ) involve inmates who have much more serious and advanced illnesses than Israel, including inmates who are HIV positive or who have AIDS, see *United States* v. *Blarek*, 7 F. Supp.2d 192 (E.D.N.Y. 1998); *United States* v. *Hammond*, 37 F.Supp.2d 204, 208-10 (E.D.N.Y. 1999)) and inmates who are seriously ill, disabled and/or infirm, see *United States* v. *Barbato*, 2002 WL 31556373 (S.D.N.Y. Nov. 15, 2002) (defendant totally disabled); *United States* v. *Roth*, 1995 WL 35676 (S.D.N.Y. Jan. 30, 1995) (mobility substantially limited); *United States* v. *Jimenez*, 212 F.Supp.2d 214, 218-19 (S.D.N.Y. 2002) (defendant was seriously infirm, suffered from psychotic hallucinations, a condition that was widespread or relatively easily-controllable; and, defendant's condition seriously eroded her capacity to threaten society). In other cases, the Court considered health issues along with other factors that are not present here. See *United States* v. *Cormona-Rodriguez*, 2005 WL 840464, *4 (S.D.N.Y. April 11, 2005) (health, life history, dependants); *United States* v. *Allen*, 250 F.Supp.2d 317, 321-22 (S.D.N.Y. 2000) (limited mental capacity combined with immaturity); *United States* v. *Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (medical condition, charitable and civic work).

spending time with his children, and traveling to other parts of the country to visit family members, including his father and mother.[14]

### B.    Israel's Culpability

Israel argues that he is less culpable than Marino because (a) Israel's judgment was impaired due to his mental and physical condition and the abuse he suffered as a child; (b) Israel's pain, surgery and drug addiction interfered with his judgment; (c) Israel's inability to admit Bayou's failure was driven by the ˙          ˙he suffered from years of abuse and not greed; and (d) Marino was the mastermind of the scheme and Israel was the Chief Executive Officer ("CEO") of Bayou in title only. (Sent. Memo. at 36- 42). Israel and Marino were equally culpable and Israel's arguments to the contrary should be swiftly rejected.

The contention that Marino was the mastermind of the scheme and Israel was the CEO in title only, is not supported by the evidence. Israel created the Bayou Fund and was the Chief Executive Officer from the beginning; he created the Fund to implement his own trading program; he brought Marquez and Marino on board; he and Marquez began lying to investors when the their trading did not go well; he participated in the meeting at the end of 1998 when the three men agreed to have Marquez set up a phony accounting firm and pretend to do the annual audit of the hedge fund; he kicked Marquez out when he concluded that Marquez was hindering his ability to raise contributions from new investors; he was solely responsible for making investment decisions once Marquez was gone; and he was responsible for attempting to invest over $100 million of the Bayou investor money in prime bank fraud schemes, in order to earn back the money he lost in trading. Israel is the one constant principal from the time the first Bayou Fund was created until all the Funds were closed down in August 2005. From 2001 when Marquez left, throughout the end, Israel was the public face of the Funds and the key person who had contact with investors and potential investors. Israel is the person investors had confidence in when they chose to hand their money over to Bayou. Without Israel, there would have been no investors.

Furthermore, the fraud began before Marino formed RFA. Israel and Marquez were providing inflated numbers to investors prior to the December 1998 meeting when Israel, Marquez and Marino hatched the plan to create the phony accounting firm and have Marino "do the audit." Thus, Marino did not start the fraud; Israel and Marquez did. And once they traveled down the road of lying to investors, Israel and Marquez used Marino, essentially, to do their dirty work. Marino, as an accountant, had the skills to successfully conceal their lies and to help them execute the fraud by creating the paper that supported the lies.

Finally, Marino's compensation does not reflect that he was the "mastermind" of the scheme and the true top of the organization. Prior to 2002, when Marquez was at Bayou, Marino was paid about half of what Israel received in compensation from Bayou. Between 2002 and 2005, Israel and Marino received essentially the same compensation of approximately $4 million. Israel actually received more, in that his wife received another $2.75 million from Bayou

---

[14] Predictions about whether Israel has a shorter life expectancy than other men his age and whether his medical condition will worsen in prison seem to be very speculative.

in connection with their divorce.

To be sure, Marino could be described as the "lynchpin" of the fraud in that he was in charge of the accounting, which was a key part of the scheme. Marino, however, also had his own health problems and other family-related issues to contend with and he was not around for the second half of 1999 and the early part of 2000. In addition, Marino was not equipped to come up with the false numbers by himself; Israel and Marquez were the traders and the experts on market conditions. And, Marino was not the only one distributing false numbers. From the beginning, Israel and Marquez were touting the Fund and inducing investors to contribute, using false profit numbers. After Marquez left, Israel carried on, passing on the fake numbers to investors and potential investors through marketing materials, one on one conversations and group telephone conference, assuring the victims they would make money if they invested in Bayou. Thus, the bottom line is that from 1997 through the end of 2001, all three men were an integral part of the fraud and they needed each other to execute it. Once Marquez was thrown out, Israel and Marino had only each other and neither could have successfully perpetrated the fraud without the other. Moreover, they both benefitted financially from the scheme – Israel by more when his wife's payments are taken into account. Thus, Israel and Marino should be viewed as equally culpable.

Finally, while the Court must consider Israel's history and characteristics, *see* 18 U.S.C. §3553(a)(1), including the potential impact on his judgment, of physical pain from his medical problems, abuse he may have suffered as a child, and drug addiction, there is no dispute that Israel did not suffer from diminished capacity, he knew he was committing a very serious crime, and, regardless of that knowledge, he continued to do it anyway.[15] Furthermore, during the course of this approximately eight year fraud, while hundreds of investors were losing hundreds of millions of dollars, Israel drew millions of dollars in compensation, lived the life of a hedge fund manager, and reaped the benefits of having a reputation as a successful hedge fund manager.

In sum, in addition to taking into account Israel's personal characteristics and history, his substantial assistance, the sentencing range calculated pursuant to the Sentencing Guidelines, and the need to avoid unwarranted disparities among similarly situated defendants, Israel's sentence should reflect the seriousness of the crimes he committed, promote respect for the law, and provide adequate deterrence to others who may engage in similar crimes.

---

[15] While the Court must consider a defendant's personal circumstances on an individual basis, it is worth keeping in mind that Marquez and Marino also suffered from documented medical and psychological problems which, they alleged, had an impact on their criminal conduct.

Thank you for your consideration.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By: _____
Margery B. Feinzig
Assistant United States Attorney
Tel. No.: (914) 993-1912

cc:    Barry Bohrer, Esq. and Barbara Trencher, Esq. (By Fax)

)

)



)



**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

*VIA E-MAIL*

*U.S. Custom House*
*2nd & Chestnut Streets - 7th Floor*
*Philadelphia, PA. 19106*

April 7, 2008

Margery Feinzig, Esquire
Assistant U.S. Attorney
U.S. Attorney's Office for the
Southern District of New York
300 Quarropas Street
White Plains, NY   10601

> Re:   <u>United States v. Samuel Israel, III</u>
>       Docket No. 05-Cr-1039

Dear Ms. Feinzig:

Thank you for your recent inquiry concerning the Federal Bureau of Prisons' (BOP) ability to provide adequate health care for federal prisoners with significant, acute or chronic medical conditions.  Specifically, you have asked whether, based on the available information, the BOP can provide the necessary and appropriate care for Mr. Israel should he be incarcerated in a federal correctional facility.

I am only aware of Mr. Israel's medical condition as described by the documents you provided this office, namely, the Defendant's Sentencing Memorandum, and attached letters from various treating physicians.  The aforementioned documents describe Mr. Israel as being diagnosed with

Mr. Israel has also been diagnosed with

Mr. Israel has also been diagnosed with

Margery Feinzig, Esquire
Assistant U.S. Attorney
April 7, 2008
Page Two

The Bureau has implemented a medical care level classification system. The care level classification system is intended to enhance the Bureau's ability to manage inmate health care effectively by matching inmates with those institutions that can best meet their medical needs, while at the same time achieving optimal use of the Bureau's health care resources.

Every institution has a care level assignment of one to four that reflects the medical resources available at that facility. If an inmate's initial medical designation is clear and falls within the lower two medical care levels, the Designation and Sentence Computation Center (DSCC) will assign the inmate to an appropriate institution. For inmates with greater medical needs or where an appropriate care level cannot be determined by the DSCC, the BOP Office of Medical Designations and Transportation in Washington, D.C., will manage the case and make an appropriate determination.

If committed to the custody of the BOP, Mr. Israel will likely be reviewed for designation by the Bureau of Prisons Office of Medical Designations. At that time, a determination will be made as to the appropriate facility, either a medical referral center or a general population institution, in which to designate Mr. Israel. Medical referral centers are prisons which provide in-patient care to seriously ill inmates. The BOP has six of these centers throughout the United States. Besides providing chronic care for seriously ill inmates, these medical centers also provide hospice care for terminally ill inmates.

Every Bureau facility, regardless of care level, has a Health Services Department, typically staffed with a physician(s) and several mid-level providers, such as physician assistants and nurse practitioners, along with technical and administrative staff. Most Health Services Departments conduct "sick-call" four or more days per week for the entire inmate population. Each Bureau institution also contracts with medical centers in the local vicinity to provide specialized medical treatment. These medical centers offer Bureau inmates access to specialists and diagnostic tools (including MRIs and CT Scans). When medical emergencies and the need for surgical procedures arise, these outside medical centers offer the Bureau a wide range of trained medical and surgical specialists. Each institution has procedures in place that instruct health services and/or correctional staff on how to contact local emergency medical services for transportation to a local medical centers.

Margery Feinzig, Esquire
Assistant U.S. Attorney
April 7, 2008
Page Three

All inmates entering our facilities are thoroughly screened by medical staff for physical and mental health conditions, and are monitored thereafter through follow-up appointments and chronic care clinics, as necessary. A medical plan of action for an inmate would include a thorough and timely history and physical exam, per existing policies and procedures, to ascertain the mental health and medical status upon a designation and arrival to a Bureau facility. Subsequently, pending the results of this evaluation, by both mental health and medical staff; the treating Clinical Director and Chief Psychologist may formulate a plan that addresses his medical, mental health and activities of daily living issues. This plan will also include an assessment of daily functioning, ie., handicap living quarters, need for a bottom bunk, ambulatory aides or bracing, pharmacy line oversight, specialty consultations, etc.

Every general population institution runs a number of chronic care clinics whose purpose it is to provide routinely scheduled quality care to medically ill inmates, as well as to stay cognizant of any changes in medical conditions that may arise. If Mr. Israel is designated to a general population institution, it is likely he will be assigned to the clinic, where his condition will be closely monitored. Inmates enrolled in chronic care clinics are seen at a minimum on a quarterly basis, and more often if medically necessary.

Additionally, Mr. Israel's mental health concerns can be adequately handled in either a general population institution or a medical referral center. The Bureau of Prisons has over 400 doctoral level psychologists and over 650 mental health and substance abuse treatment specialists. In most Bureau institutions, doctoral level psychologists function as front-line providers of mental health services to inmates. Direct inmate services include psychological assessments, crisis intervention, long-term therapy, short-term therapy, and group therapy. These therapies include supportive psychotherapy for inmates who wish to gain insight into their motivations and actions.

The BOP houses and treats a significant amount of inmates with a wide variety of mental illnesses, including those inmates that experience psychological symptoms such as
        during incarceration. Along with group and individual therapy, the Bureau's formulary contains numerous psychotropic medications to meet the mental health needs of inmates if necessary. All care provided is consistent with medical community standards.

Margery Feinzig, Esquire
Assistant U.S. Attorney
April 7, 2008
Page Four

As mentioned above, Mr. Israel is currently taking
                    .  A review of the BOP's formulary
reveals that all of these medications are either on the
formulary, or have substantially similar equivalents.  If Mr.
Israel's treatment plan changes prior to incarceration, and a
specific prescription is not included on the Bureau's formulary,
a non-formulary request may be submitted through Central Office.
This process can be completed within a few work days.

Based on the information provided to me and my knowledge of
Bureau's medical resources, the Bureau will be able to provide
appropriate care for Mr. Israel.  For your convenience, I have
attached a general outline to explain how the Bureau designates
prisoners with medical illnesses and to describe the medical
services available within the Bureau.  If I can offer any further
information in this matter, please do not hesitate to contact me.

Sincerely,

Barbara J. Cadogan
Health Systems Administrator

Enc.

U.S. Department of Justice

Federal Bureau of Prisons

_Office of the Director_

_Washington, DC 20534_

June 14, 2006

Honorable Paul G. Cassell, Chair
Judicial Conference of the United States
Committee on Criminal Law
350 South Main Street
Salt Lake City, Utah  84101-2180

Dear Judge Cassell:

During the past year and a half, the Bureau of Prisons (BOP) has undertaken several initiatives to increase the efficiency and effectiveness of BOP operations.  As you are aware, one of these initiatives is the creation of the Designation and Sentence Computation Center (DSCC) in Grand Prairie, Texas.

In concert with the centralization of designations and sentence computation at the DSCC, the BOP has also implemented a medical care level classification system.  The care level classification system is intended to enhance our ability to manage inmate health care effectively by matching inmates with those institutions that can best meet their medical needs, while at the same time achieving optimal use of BOP's health care resources.

I understand that some judges have voiced concerns to the BOP's DSCC regarding the new medical care level classification system, particularly as it may affect compliance with judicial recommendations.  I want to take this opportunity to clarify how the centralized designation and the medical care level classification systems function, and to assure you that the BOP will continue to work with you and your local offices to ensure the appropriate placement of offenders.

The BOP continues to rely on the United States Probation Office and the United States Marshals Service for information to be used in designations, including assignment of medical Care Level classifications.  The information provided in the USMS-129, the Pre-Sentence Report, Statement of Reasons, and the Judgement in a criminal case are critical to the BOP's inmate designation decisions.

Initial designations are handled by the DSCC. Staff in that office analyze the information available to them not only with regard to security and length of sentence, but also medical needs. Under our designation and medical care level classification systems, medical status, whether for healthy inmates or inmates with known medical conditions, is now given comparatively greater weight in making designation decisions than in the past.

Until an inmate comes into the BOP and is evaluated by a BOP health care provider, the Presentence Report (PSR) is the BOP's principal resource for initially assessing medical and mental health conditions. Inmates are assigned a provisional medical care level based on the PSR information. BOP institutions also have a care level assignment that reflects the medical resources available at that facility.

If an inmate's initial medical designation is clear and falls within the lower two of our four medical care levels, DSCC will normally assign the inmate to a facility with a comparable care level. For inmates with presumed greater medical needs or where the appropriate care level cannot be determined by the DSCC, the cases are managed by our Office of Medical Designations and Transportation in Washington, D.C. Inmates who will be incarcerated in a privately-run facility are referred to the BOP's Community Corrections Offices for designation. If they later come into the BOP's facilities, they are given a care level assignment at that time.

If the court recommends incarceration at a facility that is not consistent with the medical care level of the inmate, the BOP will notify the court that it is unable to implement the court's recommendation. For your convenience, I have attached an outline of our care levels and examples of which offenders are generally suited for institutions in each care level.

Should judges have questions or concerns regarding designations for defendants from their courts, the BOP would be pleased to address them. Generally, questions concerning designations, other than for inmates with significant medical or mental health conditions, should be directed to Ms. Rebecca Tamez, Chief, DSCC. She can be reached at (972) 352-4400. Questions or concerns about a designation of a prisoner with significant medical or mental health conditions may be directed to Ms. Yvonne Phillips, Chief of the BOP's Office of Medical Designations and Transportation, at (202) 514-9780.

I hope this information is useful to you and to your colleagues. I look forward to continuing the close working relationship between our agencies.

If I can be of further assistance, please contact me.

Sincerely,

Harley G. Lappin
Director

Enclosure

ENCLOSURE

## OUTLINE OF BUREAU OF PRISONS CARE LEVELS AND EXAMPLES

There are four CARE Levels in the Bureau of Prisons (BOP) medical CARE Level classification system. After initial designation and provisional care level assignment by the Designation and Sentence Computation Center (DSCC), non-provisional CARE Levels are determined by BOP clinicians. These assignments depend on treatment modalities and inmate functionality in addition to diagnostic categories such as cancer, diabetes, HIV, hepatitis.

**Q.  Who are CARE Level 1 inmates and who designates them?**
- Inmates are generally healthy, but may have limited medical needs that can be easily managed by clinician evaluations every six months; and
- Inmates are less than 70 years of age.
- CARE Level 1 designations are made by the DSCC.
- **Examples:** mild asthma, diet-controlled diabetes, stable HIV patients not requiring medications.

**Q.  Who are CARE Level 2 inmates and who designates them?**
- Inmates are stable outpatients who require at least quarterly clinician evaluations.
- Can be managed in chronic care clinics, including for mental health issues.
- Enhanced medical resources may be required from time to time, but are not regularly necessary.
- CARE Level 2 designations are made by the DSCC.
- **Examples:** medication-controlled diabetes, epilepsy, or emphysema.

**Q.  Who are CARE Level 3 inmates and who designates them?**
- Inmates are fragile outpatients who require frequent clinical contacts to prevent hospitalization for catastrophic events.
- May require some assistance with activities of daily living, but do not need daily nursing care.
- Inmate companions may be used to provide assistance.
- Stabilization of medical or mental health conditions may require periodic hospitalization.
- **Examples:** cancer in remission less than a year, advanced HIV disease, severe mental illness in remission on medication, severe congestive heart failure, end-stage liver disease.
- **Designation of CARE Level 3 inmates is made by the BOP's Office of Medical Designation and Transportation in Washington, D.C.**

**Q.  Who are CARE Level 4 inmates and who designates them?**

- Inmates require services available only at an MRC (which provide significantly enhanced medical services and limited in-patient care).
- May need daily nursing care.
- Functioning may be severely impaired and requires 24-hour skilled nursing care or nursing assistance.
- **Examples:**  cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical patients, acute psychiatric illness requiring inpatient treatment, high-risk pregnancy.
- **Designation of CARE Level 4 inmates is made by the BOP's Office of Medical Designation and Transportation in Washington, D.C.**

**Q.  When is the CARE Level classification process going to be implemented?**
A. It is currently in use.

**Q.  What can I, as a federal judge, do in the sentencing process to assist in the designations process?**

- Until an inmate comes into the BOP and is evaluated by a health care provider, the Presentence Report (PSR) is the BOP's principal resource for initially assessing medical conditions.
- The Court can assist the BOP in this process by requesting that the PSR contain complete and current information regarding the medical and mental health status of the inmate (for example, new or additional information that may be available from the local jail or the defendant's personal physician).  In order to facilitate appropriate Care Level designation, the Court should recommend that all current medical information be forwarded to the BOP at the time of sentencing,.

**Q.  Whom should the judges contact concerning designations for defendants from their courts?**

- The first point of contact within the BOP for defendants who do not have significant medical or mental health conditions should be the DSCC.  (Ms. Rebecca Tamez, (972) 352-4400.)
- If you have questions or concerns about a prisoner's medical conditions, please contact Ms. Yvonne Phillips, Chief, OMDT, at (202) 514-9780.

ENCLOSURE

Q. If the court recommends incarceration at a facility that is not consistent with the medical CARE Level of the inmate, what happens?

- The BOP notifies the court by letter when it is unable to implement the court's recommendation, stating the general reason for departure from the recommendation.